1
2
3
4
5
6

RITZERT & LEYTON, P.C.
Steven M. Gombos (VA SBN 30788)
(admitted *pro hac vice; lead counsel*)
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone: (703) 934-2660
Facsimile: (703) 934-9840
Email: sgombos@ritzert-leyton.com

7
8
9
10
11

LAW OFFICES OF LELAND B.
ALTSCHULER
Leland B. Altschuler (CA SBN 81459)
2995 Woodside Road, Suite 350
Woodside, CA 94062
Telephone: (650) 328-7917
Facsimile: (650) 989-4200
Email: Lee@AltschulerLaw.com

12
13

COUNSEL FOR: Defendant Stephens Institute
d/b/a Academy of Art University

14
15
16

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

17
18
19
20
21
22
23

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* SCOTT ROSE, MARY AQUINO, MITCHELL NELSON AND LUCY STEARNS, <br><br> Plaintiffs/Relators, <br><br> vs. <br><br> STEPHENS INSTITUTE, a California corporation, doing business as ACADEMY OF ART UNIVERSITY and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. CV-09-5966 PJH <br><br><br> NOTICE OF MOTION AND MOTION OF DEFENDANT FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT <br><br> **DATE: March 1, 2016** <br> **TIME: 9:00 a.m.** <br> **JUDGE: The Hon. Phyllis Hamilton** |

24
25
26

Motion For Summary Judgment – Case No. CV-09-5966 PJH

## <u>NOTICE OF MOTION AND MOTION</u>

TO ALL PARTIES AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 1, 2016, at 9:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 3 of the above-entitled Court, located at 1301 Clay Street, Oakland, California 94612, Defendant, Stephens Institute d/b/a Academy of Art University ("AAU"), will and hereby does move the Court for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

AAU asserts it is entitled to judgment as a matter of law as more fully stated in its Memorandum in Support of Summary Judgment being filed contemporaneously with this Notice and Motion.  AAU seeks entry of judgment on its behalf resolving all claims in the Second Amended Complaint in its favor and denying any relief to the Plaintiffs/Relators.  Defendant seeks oral argument with respect to this Motion.

1

## **TABLE OF CONTENTS**

2

3    I.       OVERVIEW ....................................................................................... 1

4    II.      SUMMARY JUDGMENT STANDARD ............................................ 5

5    III.     ARGUMENT ..................................................................................... 6

6    A.       Relators Fail To Adduce Sufficient Evidence Of *Scienter* And Therefore Their FCA
             Claims Cannot Survive Summary Judgment. ................................................... 6
7        i.    Relators' Express False Certification Claims Are Based Upon Mere Inferences About
               AAU's Compensation Plans And Practices. ................................................... 7
8
         ii.   Relators' Implied False Certification Claims Are Based Upon Mere Impermissible
9              Inferences. ...................................................................................... 11
         iii.  There Is No Factual Basis To Support An FCA Claim Under The Promissory Fraud
10             Theory. ........................................................................................ 13

11   B.       AAU's Compensation Plans Complied With The Safe Harbor As Written And Applied.
             ..................................................................................................... 15
12       i.    AAU's Compensation Plans, As Written, Complied With The Safe Harbor. ............ 16
         ii.   AAU's Compensation Practice Complied With Its Written Policies. ..................... 18
13       iii.  AAU Offered Trips For The Purpose Of Training Recruiters. ........................... 21
         iv.   After A Multi-Year Review The Department Found No Irregularities Or
14             Improprieties In AAU's Compensation Policies And Practices. ......................... 21

15   IV. CONCLUSION ................................................................................. 22

16
     CERTIFICATE OF SERVICE ................................................................. 23
17

18

19

20

21

22

23

24

25

26

**EXHIBITS**

1. Program Participation Agreement - July 25, 2000

2. Program Participation Agreement – March 30, 2006

3. Program Participation Agreement – April 10, 2012

4. July 13, 2011, Announcement of Program Review Letter

5. August 16, 2011, Response to Request for Supplemental Data for Program Review

6. August 24, 2011, Response to Request for Supplemental Data for Program Review

7. March 6, 2012, Expedited Final Program Review Determination Letter

8. Almich & Associates 2003 Compliance Audit

9. Almich & Associates 2004 Compliance Audit

10. Almich & Associates 2005 Compliance Audit

11. Almich & Associates 2006 Compliance Audit

12. Almich & Associates 2007 Compliance Audit

13. Almich & Associates 2008 Compliance Audit

14. Almich & Associates 2009 Compliance Audit

15. Almich & Associates 2010 Compliance Audit

16. Almich & Associates 2011 Compliance Audit

17. Federal Register, Vol. 67, No. 212 (November 1, 2002)

18. Nelson Initial Employment Agreement

19. Rose Initial Employment Agreement

20. Stearns Initial Employment Agreement

21. Aquino Initial Employment Agreement

22. Second Amended Complaint

Motion For Summary Judgment – Case No. CV-09-5966 PJH

23. Nelson Supplemental Responses to Interrogatories

24. Rose Supplemental Responses to Interrogatories

25. Stearns Supplemental Responses to Interrogatories

26. Aquino Supplemental Responses to Interrogatories

27. Aquino September 22, 2010 Email Re: Quantitative and Qualitative Factors

28. Nelson Disciplinary Records

29. Aquino Disciplinary Records

30. Reserved

31. Reserved

32. Reserved

33. Reserved

34. Stearns Resignation Email January 14, 2010

35. Reserved

36. May 26, 2006 Email – Meurer to Bergholt Re: Review Ideas

37. Draft Employee Performance Review Form – May 2006

38. Rippelone Performance Review – October 2006

39. Nelson Performance Review – November 2006

40. McMorrow Performance Review – October 2008

41. February 17, 2009 Email to Meurer Re: Admissions Increase

42. Draft Score Card

43. March 11, 2008, Performance Review Guidelines for Admissions

44. October 17, 2008, Bergholt/Stiverson-Smith 2008 Admissions Performance
     Recommendation

45. April 2008, Stiverson-Smith Independent Contractor Agreement

46. February 25, 2013, Declaration of Joan Stiverson-Smith

47. June 16, 2009, Julie Bell Resignation Letter

48. June 13, 2009, Julie Bell Resignation Letter

49. February 27, 2013, Declaration of Julie Bell

50. March 31, 2009, Email from Vollaro Re: DOE Regulations

51. 12-Factor Employment Performance Review Form

52. 24-Factor Employment Performance Review Form

53. FSA Handbook (excerpt on incentive compensation regulations)

54. February 17, 2009 Email from R. Lee Re: SAG, PCG, IME, and Score Value Card

55. Nelson Score Value Card – Fall 2009

56. Nelson Score Value Worksheet – Fall 2009

57. Spring 2008 Employee Performance Review Form

58. Reserved

59. Deposition Excerpts – Thai Lam

60. Deposition Excerpts – Joe Vollaro

61. Deposition Excerpts – John Meurer

62. Deposition Excerpts –  Mitchell Nelson

63. Deposition Excerpts – Scott Rose

64. Deposition Excerpts – Lucy Stearns

65. Deposition Excerpts – Mary Aquino

66. Deposition Excerpts – Joan Stiverson-Smith

67. Deposition Excerpts – Julie Bell

68. Deposition Excerpts – Joan Bergholt

69. Deposition Excerpts – Rachel Lee

70. Deposition Excerpts – Marie Santelices

71. Deposition Excerpts – Veronica Del Rico

72. Deposition Excerpts – Martha Weeck

73.  Deposition Excerpts – Craig Forman

74.  Deposition Excerpts- Noreen Chan (Sandino)

75. Affidavit of Joseph Vollaro

76. Affidavit of Rachel Lee

77. Affidavit of Christopher Visslailli

78. Affidavit of Joan Bergholt

1

# TABLE OF AUTHORITIES

2

CASES

3

*Anderson v. Liberty Lobby, Inc.*,
4     477 U.S. 242 (1986) ............................................................................ 5, 7

*Celotex Corp. v. Catrett*,
5     477 U.S. 317 (1986) ............................................................................... 5

6 *Dilettoso v. Potter*,
    2006 U.S. Dist. LEXIS 2973 (D. Ariz. Jan. 25, 2006) ............................... 6

7 *Ebeid v. Lungwitz*,
8     616 F.3d 993 (9th Cir. 2010) ............................................................. 6, 11

*Graham County Soil Water Conservation District v. United States ex rel. Wilson*,
9     *545 U.S. 409  (2005)* ............................................................................ 6

10 *John v. Floyd & Assocs., Inc. v. Tapco Credit Union*,
    550 F. App'x 359 (9th Cir. 2003) ......................................................... 18

11 *Mann v. GTCR Golder Rauner, LLC*,
    483 F. Supp. 2d 884 (D. Ariz. 2007) ...................................................... 5

12 *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
13     475 U.S. 574 (1986) .......................................................................... 5, 22

14 *Nathalie Thuy Van v. Wal-Mart Stores, Inc.*,
    583 F. App'x 761 (9th Cir. 2014) .......................................................... 11

15 *Nigro v. Sears, Roebuck & Co.*,
    784 F.3d 495 (9th Cir. 2015) ................................................................ 10

16 *Orr v. Bank of America*,
    285 F.3d 764 (9th Cir. 2002) .................................................................. 5

17 *T.W. Elect. Serv. v. Pac. Elect. Contractors Ass'n.*,
18     809 F.2d 626 (9th Cir. 1987) .................................................................. 5

*United States ex rel. Bott v. Silicon Valley Colleges*,
19     262 F.App'x 810 (9th Cir. 2008) ..................................................... 13, 15

20 *United States ex rel. Hendow v. Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006) ................................................. 6, 7, 12, 13

21 *United States ex rel. Hopper v. Anton*,
    91 F.3d 1261 (9th Cir. 1996) .......................................................... 12, 13

22 *United States ex rel. McLean v. County of Santa Clara*,
23     2011 U.S. Dist. LEXIS 125713 (N.D. Cal. Oct. 31, 2011) ...................... 10

*United States ex rel. Peretz v. Humana Inc.*,
24     2011 U.S. Dist. LEXIS 59639 (D. Ariz. April 8, 2001) ........................... 15

*United States ex rel. Pilecki-Simko v. Chubb Inst.*,
25     2010 U.S. Dist. LEXIS 48345 (D.N.J. May 17, 2010) ............................ 15

26 *United States ex rel. Woodruff v. Hawaii Pacific Health*,

Motion For Summary Judgment – Case No. CV-09-5966 PJH

560 F. Supp. 2d. 988 (D. Haw. 2008), *aff'd* 409 F. App'x 133 (9th Cir. 2010) ............... 5, 6, 10

*United States v. CDS, P.A.,*
  2015 U.S. Dist. LEXIS 131692 (D. Idaho Sept. 28, 2015) ........................................... 6

*United States v. Sanford-Brown, Ltd.,*
  788 F.3d 696 (7th Cir. 2015)................................................................................... 13

*Universal Health Servs. Inc., v. United States ex rel. Escobar,*
  780 F.3d 504 (1st Cir. 2015) *cert granted*, __ U.S.L.W. ____ (U.S. Dec. 4, 2015) (No. 15-7),
  2015 U.S. LEXIS 7677 (December 4, 2015) ........................................................... 11

*Villiarimo v. Aloha Island Air, Inc.,*
  281 F.3d 1054 (9th Cir. 2002)................................................................................. 11

STATUTES

20 U.S.C. § 1094........................................................................................................... 1
20 U.S.C. § 3279, *et seq*........................................................................................... 2
31 U.S.C. § 3729 *et seq*........................................................................................... 5
31 U.S.C. §3731(b)..................................................................................................... 6
31 U.S.C. §3731(e)..................................................................................................... 6

OTHER AUTHORITIES

67 Fed. Reg. 67054 (Nov. 1, 2002)............................................................................. 8
75 Fed. Reg. 66877 (Oct. 29, 2010)........................................................................... 12
Dear Colleague Letter, GEN-11-05 (March 17, 2011) ............................................. 12
Fed. Reg., Vol. 67, No. 212 at 67053 (November 1, 2002)......................................... 2

REGULATIONS

34 C.F.R. § 668.14(b)(22)(i) (July 1, 2010)................................................................ 1
34 C.F.R. § 668.14(b)(22)(i) (July 1, 2011)................................................................ 2
34 C.F.R. § 668.14(b)(22)(ii)(A) (July 1, 2010)................................................. 2, 8, 15
34 C.F.R. 668.14(b)(22)(1994) .................................................................................. 1

Motion For Summary Judgment – Case No. CV-09-5966 PJH

## I.   OVERVIEW

The Academy of Art is a private, for-profit art and design school located in San Francisco.  It was formed in 1929 and has over 16,000 students.  The school offers a wide variety of programs in twenty-three areas of study and offers undergraduate and graduate degrees.[1]  Ex. 75, Vollaro Aff. ¶¶41-44.

A portion of AAU's domestic students participate in Title IV, HEA loan and grant programs ("Title IV programs") to finance their education.[2]  In order to participate in Title IV programs AAU is required to enter a Program Participation Agreement ("PPA").  AAU was not permitted to negotiate the terms of the PPAs; rather, it was required to sign the PPAs as provided by the United States Department of Education ("DOE" or "Department").  *Id.* ¶45.  As a Title IV participant, AAU must comply with the Department's program regulations.  *Id.* ¶43.  In addition, AAU is subject to significant regulatory oversight by the many accrediting agencies to which it is a member and the regulations imposed by the State of California.  *Id.*

In 1994, the Department promulgated regulations implementing 1992 amendments to the Higher Education Act of 1965, which were intended to address perceived abuses occurring in the recruiting practices at some proprietary schools.  *See* 20 U.S.C. § 1094 (1992); 34 C.F.R. 668.14(b)(22)(1994).  The regulations became known as the incentive compensation ban.  The ban was intended to eliminate the payment of incentive bonus or commission payments to student recruiters based directly or indirectly on their success in enrolling students.  *Id.*  To

---

[1] Fashion, fine art, graphic design, illustration, industrial design, interior architecture and design, architecture, animation and visual effects, advertising, photography, motion pictures and television, among others.

[2] A significant percentage of AAU's students are international students who cannot participate in Title IV programs.  The incentive compensation regulations at issue in this case do not apply to international recruiters.  34 C.F.R. § 668.14(b)(22)(i) (July 1, 2010).

Motion For Summary Judgment – Case No. CV-09-5966 PJH

provide clearer guidance, DOE promulgated twelve safe harbors in regulations in 2002. *See* Fed. Reg., Vol. 67, No. 212 at 67053 (November 1, 2002).

The safe harbor at issue in this case allowed for the adjustment of fixed compensation (salary or hourly wages but not commissions or bonuses) no more than two times a year. 34 C.F.R. § 668.14(b)(22)(ii)(A) (July 1, 2010) ("Safe Harbor A"). In addition, the salary adjustment could not be based solely on success in enrolling students. *Id.* Safe Harbor A existed until July 1, 2011, when DOE eliminated the safe harbors altogether and precluded any consideration of enrollment numbers when adjusting the compensation of recruiting staff. 34 C.F.R. § 668.14(b)(22)(i) (July 1, 2011).

This case was filed December 21, 2009, pursuant to the False Claims Act ("FCA"), 20 U.S.C. § 3279, *et seq*. ECF Doc. 18 ("Second Amended Complaint" or "SAC"). Relators are four former AAU employees who worked as admission representatives at various times between 2003 and 2010. Ex. 18; Ex. 19; Ex. 20; Ex. 21. The lawsuit was filed while Relators were still employed by AAU. Ex. 62. Nelson Depo., 76:10-11; Ex. 63 Rose Depo., 99:15-16; Ex. 64 Stearns Depo., 50:19-23; Ex. 65 Aquino Depo., 130:2-5. At least one Relator worked to collect and/or develop evidence in support of their lawsuit while remaining employed at AAU after the lawsuit was filed. Ex. 65, Aquino Depo., 147:24-148:1, 199:21-200.3; Ex. 22, ECF Doc. 18, ex. A. Each Relator was a disgruntled employee by the time they either resigned or were terminated for poor performance. *See* Ex. 62, Nelson Depo., 256:15-259:10; Ex. 63, Rose Depo., 152:6-21, 164:13-19, 176:24-177:12, 178:15-20, Ex. 64, Stearns Depo., 220:10-23; Ex. 65, Aquino Depo., 151:17-23.

Despite their employment at AAU and extensive discovery, Relators have not developed any probative evidence that AAU violated the incentive compensation regulations. Instead,

Relators rely on conclusory assertions that their salaries were periodically increased solely because of their success in enrolling students. *See, e.g.,* SAC ¶33; Ex. 62, Nelson Depo., 93:16-19, 233:24-234:8; Ex. 63, Rose Depo., 110:2-7; Ex. 64, Stearns Depo., 191:8-20, 212:13-21; Ex. 65, Aquino Depo., 137:23-138:10, 198:21-24. The testimony of the managers who evaluated Relators' performance confirms the system that was used to adjust compensation and confirms AAU's routine business practice. Ex. 60, Vollaro Depo., 95:2-97:25; Ex. 61, Meurer Depo., 66:5-67:8, 68:2-74:9, 80:17-84:7, 92:14-25 (ex. 51), 98:14-100:8 (ex. 38), 101:16-102:7, 105:8-106:11, 130:19-131:6 (ex. 39), 189:4-190:8 (ex. 40), 200:19-201:10 (ex. 41); Ex. 66, Stiverson-Smith Depo., 46:17-47:6, 178:18-179:25, 186:16-187:11, 250:22-253:2, 278:20-279:15; Ex. 67, Bell Depo., 83:21-84:17, 100:12-101:8, 151:21-156:21; Ex. 68, Bergholt Depo., 42:14-43:8, 45:21-47:16, 48:20-49:16, 52:15-23, 59:20-60:22, 62:21-64:18, 69:20-71:21, 74:24-78:24, 86:12-87:1, 97:6-25, 126:1-136:9, 146:16-161:25, 170:23-171:22, 192:20-193:8; Ex. 69, Lee Depo., 93:4-95:7, 158:1-159:9, 159:12-161:15; Ex. 70, Santelices Depo., 9:22-11:2, 29:17-36:16; Ex. 71, Del Rico Depo., 83:13-23, 88:2-22; Ex. 73, Forman Depo., 80:7-91:6, 115:22-116:15, 125:4-128:5; Ex. 74, Chan Depo., 158:20-159:6; Ex. 75, Vollaro Aff., ¶¶17-25, 30-37; Ex. 76, Lee Aff., ¶¶4, 8-20, 22; Ex. 78, Bergholt Aff., ¶¶5-8, 10, 14-16, 19-22. These witnesses identify the basis of their performance reviews and confirm that they considered multiple factors, including qualitative and quantitative (i.e., success in enrolling students) components, when making any salary adjustments. *See generally, id.* Moreover, the documents used to evaluate Relators' performance reflect consideration of a totality of factors and not solely or exclusively success in enrolling students. *Id.*

Of particular significance to the issue of whether the Academy violated the incentive compensation regulations, is the fact that in 2011, two years after the lawsuit was filed, the

Department conducted a focused program review.  Ex. 4; Ex. 75, Vollaro Aff., ¶52.  The

program review evaluated AAU's compensation practices for its admissions staff during the

2009-2010 and 2010-2011 Award Years.  Ex. 75, Vollaro Aff., ¶52.  Between August 8 and

August 11, 2011, the Department interviewed relevant AAU admission representatives and

managers and collected relevant documents relating to how AAU evaluated admission

representatives for purposes of adjusting compensation.  Exs. 4, 7.  The Department requested

and received additional information related to AAU's fall 2009 and spring 2010 performance

reviews and certain training events arranged for admissions representatives.  Exs. 5-6; Ex. 75,

Vollaro Aff., ¶¶52-55.  On March 6, 2012, the Department issued an expedited Final Program

Review Determination ("FPRD"), which identified no findings and acknowledged that it had

found no violations of the incentive compensation regulations during the period reviewed.  Ex. 7;

Ex. 75, Vollaro Aff., ¶55.

Despite DOE's focused program review and approval of AAU's practices, Relators

nonetheless contend the evaluation process used during the 2009-2010 and 2010-2011 Award

Years improperly compensated admission representatives solely on the basis of enrollment

success.  Of course, they seek to personally receive millions of dollars in the process.  It is also

significant to consider in relation to Relators' claims that the United States thoroughly

investigated the facts of this case while the complaint remained under seal.  DOE and the

Department of Justice gathered an enormous amount of information and documents from the

school pursuant to a subpoena and took a number of sworn depositions in conducting their

investigation based on Relators' SAC.  Nonetheless, the government declined to intervene in this

case.  ECF Doc. 10.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when there is no dispute of material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Under this standard, this Court must "'pierce the pleadings and . . . assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting the Advisory Committee Note to 1963 Amendment of Fed. R. Civ.Pro. 56(e)). To survive summary judgment, Relators must identify specific facts and significant probative evidence raising a triable issue concerning an element essential to their claims under the False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").[3] Relators cannot rely on generalizations, characterizations, conclusory allegations, or unreasonable inferences to create a genuine issue of material fact. *Anderson*, 477 U.S. at 248; *see also United States ex rel. Woodruff v. Hawaii Pacific Health*, 560 F. Supp. 2d. 988, 1001 n.13 (D. Haw. 2008), *aff'd* 409 F. App'x 133 (9th Cir. 2010); *Mann v. GTCR Golder Rauner, LLC*, 483 F. Supp. 2d 884, 906 (D. Ariz. 2007). Inferences are reasonable only when they are derived from "specific facts" "and only if such inferences are permissible under the substantive law at issue." *T.W. Elect. Serv. v. Pac. Elect. Contractors Ass'n.*, 809 F.2d 626, 631 (9th Cir. 1987). This limit prevents Relators from "entirely gutt[ing]"

---

[3] Failing to provide any specific details, Relators merely claim that all salary adjustments were based solely on enrollments pursuant to AAU's "sham" system. As proof of this multi-year and school-wide scheme, Relators cite only the adjustments they received. This does not provide a suitable basis to conclude that AAU awarded salary adjustments solely on enrollment. Even assuming that each salary adjustment Relators received violated the ICB, this would not provide a suitable basis to show that AAU engaged in such a practice or routine according to the requirements of FRE 406.

Motion For Summary Judgment – Case No. CV-09-5966 PJH

Rule 56's requirement for "specific facts." *Id.* at 631.  Nor may Relators rely on affidavits of individuals lacking personal knowledge. *Woodruff* 560 F. Supp 2d. at 1001 n.13 (stating to survive summary judgment, affidavits must be based on personal knowledge of specific facts); *Dilettoso v. Potter*, 2006 U.S. Dist. LEXIS 2973, *10 (D. Ariz. Jan. 25, 2006).  AAU maintains that Relators should be required to prove the claims by clear and convincing evidence.[4]

## III.   ARGUMENT

To meet their burden Relators must show: (1) a false statement or fraudulent course of conduct, (2) made with *scienter*, (3) that was material, causing (4) the government to pay out money or forfeit moneys due. *Ebeid v. Lungwitz*, 616 F.3d 993, 997 (9th Cir. 2010) (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)). Relators must establish these elements irrespective of whether their claims are advanced under a false certification or promissory fraud theory. *Hendow*, 461 F.3d at 1174.  Relators advance legally false (as opposed to factually false) claims in this case.  A claim is legally false "when a party represents compliance with a statute or regulation as a condition to payment, without actually complying with such statute or regulation." *United States v. CDS, P.A.*, 2015 U.S. Dist. LEXIS 131692, *9 (D. Idaho Sept. 28, 2015).  This failure to comply must be made knowingly (i.e., with *scienter*), as that term is defined in the FCA. *Hendow*, 461 F.3d at 1172.

### A.   Relators Fail To Adduce Sufficient Evidence Of *Scienter* And Therefore Their FCA Claims Cannot Survive Summary Judgment.

---

[4] AAU asserts that the appropriate burden of proof for Relators is the clear and convincing standard because this is a *qui tam* action. *See* 31 U.S.C. §3731(e); *Graham County Soil Water Conservation District v. United States ex rel. Wilson*, 545 U.S. 409, 417-18 (2005) (preponderance of the evidence standard only applies in cases where United States brings the claim or intervenes under §3731(b)).  As argued herein, Relators' claims fail regardless of which standard applies, but are clearly deficient under a clear and convincing standard.

As to Relators' claims, the *scienter* element is a prerequisite to liability.  *Id.* at 1171. "[A] palpably false statement, known to be a lie when it is made, is *required* for a party to be found liable under the False Claims Act."  *Id.* at 1172 (emphasis added).  In *Hendow*, the Ninth Circuit observed, for purposes of Rules 12(b)(6) and 9(b), that relators met their burden by alleging that the University of Phoenix fabricated records to deceive the DOE and that the University "openly bragged about perpetrating a fraud, . . . established infrastructure to deceive the government, and . . . changed its policies to hide its fraud."  461 F.3d at 1169.

It now falls to Relators to make the more demanding showing that their FCA claims are based upon the specific type of bad acts *Hendow* described as "intentional, palpable lie[s], made with knowledge of the falsity and with intent to deceive."  *Id.* at 1175 (internal quotations omitted).  To carry this burden Relators must be able to support their allegations with significant probative evidence.  *Anderson*, 477 U.S. at 249.  They have failed to do so.

### i.   Relators' Express False Certification Claims Are Based Upon Mere Inferences About AAU's Compensation Plans And Practices.

After more than two years of active discovery, the record does not provide any factual support for Relators' claims.  The FCA claims made under the express false certification theory are based on a general condition in the PPAs that the Academy signed with DOE as a condition of its participation in Title IV programs.  *See, e.g.*, Ex. 2 at 5 (D-AAU-3000097).  The PPA and its multitude of terms and conditions were not negotiated between DOE and AAU when it sought to participate in Title IV.  Ex. 75, Vollaro Aff., ¶45.  Upon offering the PPA to institutions, DOE's proposition is simple: "take it or leave it."  *Id.*  The PPA condition at issue is AAU's assurance that it will not provide compensation to employees involved in recruiting based on their success enrolling students (the "incentive compensation ban" or "ICB").  Ex. 2 at 5 (D-AAU-3000097).

Motion For Summary Judgment – Case No. CV-09-5966 PJH

This ban is less prohibitive than it first appears because DOE created twelve safe harbors as express exceptions to the ICB. The Department "intended . . . these safe harbors be *clear and uncomplicated* . . . [so that] institutions can use [them] as a workable framework to determine if their payment arrangements violate the incentive compensation prohibition." 67 Fed. Reg. 67054 (Nov. 1, 2002) (emphasis added). At issue here is DOE's safe harbor permitting institutions to make adjustments to a covered employee's salary no more than two times a year, provided that any such adjustment was not "based *solely* on the number of students recruited, admitted, [or] enrolled." 34 CFR 668.14(b)(22)(ii)(A) (July 1, 2010) ("Safe Harbor A") (emphasis added).

AAU was aware of Safe Harbor A and during times relevant to the claims made in the SAC, designed and implemented compensation systems intended to qualify for Safe Harbor A. Ex. 75, Vollaro Aff., ¶¶3-18, 25-28, 30, 36. Further, AAU ceased relying on Safe Harbor A in October 2010, when DOE announced elimination of the safe harbors. *Id.* at ¶38. AAU's commitment to compliance is further exemplified by the fact that it modified its practices prior to the July 1, 2011 effective date of the regulation eliminating the safe harbors. *Id.*

Relators contend that AAU's compensation practices violated the PPA. Specifically, they allege that the Academy created a "sham" compensation plan that they believe functioned to provide the appearance of compliance with the ICB, while AAU instead made payments on bases that the ICB prohibits. ECF Doc. 18 ¶35. The crux of Relators' argument is that although the Academy's compensation plans and procedures were designed to meet the requirements of Safe Harbor A, the Academy nonetheless deliberately spent time and resources to concoct fake plans over many years and otherwise acted inconsistently with their plans. *Id.*

Contrary to Relators' assertions, each manager deposed in this case testified that compensation decisions were made in accordance with the Academy's plans then in effect,

which considered qualitative performance factors and were not "based solely" on success in securing enrollments.  Ex. 61, Meurer Depo., 105:8-106:11; Ex. 66, Stiverson-Smith Depo., 46:17-47:6, 128:15-21, 131:20-135:25, 142:9-145:21, 172:19-179:25, 186:16-187:11, 250:22-257:10, 306:23-311:4, 318:14-320:17, 323:5-10, 324:12-326:10, 326:12-328:17; Ex. 67, Bell Depo., 44:1-45:13, 48:5-49:12, 89:20-90:18, 109:15-18, 119:8-122:1, 241:24-242:6, 247:18-23; Ex. 68, Bergholt Depo., 38:17-45:19, 45:21-47:16; Ex. 69, Lee Depo., 82:11-91:22, 92:10-95:7; Ex 70, Santelices Depo., 15:1-22, 29:12-30:17, 43:9-19; Ex. 71, Del Rico Depo., 88:2-22; Ex. 74, Chan Depo., 158:20-159:6; Ex. 75 Vollaro Aff., ¶¶ 21, 36; Ex. 78, Bergholt Aff. ¶¶3-4, 6, 14, 22.

Although the Academy's compensation plans changed during the time period relevant to the SAC, the plans always included an evaluation of a totality of qualitative performance factors in addition to enrollment numbers.  Ex. 61, Meurer Depo., 105:8-106:11; Ex. 68, Bergholt Depo., 42:14-43:8, 48:20-49:16, 59:20-60:22, 62:21-64:18, 69:20-71:21, 86:12-87:1, 97:6-25, 170:23-171:22, 192:20-193:8; Ex. 75, Vollaro Aff., ¶¶2-29, 36-37; Ex. 78, Bergholt Aff., ¶¶3-17, 19-23.  As AAU's compensation plans evolved, all changes in the plan were diligently reviewed and implemented in consultation with the Academy's Executive Vice President of Financial Aid/Compliance, who had knowledge of DOE's regulations regarding incentive compensation. Ex. 75, Vollaro Aff., ¶¶3-38.

The record does not show the kind of bad acts (i.e., intentional palpable lies made with knowledge and the intent to deceive) necessary for FCA liability. Relators assert that AAU made salary adjustments solely on the prohibited basis of enrollment numbers.  However, by their own admissions they had no first-hand knowledge of how the salary adjustments were formulated or what went into those decisions.  Ex. 62, Nelson Depo., 37:18-25, 93:16-19, 94:7-13, 233:24-

234:8; Ex. 63, Rose Depo., 99:17-22, 110:2-7, 150:6-151:5; Ex. 64, Stearns Depo., 191:8-20,

211:16-212:21, 236:1-18, 242:4-9; Ex. 65, Aquino Depo., 107:14-19, 137:9-138:10, 144:4-13,

145:14-18, 198:21-24.  Further, witnesses Stiverson-Smith and Bell both testified to the

inaccuracy of allegations contained in their respective sworn declarations which state they were

"instructed" by senior management that AAU would make improper salary adjustments in

contravention of the established compensation plans.  *Compare* Ex. 46 (Stiverson-Smith Aff.),

and 49 (Bell Aff.), with Ex. 66, Stiverson-Smith Depo., 187:23-190:4, 289:5-300:22 and Ex. 67,

Bell Depo., 21:4-23:2, 231:11-13, 234:12-236:8, 245:23-246:24, 252:23-253:21.  These

admissions gut the purported factual support for Relators' claims found in the declarations of

Stiverson-Smith and Bell, leaving only generalized and self-serving allegations, rumor, and

innuendo.  *See United States ex rel. McLean v. County of Santa Clara*, 2011 U.S. Dist. LEXIS

125713, *29 (N.D. Cal. Oct. 31, 2011).  In effect, Relators "claim these facts as true in a

vacuum," which is insufficient to survive summary judgment.  *Woodruff*, 560 F.Supp.2d at 1001

n.13.  This Court may properly disregard such statements because they lack detailed facts and

any supporting evidence sufficient to create a genuine issue of material fact.  *See Nigro v. Sears,

Roebuck & Co.*, 784 F.3d 495, 497-98 (9th Cir. 2015).

At best, Relators' allegations demonstrate that AAU established practices intended to

comply with Safe Harbor A and therefore the ICB.  Ex. 7, Vollaro Aff., ¶¶2-38.  There is no

evidence that AAU knowingly adjusted admissions staff compensation without considering

factors in addition to enrollments.  Likewise there is no evidence that AAU wantonly flaunted

the law, or acted with reckless disregard of the ICB when deciding and paying salary

adjustments.  Instead, the record merely shows that the Academy developed its compensation

plans in consideration of activity expressly permitted under Safe Harbor A and diligently

analyzed proposed changes to the plan to ensure consistency with Safe Harbor A.  *Id.*

Relators attempt to counter this based upon their uninformed assumptions and that of

others who were not in a position to know how AAU's compensation decisions were made.  *See*

SAC ¶35; Ex. 62, Nelson Depo., 37:18-25, 93:16-19, 94:7-13, 233:24-234:8; Ex. 63, Rose

Depo., 99:17-22, 110:2-7, 150:6-151:5; Ex. 64, Stearns Depo., 191:8-20, 211:16-212-21, 236:1-

18, 242:4-9; Ex. 65, Aquino Depo., 107:14-19, 137:9-138:10, 144:4-13, 145:14-18, 198:21-24;

Ex. 66, Stiverson-Smith Depo., 46:17-47:6, 128:15-21, 131:20-135:25, 142:9-145:21, 172:19-

179:25, 186:16-187:11, 250:22-257:10, 306:23-311:4, 318:14-320:17, 323:5-10, 324:12-326:10,

326:12-328:17; Ex. 67, Bell Depo., 44:1-45:13, 48:5-49:12, 89:20-90:18, 109:15-18, 241:24-

242:6, 247:18-23.  At summary judgment, this Court need not draw "'all possible inferences in

[the plaintiff's] favor, but only all reasonable ones.'"  *Nathalie Thuy Van v. Wal-Mart Stores,*

*Inc.*, 583 F. App'x 761, 764 (9th Cir. 2014) (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281

F.3d 1054, 1065 n.10 (9th Cir. 2002)).  Simply put, based on their lack of evidence to support

their hypothesis, Relators' are not entitled to rely on the inference that the Academy's

compensation plans were a sham.

### ii. Relators' Implied False Certification Claims Are Based Upon Mere Impermissible Inferences.

The implied false certification theory shares common limitations with the express false

certification theory.[5]  *Ebeid*, 616 F.3d at 998.  "Implied false certification occurs when an entity

---

[5] The Supreme Court has called into question the viability of the implied false certification theory of FCA liability.  *Universal Health Servs. Inc., v. United States ex rel. Escobar*, 780 F.3d 504 (1st Cir. 2015) *cert granted*, ___ U.S.L.W. ____ (U.S. Dec. 4, 2015) (No. 15-7), 2015 U.S. LEXIS 7677 (December 4, 2015) (questioning whether an implied certification is valid under the FCA and whether a government contractor's reimbursement claim can be legally "false" under that theory if the provider failed to comply with a regulation that does not state that it is a condition

Motion For Summary Judgment – Case No. CV-09-5966 PJH

has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Id.* Under both theories, "[i]t is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Id.* (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)).

As with their express false certification theory, Relators fail to make the required showing of "intentional palpable lies" made with the knowledge of their falsity and the intent to deceive. *Hendow*, 461 F.3d at 1175. Relators' claim under the implied false certification theory mirrors their claim that AAU violated the FCA under the express false certification theory. Relators characterize AAU's compensation plans as a "sham" and suggest that the non-enrollment (i.e., qualitative) factors AAU utilized to evaluate admissions staff performance were pre-textual and only "basic requirements that any employee would be required to meet, and in fact and in practice had no impact on increases or decreases to the compensation of admissions representatives." SAC ¶35. As discussed above with regard to the express false certification theory, there is no evidence to support Relators' bare allegations that AAU deviated from its stated compensation practices, which were designed to comply with Safe Harbor A.

The SAC also portrays the various qualitative factors AAU employed to measure admissions representative performance as ineffectual because they were "requirements that any employee would be required to meet." SAC ¶35. Relators attack the wisdom and validity of AAU's decision to include these criteria in the salary reviews of admissions representatives.

---

of payment). As Relators' claim hinges on the implied false certification theory and because compliance with the underlying condition (i.e., the ICB) is not an expressly stated condition of payment, *Universal Health* is directly relevant to this case.

This desperate attempt to minimize qualitative factors considered by AAU is without merit. The express language of Safe Harbor A provides no limitation on factors that could be considered in addition to enrollment.[6] AAU relied on the express language of the regulation in establishing qualitative factors to arrive at a totality of performance evaluation for making compensation adjustments. By relying upon the express language of Safe Harbor A, AAU could not have acted with "the required scienter under the [FCA] for actions after the safe harbor regulation was promulgated." *United States ex rel. Bott v. Silicon Valley Colleges*, 262 F.App'x 810, 811 (9th Cir. 2008).

Even if Relators' judgment on this point were correct, the result of AAU's miscalculation would at most only amount to a colorable violation of a regulation. This is not sufficient to carry Relators' burden at summary judgment. "Violations of laws, rules, or regulations do not alone create a cause of action under the FCA." *Hopper*, 91 F.3d at 1265-67. Further, to the extent that Relators' conclusions regarding whether AAU's practices fall outside of Safe Harbor A rest on an interpretation of the Safe Harbor A that differs from AAU's, such differences "are not sufficient for [FCA] liability to attach." *Hendow*, 461 F.3d at 1174.

### iii.   There Is No Factual Basis To Support An FCA Claim Under The Promissory Fraud Theory.

"[R]ather than specifically requiring a false statement of compliance," the promissory fraud theory of liability demands proof that AAU obtained Title IV eligibility by falsely promising to comply with the incentive compensation ban when entering a PPA. *Hendow*, 461 F.3d at 1173. This "promise must be false when made" to support a claim for promissory fraud.

---

[6] Even after eliminating Safe Harbor A, the Department confirmed that these types of "standard evaluative factors" may be used "as a basis for compensating employees." Examples cited by the Department include job knowledge and professionalism, clarity in communications, accuracy, thoroughness, punctuality, and interpersonal relations. Dear Colleague Letter, GEN-11-05 (March 17, 2011); *see also* 75 Fed. Reg. 66877 (Oct. 29, 2010).

Motion For Summary Judgment – Case No. CV-09-5966 PJH

*Hopper*, 91 F.3d at 1267.  In other words, Relators must offer evidence establishing AAU's "mindset at the time of entry into the PPA."  *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 709 (7th Cir. 2015).  They have failed to do so.

Relators offer no "documentary evidence" in the record concerning AAU's entry into any PPA.  *Id.*  Nor have Relators identified any evidence that the individual who executed AAU's PPA did so while intending not to comply with the incentive compensation ban.  *Id.*  Rather, Relators rely exclusively on the conclusory allegation that AAU's compensation plans were designed to hide impermissible incentive compensation.  But even if the compensation plans violated the incentive compensation ban (which they did not, as the undisputed facts show) there is still no evidence in this case that AAU entered any PPA while intending not to comply with it, because all the alleged activity occurred months after entry into the PPA in 2006 ("2006 PPA").

AAU executed the 2006 PPA on March 30, 2006.  Ex. 2.  Relator Nelson was the only Relator employed at AAU prior to 2006.  Ex. 18-21; Ex. 77, Visslailli Aff., ¶13.  He admits that he received no performance-based increase before 2006, when AAU implemented the first of two compensation plans at issue in this case.  Ex. 62, Nelson Depo., 33:25-34:5, 57:14-58:15.  Joan Bergholt developed her compensation plan months *after* AAU executed the 2006 PPA.[7]  Ex. 78, Bergholt Aff., ¶¶3, 21; Ex. 43.  The 2006 PPA was still in effect when Rachel Lee modified the compensation plan.  Ex. 76, Lee Aff., ¶¶13, 15.  The Department specifically evaluated that plan for compliance with the incentive compensation ban and identified no violations.  *See, e.g.,* Ex. 4-7.  Even then, AAU ceased considering enrollments as a factor in adjusting the compensation of admissions representatives more than eighteen months before

---

[7] Indeed, Ms. Bergholt was first employed in the Admissions Department *after* AAU executed its PPA.  Ex. 78, Bergholt Aff., ¶¶3, 21.

Motion For Summary Judgment – Case No. CV-09-5966 PJH

AAU next executed a PPA on April 10, 2012 ("2012 PPA"). Ex. 3, Ex. 75, Vollaro Aff., ¶38; Ex. 76, Lee Aff., ¶¶21-22.

To put a fine point on this issue: Neither compensation plan was being designed or implemented at a time when AAU entered a PPA. If every speculative, unsubstantiated claim Relators alleged regarding AAU's compensation plans were true, there still would not be any basis in theory or in fact to support the claim that AAU entered a PPA while intending not to comply with the ban on incentive compensation. The compensation plans cannot be construed as evidence of AAU's intent not to comply with the incentive compensation ban at the time the PPAs were signed. *United States ex rel. Peretz v. Humana Inc.*, 2011 U.S. Dist. LEXIS 59639 *15 (D. Ariz. April 8, 2001) ("Humana could not have known that its certificates were false when made if the conduct which allegedly demonstrates falsity did not occur until after the certifications were made."). Relators therefore fail to raise a triable issue regarding AAU's intent when it entered into any PPA.

**B.    AAU's Compensation Plans Complied With The Safe Harbor As Written And Applied.**

At all times relevant to this action, the Department permitted Title IV-eligible institutions to compensate recruiters based upon recruiting success so long as their salary was not adjusted more than twice annually "and any adjustment [was] not based solely on the number of students recruited." 34 C.F.R. § 668.14(b)(22)(ii)(A) (July 1, 2010). Courts have consistently interpreted "solely" in this context to mean that recruiters cannot be compensated "exclusively" or "only" based upon student enrollment. *See generally United States ex rel. Pilecki-Simko v. Chubb Inst.*, 2010 U.S. Dist. LEXIS 48345 *7 (D.N.J. May 17, 2010) (noting dismissal of claim where compensation plan "was not based solely on enrollment starts, but also student retention, success at recruiting activities, administrative records-keeping, and professionalism"); *Bott*, 262 F. App'x

at 810 (affirming dismissal where relators failed to plead specific facts supporting the inference that salary reviews were performed solely on the basis of recruiting success). As designed and implemented, AAU's compensation plans complied with the terms of Safe Harbor A by basing compensation on performance of identifiable qualitative criteria, not simply enrollment. Ex. 75, Vollaro Aff., ¶¶2-38; Ex. 76, Lee Aff., ¶¶3-22; Ex. 78, Bergholt Aff., ¶¶3-17, 19-23. Accordingly, there is no triable issue of fact that AAU falsely certified its compliance with the ban on paying incentive compensation or falsely promised to comply with the incentive compensation ban when entering the program participation agreement.

### i.   AAU's Compensation Plans, As Written, Complied With The Safe Harbor.

Prior to 2009, AAU implemented a compensation plan that, as written, complied with the prohibition on incentive compensation. In direct reliance on Safe Harbor A, AAU developed its compensation plan to evaluate recruiters using criteria designed to capture the totality of a recruiter's performance, not simply his or her success enrolling students. Ex. 61, Meurer Depo., 105:8-106:11; Ex. 68, Bergholt Depo., 42:14-43:8, 48:20-49:16, 59:20-60:22, 62:21-64:18, 69:20-71:21, 86:12-87:1, 97:6-25, 170:23-171:22, 192:20-193:8; Ex. 75, Vollaro Aff., ¶¶2-29, 36-37; Ex. 78, Bergholt Aff., ¶¶3-17, 19-23. Under this plan, AAU evaluated at first twelve, and later twenty-four, distinct criteria, including database management, product knowledge, event participation, time management, and support and training of new staff. Ex. 51-52; Ex. 60, Vollaro Depo., 95:2-97:25; Ex. 61, Meurer Depo., 68:2-74:9, 80:17-84:7, 92:14-25, 98:14-100:8, 130:19-131:6, 189:4-190:8; Ex. 68, Bergholt Depo., 52:15-23, 75:15-77:4, 126:1-136:9; Ex. 70, Santelices Depo., 32:4-22; Ex. 75, Vollaro Aff., ¶¶18-25, 30-33; Ex. 76, Lee Aff. ¶¶9-11, 20; Ex. 78, Bergholt Aff., ¶¶15, 21-22. Enrollment success constituted only one of many criteria considered under this totality of performance approach. *See generally id.*

Motion For Summary Judgment – Case No. CV-09-5966 PJH

1    This important feature of the plan was explained to the admissions department staff, and

2    it was understood in the admissions department that salary adjustment would be based on

3    meeting enrollment goals and other factors. Ex. 27; Ex. 44; Ex. 59, Lam Depo., 30:5-33:4,

4    55:22-56:3, 79:2-4, 91:20-92:14; Ex. 61, Meurer Depo., 105:8-106:11; Ex. 63, Rose Depo.,

5    33:15-18, 109:12-17; Ex. 64, Stearns Depo., 67:17-68:23, 157:12-158:11, 161:7-23; Ex. 65,

6    Aquino Depo., 133:4-13, 140:2-5, 140:15-18, 140:21-141:3, 145:10-13, 171:12-21, 174:4-19;

7    Ex. 66, Stiverson-Smith Depo., 46:17-47:6, 128:15-21, 131:20-135:25, 142:9-145:21, 172:19-

8    179:25, 186:16-187:11, 250:22-257:10, 306:23-311:4, 318:14-320:17, 323:5-10, 324:12-326:10,

9    326:12-328:17; Ex. 67, Bell Depo., 44:1-45:15, 48:5-49:12, 89:20-90:18, 109:15-18, 119:8-

10   121:1, 241:24-242:6, 247:18-23; Ex. 68, Bergholt Depo., 38:17-45:19, 45:21-47:16; Ex. 69, Lee

11   Depo., 82:11-91:22, 92:17-95:7; Ex 70, Santelices Depo., 14:2-22, 29:12-30:17, 43:9-19; Ex. 75

12   Vollaro Aff., ¶¶ 21, 36; Ex. 78, Bergholt Aff. ¶¶3-4, 6, 14, 22. Moreover, consistent with its

13   written plan, AAU evaluated all recruiters on a totality of performance basis, whether they met,

14   exceeded, or fell short of their enrollment goals. See, e.g., Ex. 78, Bergholt Aff. ¶10. AAU

15   adjusted the compensation of admissions representatives in accordance with its plans and

16   procedures in December 2006, June 2007, and December 2007. Ex. 75, Vollaro Aff. ¶37; Ex.

17   68, Bergholt Depo., 146:16-147:1.

18        In 2009, AAU implemented a more structured compensation plan that was designed to

19   evaluate the totality of a recruiter's performance in a more objective manner by assessing distinct

20   qualitative and quantitative measures. Ex. 73, Forman Depo., 80:7-91:6, 115:22-116:15, 125:4-

21   128:5; Ex. 76, Lee Aff., ¶¶4, 8-18, 20; Ex. 75, Vollaro Aff., ¶¶31-32. Detailed criteria for

22   assessing qualitative performance were established in two guides AAU prepared and distributed

23   to the admissions department:  the Student Admissions Guide ("SAG") and the Professional

Motion For Summary Judgment – Case No. CV-09-5966 PJH

Courtesy Guide ("PCG").  Ex. 75, Vollaro Aff., ¶31; Ex. 76, Lee Aff., ¶¶13-18, 20.  In addition

to those guides, AAU created a Score Value Worksheet, which allowed managers to critically

assess a recruiter's compliance with SAG and PCG, and which formed the qualitative measure of

performance.  Ex. 56; Ex. 75, Vollaro Aff., ¶33; Ex. 76, Lee Aff., ¶¶14-15, 17.  The Score Value

Worksheet represented the qualitative factor in the analysis; enrollment data was tracked

separately.  Ex. 56.  The final step in the process incorporated the qualitative and quantitative

assessments into a Score Value Card to produce a net weighted assessment.  Ex. 55; Ex. 69, Lee

Depo., 159:12-161:15; Ex. 75, Vollaro Aff., ¶¶31-34; Ex. 76, Lee Aff., ¶¶15-16.  The Score

Value Card produced a blended net salary adjustment that assessed recruiter performance across

both measures.  Ex. 55; Ex. 73, Forman Depo., 80:7-91:6, 115:22-116:15, 125:4-128:5; Ex. 76,

Lee Aff., ¶17; Ex. 75, Vollaro Aff., ¶¶31-34.  This approach, like AAU's previous compensation

plan, both facially and as applied, complied with Safe Harbor A by basing compensation on

qualitative factors *in addition to* enrollment.  Indeed, DOE reviewed voluminous documents

related to AAU's compensation policies during the 2009-2010 and 2010-2011 Award Years and

made no adverse findings regarding AAU's compensation practices.  Ex. 4-7, Ex. 75, Vollaro

Aff., ¶¶52-55.

        ii.        **AAU's Compensation Practice Complied With Its Written Policies.**

There is no evidence that AAU awarded salary adjustments on any basis other than its

formal compensation plans.  Relators' assertions to the contrary fail to raise a triable issue of

fact.  Those assertions are not based on personal knowledge of the decision-making process

supporting AAU's salary adjustments and simply "set[] out mere speculation for the critical facts

. . . claimed to be at issue." *John v. Floyd & Assocs., Inc. v. Tapco Credit Union*, 550 F. App'x

359, 360 (9th Cir. 2003).

The heart of Relators' claim is presented through two former AAU management-level employees, Julie Bell and Joan Stiverson-Smith, who have no personal knowledge of how AAU measured the compensation of its admissions representatives. According to her own deposition testimony, Julie Bell was not involved in any decision about compensation adjustment, and instead based her opinion on the "fabric of the culture." Ex. 67, Bell Depo., 232:5-12, 25:13-17, 89:8-19; 118:5-10; 134:24-135:14, 208:4-8, 239:12-23, 241:4-20, 244:22-246:24. Even on its own terms this testimony fails to raise an issue of material fact concerning AAU's compensation practices. Bell's assertion that "in order to get your full increase in pay you had to make your numbers" proves that enrollment was a necessary condition to receive the maximum available salary adjustment. Id. 173:13-21, 235:6-16, 236:3-8. Her testimony unwittingly confirms that enrollment success constituted but one of the multiple factors necessary to receive the maximum available salary adjustment. The testimony creates no factual basis for Relators' speculative claim that enrollment was the only factor considered in adjusting compensation.

Stiverson-Smith's testimony is similarly speculative. She too had no personal knowledge of how AAU determined salary adjustments. Ex. 66, Stiverson-Smith Depo., 294:6-10, 297:3-16. During the one year she was employed by AAU, no adjustments to recruiter salary were made. Id. 226:11-13, 315:3-17, 328:14-329:7. Moreover, like Bell, what testimony Stiverson-Smith provides actually supports the validity of AAU's compensation practices. Exhibit 44, which Stiverson-Smith jointly prepared with Bergholt, includes suggested salary adjustments for recruiters that plainly reference qualitative factors. Id. 323:5-10, 324:12-328:17; Ex. 78, Bergholt Aff., ¶22. Stiverson-Smith further testified that every salary recommendation she and Bergholt prepared was based upon qualitative criteria. Ex. 66, Stiverson-Smith Depo., 318:14- 320:17. For example, consider her testimony regarding Relator Rose:

Motion For Summary Judgment – Case No. CV-09-5966 PJH

| | |
|---|---|
| Q: | So, you would have considered his qualitative work in making salary change recommendation? |
| A: | I thought it was extravagant, but yes. |

*Id.* 320:15-17.

The remainder of Relators' evidence is comprised of self-serving conclusory assertions that AAU awarded salary adjustments solely on the basis of enrollment. Those assertions are not only unsupported by personal knowledge but they stand in stark contrast to the only available evidence. The qualitative criteria AAU assessed were neither "pre-textual" nor "sham" factors, but instead the result of considerable effort to design and implement an approach to evaluation that captured a recruiter's totality of performance. And far from being "based on basic requirements that any employee would be required to meet," SAC ¶35, the qualitative criteria were relevant to the recruiter position, as Relators' witnesses have testified. Ex. 66, Stiverson-Smith Depo., 45:8-47:6, 218:2-20, 309:11-311:4; Ex. 67, Bell. Depo., 83:21-84:17, 100:12-101:8, 143:8-12, 151:21-156:21. Relators cite emails that purportedly show AAU considered factors only related to enrollment. SAC, Ex. A. But Relator Aquino concedes that she requested only the quantitative components of the salary adjustment criteria for purposes of manufacturing evidence for trial. Ex. 65, Aquino Depo., 147:24-148:1, 199:21-200.3. Such information reveals only one input that must be considered along with additional qualitative factors to produce the blended net salary adjustment under AAU's compensation plan. Relator Aquino knows this:

**From:** Aquino, Mary
**Sent:** Wednesday, September 22, 2010 8:20 AM
**To:** Lee, Rachel
**Cc:** Del Rico, Veronica; Chan, Noreen
**Subject:** RE: Goal Breakdown

Hi Rachel,

I fully understand that there is a quantitative and qualitative expectation that we have to meet but I would still greatly appreciate to have a hard copy of the goal sheet that states the increase/decrease of our salary based on whether or not we hit the goal given to us per semester.

Again, thank you for your time and consideration.

Motion For Summary Judgment – Case No. CV-09-5966 PJH

1  Ex. 27 (REL 001076).

2

3              iii.      **AAU Offered Trips For The Purpose Of Training Recruiters.**

4          Relators' claim that AAU illegally compensated recruiters based upon enrollment

5  through trips and gifts is factually unsubstantiated.  Although Relators' SAC references AAU

6  compensating recruiters with a trip to Hawaii, they offer no evidence of an impermissible

7  incentive of any kind.  There is no evidence in this case to contradict testimony that the trips

8  were designed for the purpose of educating and improving the skills of the admissions

9  representatives.  Ex. 68, Bergholt Depo., 164:2-8, 165:19-167:9; Ex. 60, Vollaro Depo., 122:9-

10  11, 124:19-25, 214:9-15.  Indeed DOE reviewed AAU's training activities, including off-site

11  training, during the program review in which it made no allegations of noncompliance with the

12  incentive compensation ban.  Ex. 4-7; Ex. 75, Vollaro Aff., ¶¶52-55.  Accordingly, Relators fail

13  to raise a triable issue concerning impermissible enrollment-based compensation.

14              iv.      **After A Multi-Year Review The Department Found No Irregularities
                          Or Improprieties In AAU's Compensation Policies And Practices.**

15

16          After Relators filed suit, the Department conducted a focused program review that

17  evaluated AAU's recruiter compensation practices during the 2009-2010 and 2010-2011 Award

18  Years.  *Id.*  This review included a three-day site visit during which the Department interviewed

19  AAU admission representatives and managers as well as an extensive review of documentation

20  relating to AAU's recruiter evaluation and compensation policies and practices.  *Id.*

21  Approximately seven months after the site visit, the Department issued an expedited Final

22  Program Review Determination ("FPRD") that found no violations of the incentive

23  compensation ban.  *Id.*

24

25

26

Motion For Summary Judgment – Case No. CV-09-5966 PJH

1    Despite the Department's finding following its exhaustive inquiry – and in spite of their

2  lack of personal knowledge – Relators contend AAU's evaluation process employed during the

3  2009-2010 and 2010-2011 Award Years improperly compensated admission representatives

4  solely on the basis of enrollment success.  After discovery lasting more than three times the

5  length of the Department's review process, this case is at the same end point:  There is no

6  evidence that AAU violated the incentive compensation ban.  Of course, Relators' motivation is

7  driven less by regulatory compliance than the potential for massive recovery under the FCA.

8  Summary judgment exists to protect defendants from exactly this sort of unsubstantiated

9  litigation.  *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

10  (quoting the Advisory Committee Note to 1963 Amendment of Fed. R. Civ.Pro. 56(e)) ("[The]

11  purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see

12  whether there is a genuine need for trial.'").

13  

14  ### IV. CONCLUSION

15    For the foregoing reasons, this Court should grant Defendant's motion for summary

16  judgment and dismiss Relators' SAC with prejudice.

17  

18  Respectfully Submitted,

19  Dated:  December 21, 2015

20  

21                            /s/
                       Steven M. Gombos, VA No. 30788
                       (admitted *pro hac vice*)
22                     Ritzert & Leyton, P.C.
                       11350 Random Hills Road, Suite 400
23                     Fairfax, Virginia 22030
                       Telephone:  (703) 934-2660
24                     Facsimile:  (703) 934-9840
                       Email:  sgombos@ritzert-leyton.com
25                     Lead Counsel for Defendant

26  

Motion For Summary Judgment – Case No. CV-09-5966 PJH

22

1

## CERTIFICATE OF SERVICE

2

3        I certify that I will/have electronically file(d) the foregoing with the Clerk of the Court
using the CM/ECF system which shall cause the same to be delivered to the following via
4    electronic transmission to the following counsel:

5    c/o Stephen R. Jaffe
The Jaffe Law Firm
6    101California Street, Suite 2710
San Francisco, California 94111
7    (415) 618-0100

8    Michael Von Loewenfeldt, Esq.
Kerr & Wagstaffe, LLP
9    101 Missions Street, 18th Floor
San Francisco, CA 94105
10   Telephone: (415) 371-8500
Facsimile: (415) 371-0500
11   mvl@kerrwagstaffe.com

12   Counsel for Plaintiffs/Relators

13

14                                          _____
                                               /s/
15                                          Steven M. Gombos
                                            Attorney for Defendant
16                                          December 21, 2015

17

18

19

20

21

22

23

24

25

26

Motion For Summary Judgment – Case No. CV-09-5966 PJH
                                            23