1

**THE JAFFE LAW FIRM**
STEPHEN R. JAFFE (49539)

2

Stephen.R.Jaffe@JaffeTrialLaw.com

3

101 California Street, Suite 2710
San Francisco, California 94111

4

Telephone: (415) 618-0100
Facsimile: (415) 618-0080

5

6

**KERR & WAGSTAFFE LLP**
MICHAEL VON LOEWENFELDT (178665)

7

mvl@kerrwagstaffe.com
BRADY R. DEWAR (252776)

8

dewar@kerrwagstaffe.com
KENNETH P. NABITY (287927)

9

nabity@kerrwagstaffe.com
101 Mission Street, 18th Floor

10

San Francisco, CA 94105
Telephone: (415) 371-8500

11

Facsimile: (415) 371-0500

12

13

ATTORNEYS FOR PLAINTIFF RELATORS
Scott Rose, Mary Aquino, Mitchell Nelson and

14

Lucy Stearns

15

## UNITED STATES DISTRICT COURT

16

### NORTHERN DISTRICT OF CALIFORNIA

17

#### OAKLAND DIVISION

18

19

UNITED STATES OF AMERICA, ex rel.
SCOTT ROSE, MARY AQUINO, MITCHELL

20

NELSON AND LUCY STEARNS,

21

Plaintiffs/Relators,

22

23

v.

24

STEPHENS INSTITUTE, a California
corporation, doing business as ACADEMY OF

25

ART UNIVERSITY and DOES 1 through 50,
inclusive,

26

27

Defendants.

28

Case No. 4:09-cv-05966-PJH

**PLAINTIFF/RELATORS' OPPOSITION
TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Date:        March 9, 2016
Time:        9:00 a.m.
Judge:       Hon. Phyllis Hamilton
Courtroom: 3

Filed:       December 22, 2009
Trial:       Not Set

KERR
&
WAGSTAFFE
LLP

# TABLE OF CONTENTS

*Page*

I.      INTRODUCTION ........................................................................................ 1

II.     FACTS REQUIRING TRIAL ..................................................................... 2

     A.     Federal Loan/Grant Programs And The Incentive Compensation Ban ............... 2

     B.     Academy of Art University ("AAU") and The Relators ...................................... 5

     C.     AAU's Unlawful 2006-2008 Compensation Practices ......................................... 7

          1.     AAU "Backed Into" Performance Evaluations To Match Predetermined "Salary Adjustments" Based Solely On Enrollment Numbers, Or Ignored Performance Evaluations Entirely ........................ 8

          2.     The Sham Performance Reviews Continued For Summer/Fall 2008 ..... 12

     D.     AAU's Unlawful 2009-2010 Compensation Practices ....................................... 14

          1.     Enrollment Quota Based on Salary ....................................................... 14

          2.     The Scorecard .......................................................................................... 14

          3.     AAU Covers Up Its Scheme ................................................................... 16

     E.     "Hawaii is in our sights" —AAU Awarded Representatives All-Expense Paid Vacations and Other Prized Solely Based On Meeting Team Enrollment Goals ............................................................................................... 17

     F.     AAU Abandons And Attempts To Cover Up Its Unlawful Schemes ................. 18

     G.     AAU's Admissions Practices Result in Very Low Retention and Graduation Rates ................................................................................................ 20

III.    ARGUMENT ............................................................................................... 20

     A.     Standard on Summary Judgment ...................................................................... 20

     B.     Evidence Establishes that the Relators Can Prove All Elements of the False Claims Act .............................................................................................. 21

          1.     AAU Made False Statements to the Government .................................. 22

          2.     AAU's False Statements Were Made with Scienter .............................. 23

          3.     AAU's False Statements Were Material ................................................ 25

          4.     AAU's False Claims Caused the Government to Pay Out Money ........ 26

     C.     AAU's Attempts To Avoid Liability Do Not Justify Summary Judgment ........ 27

1        1.     The "Totality of Performance" Scheme Violated the HEA As Applied ............................................................................................... 27

2.     The Scorecard, As Written and Applied, Violated the HEA ................. 29

3.     AAU's Grant of Vacations and Weekly Awards Violated the HEA ...... 29

4.     The DOE Review Provides No Defense To AAU ................................ 30

claims against AAU after a program review. AAU cites no legal authority even suggesting that the DOE's decision is determinative in a False Claims case.  AAU also vastly overstates the purpose of the program review and the DOE's conclusions. .......................................... 30

It is indisputable that the DOE did not charge AAU.  And perhaps the Court will let the jury consider that fact, although Relators believe it is inadmissible.  The DOE's investigation and letter provide no basis, however, for granting summary judgment to AAU. ..................... 30

IV.     CONCLUSION ................................................................................................ 30

# <u>TABLE OF AUTHORITIES</u>

*Pages*

## <u>*Cases*</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................. 20

*Cornwell v. Electra Cent. Credit Union*,
    439 F.3d 1018 (9th Cir. 2006) ................................................................................ 21

*Desert Palace, Inc. v. Costa*,
    539 U.S. 90 (2003) ................................................................................................... 21

*Ebeid ex rel. U.S. v. Lungwitz*,
    616 F.3d 993 (9th Cir. 2010) .................................................................................. 22

*Fonseca v. Sysco Food Servs. of Arizona, Inc.*,
    374 F.3d 840 (9th Cir. 2004) .................................................................................. 21

*Great Am. Assur. Co. v. Liberty Surplus Ins. Corp.*,
    669 F. Supp. 2d 1084 (N.D. Cal. 2009) ........................................................... 21, 28

*Mitchell v. City of Pittsburg*,
    2012 WL 3313178 (N.D. Cal. Aug. 13, 2012) ...................................................... 20

*Owner–Operator Indep. Drivers Ass'n*,
    632 F.3d 1111 (2011) ................................................................................................ 5

*S.E.C. v. M & A W., Inc.*,
    538 F.3d 1043 (9th Cir. 2008) ................................................................................ 20

*SEC v. Koracorp Indus., Inc.*,
    575 F.2d 692 (9th Cir. 1978) .................................................................................. 20

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014) ............................................................................................ 20

*U.S. ex rel. Aflatooni v. Kitsap Physicians Servs.*,
    163 F.3d 516 (9th Cir. 1999) .................................................................................. 21

*U.S. v. Corinthian Colleges*,
    655 F.3d 984 (9th Cir. 2011) .................................................................................. 23

*United States ex rel. Hendow v. Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006) ..................................................................... 3, 22, 26

*United States ex rel. Main v. Oakland City Univ.*,
    426 F.3d 914 (7th Cir.2005) ..................................................................................... 3

*United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*,
    251 F. Supp. 2d 114 (D.D.C. 2003) ....................................................................... 24

*United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C.W. Roen Const. Co.*,
    183 F.3d 1088 (9th Cir. 1999) ................................................................................ 24

KERR
&
WAGSTAFFE
LLP

*United States ex rel. Shackelford v. Am. Mgmt., Inc.*,
    484 F. Supp. 2d 669 (E.D. Mich. 2007)................................................................24

*United States v. Corinthian Colls.*,
    655 F.3d 984 (9th Cir. 2011) ...........................................4, 24, 25, 27, 28

*United States v. Educ. Mgmt. LLC*,
    2014 WL 1796686 (W.D. Pa. May 6, 2014)......................................................21

*United States v. Everglades Coll., Inc.*,
    2014 WL 5139301 (S.D. Fla. Aug. 14, 2014)....................................................29

*United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257, 1274 (D.C. Cir. 2010) ...............................................................24

*Urquilla-Diaz v. Kaplan Univ.*,
    780 F.3d 1039 (11th Cir. 2015) .........................................................................23

### *Statutes*

20 U.S.C. § 1070 ..................................................................................................2

20 U.S.C. § 1094 ........................................................................................2, 3, 25, 29

31 U.S.C. § 3729 ...........................................................................................23, 24

31 U.S.C.A. § 3731 ...............................................................................................21

### *Regulations*

34 C.F.R. § 668.14 .........................................................................................2, 3, 25

34 C.F.R. § 668.162 .............................................................................................27

34 C.F.R. 668.144 ................................................................................................29

### *Other Authorities*

138 Cong. Rec. H1736-01 (1992), 1992 WL 57307.............................................2

Institutional Eligibility, 67 Fed. Reg. 51718-01 (Aug. 8, 2008)..........................3

Model Civ. Jury Instr. 9th Cir. 1.9 (2007) ..........................................................21

Program Integrity Issues, 75 Fed. Reg. 34806-01 (June 18, 2010) ...................4, 5

Program Integrity Issues, 75 Fed. Reg. 66832-01 (2010)..............................4, 18, 30

Program Integrity: Gainful Employment – New Programs, 75 Fed. Reg. 66665-02 (Oct. 29, 2010) ........................................................................................................18

Senate Report No. 102-58 (May 17, 1991)........................................................2, 3

Senate Report No. 99-345 (1986) ......................................................................21

I.     INTRODUCTION

Actions speak louder than words.  Defendant Stephens Institute, which does business as the Academy of Art University (hereinafter "AAU"), asks this Court to grant summary judgment because AAU's managers *say* they did not violate the law and "documented" AAU's purported compliance.  AAU's actions, however, tell a very different story, showing clearly that AAU paid its admissions representatives based on whether they met enrollment quotas while trying to camouflage that illegal conduct.  AAU violated the Incentive Compensation Ban in three ways:

First, prior to 2009, AAU promised and delivered bonuses based solely on admissions representatives' success at achieving established enrollment goals, and then reverse engineered "qualitative" reviews never shown to the employees to disguise its conduct.

Second, in 2009 and 2010, AAU paid or penalized representatives in discrete, specified amounts for meeting or missing individual and team enrollment goals, justifying this blatant violation of law by accompanying it with separate, much smaller adjustments based on subjective "qualitative" factors.

Third, AAU awarded all-expense-paid vacations to New York, Sonoma, and Hawaii, and gift cards, solely based on whether teams of admission representatives met their enrollment goals.

In every case, AAU furtively attempted to cover up its scheme by hiding the purported performance reviews from its employees, by destroying documents, and by refusing – as a matter of "policy" – to provide admission representatives with the very documentation it now claims it used to determine their compensation.  Despite its patently illegal pay schemes, AAU repeatedly certified to the Department of Education ("DOE") that it was in compliance with the Incentive Compensation Ban and other applicable federal laws and regulations.

Based on its false certifications to the DOE, AAU collected over $600 million in federal financial aid, a substantial percentage of its income during the period in question, fooling federal taxpayers into enriching the school and its owners and saddling numerous underqualified students with debts.  There is more than enough evidence for a jury to find that AAU violated the False Claims Act, and summary judgment should be denied.

KERR
&
WAGSTAFFE
LLP

1    **II.     FACTS REQUIRING TRIAL**

2        **A.     FEDERAL LOAN/GRANT PROGRAMS AND THE INCENTIVE COMPENSATION BAN**

3            Title IV of the Higher Education Act ("HEA") provides substantial financial aid

4    resources for eligible students of eligible institutions.  *See generally* 20 U.S.C. §§ 1070, *et seq.*

5    (1965).  At issue here are student loan and grant programs through which the Federal

6    Government provided funds to AAU to pay for students' education expenses.  *Id.*  In order to

7    receive these funds, an educational institution such as AAU must enter into a Program

8    Participation Agreement ("PPA") with the DOE in which it agrees to comply with various

9    statutory, regulatory, and contractual requirements.  *See* 20 U.S.C. § 1094 (a); 34 C.F.R. §

10   668.14 (a)(1) (2011).  The critical requirement here is commonly referred to as the "Incentive

11   Compensation Ban."

12           The Incentive Compensation Ban prohibits schools from "provid[ing] any commission,

13   bonus, or other incentive payment based directly or indirectly on success in securing enrollments

14   … to any persons or entities engaged in any student recruiting or admission activities …."  20

15   U.S.C. § 1094(a)(20).  This ban was added in 1992 during the reauthorization of HEA.  Congress

16   was especially concerned with for-profit schools recruiting unqualified students who became a

17   drain on the federal student aid program.  *See* 138 Cong. Rec. H1736-01 (1992), 1992 WL

18   57307.

19           That concern arose from a 1991 report detailing the various abuses stemming from for-

20   profit schools.  S. R.No. 102-58 (1991), 1991 WL 153999.  The report found that "[o]ne of the

21   most widely abused areas . . . lies in admissions and recruitment practices."  *Id.* at *12.  Students

22   are "improperly screened" and "usually drop out, often after having incurred student loan debts

23   they have no means to repay."  *Id.* at *13.  To illustrate this point, the report cited a former

24   school owner who stated, "My approach . . . was that 'if [a prospect] could breathe, scribble his

25   name, had a drivers [sic] license, and was over 18 years of age,' he was qualified . . . ."  *Id.* at

26   *12.  The Senate Report found that the incentive to enroll students irrespective of whether they

27   would graduate is inherent in for-profit schools.  "There is no way to escape being a slave to the

28   quarterly report.  Quality education and higher earnings are two masters. You can't serve both."

KERR
—— & ——
W A G S T A F F E
LLP

*Id.* at *8 (staff members quoting a for-profit school president).

The Incentive Compensation Ban is thus designed to prohibit schools from incentivizing recruiters or other admissions personnel from "sign[ing] up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans."  *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005); *see United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1169 (9th Cir. 2006) (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of student[s] for a given period" and that the "new provisions include prohibiting the use of commissioned sales persons and recruiters").

The ban prohibits payment "based **directly *or* indirectly** on success in securing enrollments." 20 U.S.C. § 1094(a)(20) (emphasis added).  In 2003, the DOE enacted a regulation containing "safe harbor provisions" intending to clarify what did, and did not, qualify as an *indirect* payment.  Institutional Eligibility, 67 Fed. Reg. 51718-01, *51723 (Aug. 8, 2008).  As relevant here, Safe Harbor A provided an allowance for compensation adjustments that are not based solely on the number of students admitted:

> Activities and arrangements that an institution may carry out … include, but are not limited to: (A) The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, *as long as* that compensation is not adjusted up or down more than twice during any twelve month period, and ***any adjustment*** is ***not based solely*** on the number of students recruited, admitted, enrolled, or awarded financial aid. …

34 C.F.R. § 668.14(b)(22)(ii)(A).  The DOE recognized that Safe Harbor A "recognizes the balance between the need of an institution to base its employees' salaries or wages on merit, and concern that such adjustments do not make the statutory prohibition against the payment of commissions, bonuses and other incentive payments meaningless."   Institutional Eligibility, 67 Fed. Reg. 51718-01, *51723 (Aug. 8, 2002).

Perhaps unsurprisingly, many schools (like AAU here) treated Safe Harbor A as a way of circumventing the Incentive Compensation Ban by pretending to consider nebulous "qualitative" factors as well as enrollments.  As the DOE has since concluded, "safe harbors . . . led to inappropriate incentive compensation practices by institutions that are prohibited by HEA."

Program Integrity Issues, 75 Fed. Reg. 34806-01, *34818 (June 18, 2010).  The DOE described some of those illegal practices:

> For example, it has been the Department's experience that many institutions routinely use employee evaluation forms that acknowledge that the number of students enrolled is an important, if not the most important, variable, in determining recruiter compensation. These forms also list certain qualitative factors that are ostensibly considered in making compensation decisions. ***The forms, on their face, appear to demonstrate compliance with the first safe harbor, which permits compensation schemes that are not "solely" based on the number enrolled. However, the Department has been repeatedly advised by institutional employees that these other qualitative factors are not really considered when compensation decisions are made, and that they are identified only to create the appearance of title IV compliance.*** It is clear from this information that institutions are making actual compensation decisions based exclusively on the numbers of students enrolled.

Program Integrity Issues, 75 Fed. Reg. 66832-01, *66872-73 (Oct. 29, 2010) (emphasis added).

To combat these abuses, the Ninth Circuit has emphasized that Safe Harbor A must be read consistently with the purpose of the Incentive Compensation Ban.  For example, in *United States v. Corinthian Colls.*, 655 F.3d 984 (9th Cir. 2011), the Court clarified that "sham" qualitative considerations violate the HEA, even if facially intended to fit in the Safe Harbor:

> If, for example, recruiter performance ratings are awarded on the basis of the number of students that a recruiter enrolls, then this rating system would not in fact provide an *additional* basis on which compensation decisions are made. Under such a system, Corinthian would, in essence, make adjustments to recruiter salaries based "solely" on the number of students enrolled by that recruiter. Interpreting the Safe Harbor Provision so that it covers such a system would directly undermine the HEA express prohibition on "incentive payment based directly or indirectly on success in securing enrollments," *see* 20 U.S.C. § 1094(a)(20).

*Id.* at 994.  The Ninth Circuit added that – even under Safe Harbor A – it would be an "absurd result" to allow a compensation system that considered only the "basic performance requirements that are expected of any employee (such as showing on time)" when making purported compensation increases.  *Id.*  Thus, the Ninth Circuit stated:

> Under such a system, educational institutions could entirely circumvent the HEA incentive compensation ban by simply formalizing, through a performance rating system, the basic requirements expected of *any* employee, that is, the requirements of employment itself.  Allowing the Safe Harbor Provision to shield such a program from HEA's recruiter compensation requirements would render meaningless the "purpose or

1    objective" of the statute.

2  *Id.* at 994 (citing *Owner–Operator Indep. Drivers Ass'n,* 632 F.3d 1111, 1115 (2011)).

3    As a result of these and other widespread abuses, the DOE repealed the Safe Harbor

4  Provisions in 2010, effective July 1, 2011, "to ensure that section 487(a)(20) of the HEA is

5  properly applied."  Program Integrity Issues, 75 Fed. Reg. at *34818.

6    **B.    ACADEMY OF ART UNIVERSITY ("AAU") AND THE RELATORS**

7    AAU is a privately owned, for-profit art school in San Francisco.  AAU is an "open

8  enrollment" school, which means AAU has no admission standards whatsoever so long as an

9  applicant graduated high school.  Declaration of Kenneth P. Nabity Ex. ("Rel. Ex.") 90 (Chan),

10  at 23:19-24:12; 138:6-16; Rel. Ex. 78 (Nelson), at 187:10-21; Rel. Ex. 92 (Lam), at 45:13-19.

11  The school is owned and operated by the Stephens Institute, a private corporation with a single

12  shareholder: Elisa Stephens.  Rel. Ex. 76 (Stephens), at 39:24-41:2.  Stephens closely manages

13  every detail of the day-to-day operation of AAU – she personally approves all hiring, firing,

14  promotions, demotions, and all compensation changes.  *Id.*, at 80:1-16, 112:1-115:16.  Despite

15  her detailed control over compensation, AAU's motion curiously makes no mention of Ms.

16  Stephens and provides no evidence from her.

17    Student tuition is the primary source of revenue for AAU.  Rel. Ex. 83 (Weeck), at 12:22-

18  13:4; Rel. Ex. 89 (Del Rico), at 72:3-19; Rel. Ex. 82 (Bergholt), at 106:1-17; Rel. Ex. 92 (Lam),

19  at 87:3-6.  A large portion of that tuition is federally subsidized.  AAU MSJ at 1; Rel. Ex. 81

20  (Vollaro), at 41:25-43:19.  In order to receive those funds, AAU was required to and did enter

21  multiple PPAs with the DOE.  AAU MSJ Exs. 1-3.  In the PPAs, AAU specifically promises it

22  "will not provide, nor contract with any entity that provides, any commission, bonus, or other

23  incentive payment based directly or indirectly on success in securing enrollments or financial aid

24  to any persons or entities engaged in any student recruiting or admission activities…."  *Id.*

25    During the relevant time period, AAU sought to dramatically expand enrollment to

26  increase its bottom line.  In December 2005, Stephens asked AAU's EVP of Marketing Rachel

27  Lee, to propose solutions "[t]o take Recruitment to the next level."  Rel. Ex. 1.  Lee wrote that

28  AAU must find a strong leader who was "goal-driven, results-oriented, and Experienced in the

1    fields of Sales and business," and needed a "new breed of Recruiters" with the ability to "close

2    the sales off site," and who "understand Sales and know the basic 101 Sales technique."  *Id.*

3         To that end, AAU's Admissions Department operated in a high-pressure "sales" and

4    "boiler room" environment.  AAU hired admissions representatives with sales backgrounds,

5    utilized sales-based computer software (SalesForce) to manage "leads" and provided other

6    incentives to Representatives to maximize enrollments.  Rel. Ex. 82 (Bergholt), at 55:3-18; Rel.

7    Ex. 91 (Forman), at 78:4-22; Rel. Ex. 77 (Rose), at 12:15-25, 14:17-15:3, 18:4-15; Rel. Ex. 79

8    (Aquino), at 68:11-69:16; Rel. Ex. 80 (Stearns), at 40:16-41:13, 68:7-20, 148:5-17, 221:23-

9    222:2.  AAU admissions personnel used traditional sales lingo – referring to potential students as

10   "targets," "leads," and organizing recruiters into "hunt groups."  Rel. Ex. 85 (Meurer), at 18:6-

11   24, 115:6-117:2; Rel. Ex. 93 (Adsuar), at 44:17-45:23; Rel. Ex. 89 (Del Rico), at 50:14-17; Rel.

12   Ex. 87 (Bell), at 74:24-75:6, 75:24-76:10, 142:17-143:1, 143:25-144:8, 178:16-179:7; Rel. Ex.

13   92 (Lam), at 47:18-22; Rel. Ex. 88 (Lee), at 148:16-150:11; Rel. Ex. 91 (Forman), at 76:11-

14   78:22; Rel. Ex. 77 (Rose), at 78:9-79:2; Rel. Ex. 79 (Aquino), at 66:24-67:4; Rel. Ex. 82

15   (Bergholt), at 55:3-18.  AAU assigned individual specific enrollment quotas or "goals" to each

16   representative and consistently reminded them how they were doing to meet their goal.  Rel. Ex.

17   85 (Meurer), at 115:6-117:2; Rel. Ex. 91 (Forman), at 68:15-70:22, 120:4-13; Rel. Ex. 83

18   (Weeck), at 60:18-20, 88:17-25; Rel. Ex. 86 (Santelices), 25:16-27:11; Rel. Ex. 76 (Stephens), at

19   82:9-14; Rel. Ex. 77 (Rose), at 48:14-49:7, 181:9-183:9; Rel. Ex. 79 (Aquino), at 68:11-69:16;

20   Rel. Ex. 90 (Chan), at 31:23-34:5; Rel. Ex. 82 (Bergholt), at 57:8-59:19, 105:14-106:13; Rel. Ex.

21   89 (Del Rico), at 50:6-8, 62:15-22, 72:3-19; Rel. Ex. 92 (Lam), at 86:13-87:6; Rel. Ex. 88 (Lee),

22   at 99:2-25, 129:15-130:23.

23        While many defense witnesses were clearly coached to describe the admissions process

24   as being about "helping someone's dream become a reality" and "expanding opportunity," the

25   admissions representative job description frankly states that "The primary responsibility of the

26   Admissions Representative is to enroll and register students on a consistent basis.  The goal of

27   the Admissions Representative is to register as many students [sic] who have applied."  AAU

28   Exs. 18-21; *see also* Rel. Ex. 2.  Once this dispute arose, AAU began sanitizing this language,

1    but as late as June 2012, Human Resources Recruiter Tiwah Griffith emailed recruiters of

2    admissions representatives and told them that when asked whether the position was a "sales job,"

3    they should state, "Ultimately, we're a for-profit school and the role of the Admissions Rep is to

4    recruit and enroll students."  Rel. Ex. 3.

5         All four of the Relators worked as admissions representatives and Senior Representatives

6    in AAU's Undergraduate Admissions Department.  Relator Scott Rose worked as an admissions

7    representative at AAU from March 2006 to January 2010.  AAU Ex. 19; Rel. Ex. 77 (Rose), at

8    24:23-24, 99:15-16.  Relator Mitchell Nelson worked as an admissions representative at AAU

9    from October 2003 to January 2010.  AAU Ex. 18; Rel. Ex. 78 (Nelson), at 21:1-15, 76:10-11.

10   Relator Mary Aquino worked as an admissions representative at AAU from July 2006 to

11   September 2010.  AAU Ex. 21; Rel. Ex. 79 (Aquino), at 76:11-14, 130:2-5.  Relator Lucy

12   Stearns worked as an admissions representative at AAU from November 2006 to January 2010.

13   AAU Ex. 20; Rel. Ex. 80 (Stearns), at 42:23-25, 50:19-23.

14        **C.    AAU'S UNLAWFUL 2006-2008 COMPENSATION PRACTICES**

15        In approximately April of 2006, although she "had no background at all in admissions"

16   and "didn't have any working knowledge at all of the actual department," AAU placed Joan

17   Bergholt in charge of admissions.  Rel. Ex. 82 (Bergholt), at 34:12-22, 184:2-18.  Bergholt's job

18   was to motivate representatives to enroll more students – and she made it immediately clear that

19   cash would be the motivation.  Rel. Ex. 77 (Rose), at 18:4-15.

20        Although Bergholt now denies it, she expressly told admissions representatives that they

21   would be paid an additional $30,000 if they hit their enrollment goal.  Rel. Ex. 78 (Nelson), at

22   43:14-46:1; Rel. Ex. 16.  Admissions representatives could earn smaller increases on "different

23   plateaus" based on how many enrollments they made toward their individual enrollment goal.

24   Rel. Ex. 77 (Rose), at 32:19-33:24.  Admissions representatives were "salivating" at the $30,000

25   number.  *Id.*  Additionally, admissions teams (*i.e,.* undergraduate, online, graduate admissions,

26   etc.) would receive a vacation if that team met their team enrollment goals.  Rel. Ex. 61.

27        To disguise AAU's blatantly unlawful incentive program, AAU internal documents

28   characterized the unlawful incentive bonuses as "salary adjustments" based on the "totality of

1    performance," and called a trip to Hawaii an "off-site strategic planning session." Rel. Ex. 4;

2    Rel. Ex. 77 (Rose) at 16:18-17:1; Rel. Ex. 78 (Nelson) at 33:23-33:2. These paper policies were

3    a sham and fraud calculated to appear to comply with the safe harbor rules but, in reality, plainly

4    violated it. AAU's actual compensation activity clearly proves that admissions representatives

5    were paid for reaching their goals, just as Bergholt said they would be.

6               **1.    AAU "Backed Into" Performance Evaluations To Match**
              **Predetermined "Salary Adjustments" Based Solely On Enrollment**
7               **Numbers, Or Ignored Performance Evaluations Entirely**

8               AAU's purported "totality of performance" analysis was crafted solely to make it seem as

9    though its practices were in conformity with the "safe harbor" regulations – precisely the type of

10   deceptive abuse the DOE later found was rampant in the for-profit school industry. In reality,

11   AAU determined "adjustments" based on enrollment goal performance, and then reverse

12   engineered the "qualitative" scores to match, or ignored the qualitative scores entirely.

13              For admissions representatives who received compensation in Fall 2006, for example,

14   Director of Admissions John Meurer wrote his performance reviews to match the enrollment-

15   goal based compensation <u>after</u> that increase had already been determined.

| Admissions Representative | Number of Enrollments | Nov. 2, 2006: Increase | Nov. 8, 2006: Performance Review |
|---|---|---|---|
| Rick Pomfret | 202 | $30,000 | 105 |
| Mitchell Nelson | 158 | $30,000 | 100 |
| Cathy Nguyen | 150 | $30,000 | 98 |
| Scott Rose | 92 | $15,000 | 88 |
| Melissa Reinhold | 60 | $10,000 | 82 |
| Lucas Miller | 20 | $5,000 | 74 |

22   Rel. Exs. 5, 6, 7, 8, 9, 10, 11, 12. These November 2006 performance reviews were a complete

23   sham, created <u>after</u> raises were decided based <u>solely</u> on enrollments in order to defraud the

24   Government. There is no other way to explain how perfectly the November 8, 2006 reviews

25   track the raises determined on November 2, 2006. Indeed, Meurer spent less than <u>two hours</u>

26   filling out the November reviews for <u>fourteen</u> employees <u>after</u> the compensation amounts had

27   been determined. Rel. Exs. 5, 6, 13 (sent 11/8/2006 at 11:35 a.m.), 14 (sent 11/8/2006 at 1:15

28   p.m.), 15 (sent 11/8/2006 at 3:06 p.m.).

KERR
&
WAGSTAFFE
LLP

Meurer admits that salary adjustment recommendations were based on the quantitative data *prior to completion of the performance evaluations*. Rel. Ex. 85 (Meurer), at 161:8-162:8. Indeed, the first document produced when determining adjustments was a spreadsheet that *only* included the date of hire, current salary, enrollment goals, actual enrollments, and proposed salary adjustments. *Id.*; Rel. Ex. 5, 6.

In an even more brazen example from Fall 2006, Online Admissions Manager Jonathan Ward provided proposed salary changes to Bergholt, explaining a $20,000 adjustment for two representatives by noting, "I figure we could state that's 2/3 of what was promised to someone who made their goal, and they made their grad goal, but not undergrad." Rel. Ex. 16 (emphasis added). Ward's statement confirms the Relators' testimony that Bergholt promised admissions representatives who hit their goal a $30,000 increase. Rel. Ex. 80 (Stearns), at 40:16-41:13, 68:7-20, 147:12-17; Rel. Ex. 87 (Bell), at 24:9-25; Rel. Ex. 77 (Rose), at 33:1-14, 53:10-15; Rel. Ex. 78 (Nelson), at 43:14-46:1.

Although these are plainly bonuses, AAU further disguised them by calling them "salary adjustments" and paying them over time. On November 13, 2006, Bergholt clarified that "the amount that has been approved is to be paid over 6 months; you cannot add just that amount to the base because they would only get half of that in 6 months….." Rel. Ex. 17; Rel. Ex. 79 (Aquino) at 122:11-123:3.

Similarly in Spring 2007, Bergholt asked the Admissions Managers to prepare the written Performance Reviews, but instructed, "Remember that the totality rating needs to be consistent with the salary increases or decreases." Rel. Ex. 18 (emphasis added). Bergholt insisted at deposition that the rating was already done, but the increases were yet to be determined. Rel. Ex. 82 (Bergholt), at 158:24-161:14. Bergholt's testimony is not credible. The salary adjustments were determined based on enrollment goal results over two weeks before Bergholt asked the managers to prepare the performance reviews. Rel. Exs. 19, 20 (tellingly, Meurer's email subject line was "Salary adjustments for Spr 07 enrollments"). Indeed, Stephens had already approved the final adjustments based solely on enrollments when Bergholt sent the email to create qualitative support for adjustments. Rel. Ex. 19.

Fall 2007 was more of the same.  Stephens approved all compensation adjustments – which included raises and decreases – on December 11, 2007 solely based on enrollment statistics.  Rel. Ex. 40.  After the raises/bonuses were determined, Director of Undergraduate Domestic On-Site Admissions Marie Santelices sent written Performance Reviews for Bergholt's review on December 12, 2007.  Rel. Ex. 23.  Bergholt responded, "we need to bring these ratings up, especially for the people who are getting good raises.  There is not enough of a disparity between your best people and your bottom folks." *Id.* (emphasis added).

The admissions representatives' pay bears out these facts.  Cathy Nguyen, Rick Pomfret, and Mitch Nelson met their Fall 2006 goal of 140 enrollments and received a $30,000 "adjustment."  Rel. Exs. 6, 24, 25, 26.  In Spring 2007, Nguyen only enrolled 45 towards her goal of 65, and was cut $10,000.  Rel. Exs. 19, 27.  Nelson hit his goal, maintaining the earlier adjustment (which was at the annual $30,000 maximum already).  *Id.*  Richard Pomfret missed his Spring 2007 goal, recruiting only 51 of 60 students, and got a $15,000 paycut.  *Id.*  Scott Rose recruited 61 of 60 students, and got a $15,000 bump on top of the $15,000 he received for Fall 2006 (total of $30,000 for the year as promised).  *Id.*

These payments are totally independent of the purported qualitative scores.  Nguyen and Pomfret had the same qualitative scores for both Fall 2006 and Spring 2007, yet each saw a raise in Fall 2006 when they surpassed 140 enrollments and a reduction in Spring 2007 when they failed to meet their goal.[1]  *Id.*; *compare* Rel. Ex. 28, *with* Rel. Ex. 29; *compare* Rel. Ex. 30, with Rel. Ex. 31.  In Spring 2007, Pomfret had a *higher* qualitative score than Rose, yet Pomfret's compensation was *decreased* by $15,000, while Rose received a $15,000 *increase*.  Rel. Exs. 19, 27; *compare* Rel. Ex. 32, *with* Rel. Ex. 31.  Again, Pomfret missed his goal, while Rose hit the goal.  *Id.*

Aware of the sham nature of these "qualitative" reviews, AAU did not provide them to

---

[1]    In Fall 2007, Pomfret hit the goal, and received a $15,000 increase.  Rel. Ex. 73.  Over those three reviews, Pomfret received $30,000 (met goal for Fall 2006), -$15,000 (missed goal for Spring 2007), and $15,000 (met goal for Fall 2007).  Rel. Exs. 19, 27, 73.



representatives and, indeed, hid them. Reviewers were instructed that admissions representatives could not receive copies of their evaluations as a matter of "policy." Rel. Ex. 33. Discussions of any raises were to be communicated verbally. Rel. Exs. 34, 17. Admissions representatives neither saw the evaluations, nor was any "qualitative" information discussed during the purported "reviews." *Id.*; Rel. Ex. 77 (Rose), at 104:12-16, 104:24-105:6, 132:6-133:16.

The Relators each watched their compensation fluctuate with the number of enrollments secured. Scott Rose began receiving the maximum possible yearly increases for hitting his enrollment goals from the start – $15,000 for Fall 2006; $15,000 for Spring 2007; and $15,000 for Fall 2007. Rel. Exs. 35-37. After only three semesters, Rose had doubled his salary from $45,000 to $90,000. *Id.*; Ex. 38; Rel. Ex. 77 (Rose), at 13:13-17.

During that time, Rose's "qualitative" performance was "terrible" – he arrived late, left early, called in sick when he was not sick, and took long lunches. Rel. Ex. 39; Rel. Ex. 77 (Rose), at 54:22-55:11; Rel. Ex. 88 (Lee), at 145:1-146:3. But his poor attitude and attendance never interrupted his increases. Indeed, Rose was told more than once that as long as he was hitting his goals, he could do whatever he wanted. Rel. Ex. 77 (Rose), at 76:5-77:18.

The other Relators experienced similar raises or cuts based solely on their enrollment results. For Fall 2006, Relator Nelson was one of three Representatives to receive a $30,000 increase, and, not surprisingly, each of those three Representatives also enrolled over 140 students. Rel. Exs. 5, 6, 25. When Nelson hit his goals again in Fall 2007, he received an additional $25,000. Rel. Ex. 40. During those *three* semesters, Nelson's salary spiked from $54,000 to $109,000. Rel. Exs. 5, 6, 25, 40. Despite this huge increase, Nelson's managers testified he "wasn't a team player" and did not engage with students. Rel. Ex. 86 (Santelices), at 39:14-40:19; Rel. Ex. 88 (Lee), at 148:16-150:19.

Relator Aquino received her first reviews in Spring and Fall 2007, when she received a total of $30,000 for hitting her enrollment goals. Rel. Exs. 19, 27, 73. Aquino was unable to hit her goals again, and her pay was cut. Rel. Ex. 79 (Aquino), at 87:3-19. AAU forced Aquino to enter an "Overpayment Adjustment Form," whereby AAU would not only reduce her regular compensation by $18,200, but also *deduct* hundreds of dollars from her future paychecks in order

KERR
&
WAGSTAFFE
LLP

1   to *retroactively apply* the reduction.  Rel. Exs. 41, 42.

2        When Lucy Stearns joined AAU, she was concerned that the compensation would not

3   equal what she had been making in her prior sales job.  During her interview, Meurer assured her

4   that if she hit her numbers, she would receive increases in line with what she was making on

5   commissions at her prior job.  Rel. Ex. 80 (Stearns), at 40:16-41:13; 68:7-20.  Stearns understood

6   that the "salary adjustments" were "commissions."  *Id.*  And when Stearns missed her goal by

7   two enrollments for Fall 2007, she received $25,000 instead of $30,000.  Rel. Ex. 40.

8        This is not just the Relators' impressions of the reasons for their pay.  Former AAU

9   Managers Joan Stiverson-Smith and Julie Bell both provided declarations testifying that in their

10  experience, AAU measured the compensation of its admissions representatives solely based upon

11  the number of students they enrolled at AAU.  Rel. Exs. 43; 44.  The qualitative criteria,

12  however, were "cosmetic and superficial in nature" and were "backed into" in order to create the

13  appearance of consistency with Safe Harbor A.  *Id.*  Neither Stiverson-Smith nor Bell are

14  Relators in the case, and they have no financial or other interest in its outcome.

15            **2.      The Sham Performance Reviews Continued For Summer/Fall 2008**

16        On October 17, 2008, Bergholt and Stiverson-Smith prepared a memo summarizing

17  salary recommendations for the admissions representatives for Summer and Fall 2008.  AAU Ex.

18  44.  The 2008 numbers show that only a few Representatives hit their enrollment goals, and

19  overall goals were missed entirely.  *Id.*; Rel. Ex. 38.  The Relators received recommended

20  "adjustments" directly tied to their enrollment numbers.  Rose, Stearns, and Nelson would

21  receive the highest recommendations for salary increases for Undergraduate admissions

22  representatives, after enrolling the highest number of students.  *Id.*  Aquino was scheduled to

23  receive a *reduction* in pay of $10,000, after enrolling only 57% of her goal.[2]  *Id.*

24

25

---

26  [2]      This False Claims Act case is unique because not only were enrollment advisors
rewarded with increased compensation for achieving or exceeding pre-set enrollment goals, but

27  AAU's enrollment advisors had their compensation substantially *reduced* if they failed to
achieve the same pre-set enrollment goals, including paycheck deductions for retroactive

28  application of those compensation decreases.  See, further discussion, *infra*.

| Joan Stiverson-Smith and Joan Bergholt Recommendations for Fall 2008 | | | | |
|---|---|---|---|---|
| Individual Rep | Enrollment Goal | Total Enrolled | Percentage of Goal | Recommended Adjustment |
| Rose | 200 | 224 | 112% | $25,000 |
| Nelson | 200 | 193 | 97% | $18,000 |
| Stearns | 200 | 193 | 97% | $18,000 |
| Aquino | 200 | 113 | 57% | -$10,000 |

*Id.*

Consistent with this methodology, the only two Graduate On-Site admissions representatives to exceed their goals – Rick Boucher and Dee Okoronkwo – were each recommended to receive a $30,000 "increase." *Id.*

Prior to the reviews and adjustments, Rachel Lee was appointed Chief Operating Officer of Marketing and Admissions and replaced Stiverson-Smith and Bergholt. Rel. Ex. 88 (Lee), at 63:3-6. One of the first things Lee did was to talk with prior leadership in the Admissions Department about the representatives and review their files. *Id.* at 136:24-137:12. Lee testified that the prior leadership and managers told her that Scott Rose and Mitch Nelson were bad representatives. She learned that each was "not reliable," constantly truant from work, could not be trusted, and were not team players. *Id.* at 145:1-146:3, 148:16-150:19; Rel. Ex. 91 (Forman), at 64:6-65:22. Lee told Craig Forman that she believed Scott Rose had a drinking problem. Rel. Ex. 91 (Forman), at 64:6-65:22. Lee even indicated she might have fired them but for her belief that they could be given "individual opportunity with the new system that [she] put in place and more structure. . . ." Rel. Ex. 88 (Lee), at 150:12-19. Yet, according to the salary adjustments Bergholt recommended and AAU gave to Rose and Nelson during that time period, each consistently received the <u>highest</u> level of adjustments among undergraduate admissions representatives. Rel. Exs. 38; 45. AAU's payment of maximum raises to these two individuals who had high sales results but were otherwise considered terrible employees brings into stark relief the sham nature of any claim that "qualitative" factors determined compensation.

Lee dramatically reduced the raises that had been promised in order to save money for AAU. Rel. Ex. 47. Her notes explaining her recommendations state that "Current staff salaries are not logical based on goals & hire dates." *Id.* At the bottom of her recommendations, she

KERR
&
WAGSTAFFE
LLP

1    totaled the "R. Lee Savings" at $215,005, noting that her recommendations would result in a

2    lower total payout by AAU and a lower "Salary Cost Per Enrollment." *Id.* When the reviews

3    originally scheduled for October 2008 were finally delivered in January 2009, there was

4    generally no discussion of performance – Lee merely informed each Representative of the salary

5    change. Rel. Ex. 78 (Nelson) at 233:5-23; Rel. Ex. 88 (Lee), at 119:13-25. She did, however,

6    tell Scott Rose that she knew about his alleged poor performance and that he needed to shape up.

7    Rel. Ex. 77 (Rose), at 55:15-56:1.

8        **D.      AAU'S UNLAWFUL 2009-2010 COMPENSATION PRACTICES**

9        Under Rachel Lee, and her new second-in-command, Veronica Del Rico, the former

10   incentive compensation system was replaced with new enrollment goals and a "scorecard"

11   system that included ***separate quantitative and qualitative adjustments***. Rel. Exs. 48; 49. This

12   new system was again a clear violation of the Incentive Compensation Ban.

13           **1.      Enrollment Quota Based on Salary**

14       The first major change Lee made was to assign enrollment quotas (goals) based solely on

15   how much money each Representative was making. Lee devised a "cost per enrollment" by

16   dividing the Representatives' salaries by that number to determine their goal. Rel. Exs. 47, 50.

17   Thus, a representative paid $50,000 had two-thirds the goal of one paid $75,000. These quotas

18   were set irrespective of each Representative's experience, skills, or any other factors. *Id.*

19   Because, the scorecard system required a *decrease* in salary for anyone who didn't meet their

20   goals, this new method of assigning goals forced representatives to meet disparate enrollment

21   quotas simply to maintain their current compensation. There is no functional difference between

22   giving a raise for enrollments and cutting salary because of a lack of enrollments. Setting an

23   enrollment quota by calculating how many students "warrant" the current salary, with reductions

24   if the quota is not met, is a direct violation of the Incentive Compensation Ban.

25           **2.      The Scorecard**

26       AAU then devised a multi-part "scorecard" that provided four separate salary

27   adjustments. Rel. Exs. 48, 52, 53, 54, 49; Del Rico, Depo., at 78:19-24, 87:10-16; Rel. Ex. 88

28   (Lee), at 158:1-15. Two adjustments were based solely on students enrolled: "individual goal



1    met" and "team goal met."  *Id.*  The other two were based on managers' assignment of positive

2    or negative "qualitative" scores.  *Id.*

3          The scorecard indisputably provided specified increases or decreases in compensation

4    based <u>solely</u> on the individual and team enrollments against the enrollment goals, as AAU's own

5    employees admitted.  Rel. Ex. 81 (Vollaro) at 154:20-155:16; Rel. Ex. 88 (Lee) at 162:13-21;

6    Rel. Ex. 89 (Del Rico) at 84:7-17.  Although the incentive amounts changed, the structure

7    remained the same from 2009 through 2010.

8    | | Spring and Fall 2009 | Spring and Fall 2010 |
     |---|---|---|
     | Individual Goal Met | +/- $8,000 | +/- $8,000 |
     | 25% Over / Under Goal | +/- $12,000 | +/- $10,000 |
     | 50% Over / Under Goal | +/- $20,000 | +/- $15,000 |
     | Team Goal Met | +/- $3,000 | +/- $4,000 |

12   Rel. Exs. 48 at p. 17, 49.

13         The scorecard system produced absurd results.  For instance, if a Representative had an

14   enrollment goal of 40, but enrolled 39 students, that failure to meet the goal by a <u>single</u> student

15   would result in a $16,000 swing (*i.e.,* 39 enrollments meant an $8,000 quantitative *decrease*, but

16   40 enrollments meant an $8,000 quantitative increase).  Rel. Ex. 89 (Del Rico) 132:5-133:13.

17   That $16,000 swing would be based <u>solely</u> on <u>one</u> enrollment.  *Id.*

18         While Representatives could also get a separate increase or decrease based on the two

19   qualitative adjustments, those potential adjustments were always smaller than the enrollment

20   adjustments.  Rel. Exs. 48, 49, 54, 54.  Thus in 2009, the most that could be added or subtracted

21   based on "qualitative" factors was $6,000.  Rel. Exs. 48, 53.  By contrast, meeting or missing

22   individual and team goals could result in a $23,000 adjustment.  *Id.*

23         The scorecard system, which makes a *direct payment* for hitting enrollment goals in

24   violation of 20 U.S.C. § 1094, created concerns within AAU's management ranks.  Weeck asked

25   Stephens and Visslailli, "Has this been run by Joe are we ok with passing this out?  Since this

26   seems to be goal driven which is not what the Department of Ed is okay with."  Rel. Ex. 55.

27   John Meurer thought that "compliance was concerned" with the scorecard, which is why the

28   matrix was not allowed to be shared with reps and reviews were to be delivered verbally.  Rel.

1   Ex. 85 (Meurer), at 188:7-25.

2        During the Scorecard era, admissions representatives were also terminated solely based

3   on the inability to meet enrollment goals.  For example, when AAU sought to terminate graduate

4   admissions representative Danny Wong, the explanation was as follows:

5        -   Danny did not achieve his enrollment goals for the Fall 2009 and Spring, Summer
             and Fall 2010 semesters;

6        -   Despite six months of hands-on training from January through June of 2010, a
             performance improvement plan in June of 2010 and a written warning in September

7            of 2010, Danny remains unable to obtain the requisite number of enrollments.

8        -   Kathy Chuck and Cindy Cai support this termination.

9   Rel. Ex. 56 (emphasis added).

10        **3.        AAU Covers Up Its Scheme**

11        AAU went to great lengths to prevent distribution of the Scorecard because of clear

12   concerns regarding its legality.  For example, when Lee finalized the scorecard for Summer/Fall

13   2010, she sent it by email but instructed, "Can you print this out and hand deliver to Joe and

14   Lydia personally and delete the soft copy as well as tell them we ask them to trash the old one a

15   sap [sic].  Let me know when you hand deliver this to them on Tuesday."  Rel. Ex. 49.   Director

16   of Admissions Noreen Chan testified that a copy of the scorecard was not available on the shared

17   network file that only management could access, and that she was only shown the scorecard by

18   Lee and Del Rico, but was never allowed to possess or hold a copy.  Rel. Ex. 90 (Chan), at 99:9-

19   101:6.  Chan's predecessor, Craig Forman, also never received a copy, although he was shown a

20   copy in meetings.  Rel. Ex. 91 (Forman), at 128:19-25, 130:21-131:6.

21        Similarly, AAU refused to provide Relators with a copy of the scorecard.  Rel. Ex. 77

22   (Rose), at 43:10-44:11, 44:24-45:22.  In September 2010, Relator Aquino began to ask for a

23   written version of the scorecard, and sought to have that scorecard – which promised admissions

24   representatives compensation based on performance – incorporated as part of her written

25   employment contract.  Rel. Ex. 79 (Aquino), at 183:15-184:25.  Lee, Del Rico, and Chan refused

26   her requests and replied that the scorecard was "for management use only."  Rel. Ex. 57.  Behind

27   the scenes, Lee was forwarding Aquino's requests to head of compliance Joe Vollaro.  Rel. Ex.

28   58.  AAU terminated Aquino the following Monday, September 27, 2010.  Rel. Ex. 59.

1    Additionally, AAU manipulated language when providing information to the

2    Government.  In March 2009, Chris Vislalilli, Director of Human Resources, forwarded a

3    "position statement" to Martha Weeck and Joe Vollaro for comment.  Rel. Ex. 60.  Weeck

4    sought to cut language stating that an admissions representative "is expected to meet monthly

5    student recruitment and retention goals."  *Id.*  Vollaro added that it was good that the statement

6    "does not mention any salary increase or bonus," but that AAU "must be careful."  *Id.*

7    **E.    "HAWAII IS IN OUR SIGHTS" —AAU AWARDED REPRESENTATIVES ALL-**
     **EXPENSE PAID VACATIONS AND OTHER PRIZED SOLELY BASED ON MEETING**
8    **TEAM ENROLLMENT GOALS**

9    In addition to the raises/bonuses, admissions teams were given other, non-cash incentives

10   based solely on enrollments.  First, if a team (undergraduate, graduate, online, etc.) collectively

11   hit their team enrollment goal, that team would receive a trip.  On September 6, 2007, Bergholt

12   wrote to the Online Admissions team, "Hawaii is in our sights.  Remember we need summer and

13   fall combined with double regs at stick!!"  Rel. Ex. 61.

14   The Online Admissions team met their goal, and ultimately won the trip.  Bergholt

15   admitted at deposition that the trip to Hawaii was awarded to the team <u>solely based</u> on it

16   surpassing its enrollment goals.  Rel. Ex. 82 (Bergholt), at 164:9-19.

17   To make the trip seem legitimate, Bergholt claims that the trip was offsite "training."

18   Rel. Ex. 82 (Bergholt), at 165:19-24.  The absurdity of that testimony should be self-evident –

19   that only the <u>best-performing</u> team received additional training makes no sense.

20   Hawaii was not the only trip given as an incentive to admissions representatives.  Again

21   in Fall 2008, AAU awarded the Graduate Admissions group an all-expense paid vacation to New

22   York.  Rel. Exs. 62.  To make the award appear legal, Stephens instructed Joan Stiverson-Smith,

23   then working as Executive Vice President of Admissions (above Bergholt and directly reporting

24   to Stephens), to require that the Representatives attend the Metropolitan Museum of Art to make

25   it "look like they are getting training."  Rel. Ex. 84 (Stiverson-Smith), at 302:14-23.  In reality,

26   AAU admits that there was no such training.  Rel. Ex. 62.

27   Second, AAU held contests for Starbucks and Target gift cards based on applications and

28   enrollments secured.  Rel. Ex. 89 (Del Rico) at 68:15-69:12, 71:10-72:2; Rel. Ex. 63.  AAU's

KERR
&
WAGSTAFFE
LLP

17

1    employees admit that these incentives were based solely on recruitments and enrollments.  *Id.*

2    **F.    AAU ABANDONS AND ATTEMPTS TO COVER UP ITS UNLAWFUL SCHEMES**

3    In September 2010, AAU was served with an investigative subpoena from the

4    Department of Justice concerning this case.  Rel. Ex. 76 (Stephens), at 89:20-90:4.  On October

5    29, 2010 the DOE published final regulations repealing the "safe harbors" to become effective

6    July 1, 2011.  *See* 75 Fed. Reg. 66832-01; Program Integrity: Gainful Employment – New

7    Programs, 75 Fed. Reg. 66665-02 (Oct. 29, 2010).  Following these events, AAU abruptly

8    abandoned its scorecard approach in Fall 2010 and replaced it with an across-the-board 3%

9    salary increase.  Rel. Ex. 81 (Vollaro), at 168:25-170:14; Rel. Ex. 64.

10   Despite having been incentivized all year to enroll students based on the scorecard,

11   admissions representatives were told for the first time in their Fall 2010 reviews that AAU was

12   abandoning the enrollment goals they had worked towards.  Rel. Ex. 81 (Vollaro), at 173:8-21.

13   Although they would not be in effect until July 1, 2011, AAU claimed the reason for the change

14   was to anticipate the new regulations.  Vollaro testified each performance review lasted three to

15   five minutes.  Rel. Ex. 81 (Vollaro), at 212:18-22.

16   The Representatives were livid. Their expressions of confusion, anger, and frustration

17   that their enrollment numbers no longer determined their raises dramatically prove the scorecard

18   scheme (and its predecessor plan) paid people for solely for making enrollments. For example,

19   -   Del Rico summarized a meeting with Undergraduate admissions
20       representative Justin David.  Del Rico notes that David "wanted actual points
         along with feedback in writing," but Del Rico "communicated that this would
21       not be provided."  David added that "given prior meetings and conversations
         with his managers, he was under an entirely different impression as to what he
22       needed to do in order to earn additional compensation."  Rel. Ex. 65.

23   -   Del Rico summarized a meeting with Undergraduate admissions
24       representative Deanna King.  Del Rico said that King was feeling "upset,
         frustrated, and lied to" about compensation expectations.  *Id.*

25   -   On March 14, 2011, Online admissions representative Bree Maxwell resigned
26       via email, noting: "Before I accepted the job with AAU, I was told that I
         would be paid a base salary with performance bonus at the end of the Spring
27       and Fall semesters.  The performance bonus was a critical component was to
         why I took the job with AAU. . . Given that the change in bonus wasn't
28       communicated until 12 weeks into the fall semester 2010, all of the work prior

1        to this should have been on the old bonus structure and any work following
this time period should have been under the new bonus."  Rel. Ex. 66.

2

3        AAU also changed its terminology from the sales-focused perspective it had used for

4  years.  On January 31, 2011, Noreen Chan interviewed two admissions representatives for

5  manager positions.  In an email, Chan notes that one interviewee stated "Hit those numbers!"

6  Chan notes, "Due to federal regulations, we want to <u>move away from</u> seeing students as

7  'numbers.'"  Rel. Ex. 67.

8        Even into 2012, Chan summarized a conversation with admissions representative Kelly

9  Imamura where Chan had to emphasize that, "She will not be compensated based on the number

10  of enrollments she committed to, nor the number she enrolls for Spring or any semester."  Chan

11  reflects that Imamura "was just taken aback <u>because the message seemed so different than what</u>

12  <u>she has been exposed to since starting this role</u>."  Rel. Ex. 68 (emphasis added).

13        The concerns were so serious that AAU began literally and digitally scrubbing evidence

14  of its historical focus on enrollment goals.  In March 2011, Noreen Chan summarized an "Urgent

15  Denver Matter" after travelling to visit AAU's office there.  Chan complains that Denver still has

16  two white boards displaying applications and registrations from admissions representatives.

17  Chan notes that she spoke with Joe Fernandez, then Admissions Manager in the Denver office,

18  and that Fernandez "mentioned he did not understand the change and how to manage

19  Representatives without using the quantitative metrics."  According to Chan, this had been going

20  on for "almost six months."  Rel. Ex. 69.

21        Additionally, on June 28, 2011, Rachel Lee emailed Noreen Chan looking for

22  documentation regarding the Fall 2010 registration goals.  Noreen Chan emailed Rachel Lee and

23  acknowledged: "<u>I just deleted all those docs</u>. found [sic] them in mgmt. file and deleted them."

24  (el. Ex. 70 (emphasis added).  When Lee followed up, Chan added, "<u>Saw REP GOALS and I</u>

25  <u>was trying to protect us</u>.  Sorry."  *Id.* (emphasis added).  Chan weakly asserted at deposition that

26  she did not know what this email meant and that she did not even know to whom the word "us"

27  refers.  Rel. Ex. 90 (Chan), at 85:16-88:9.

28

1

2

### G.   AAU's ADMISSIONS PRACTICES RESULT IN VERY LOW RETENTION AND GRADUATION RATES

3        AAU's focus on filling seats and high-pressure admissions practices has resulted in

4   highly unsatisfactory student retention and graduation statistics.  AAU's incentive compensation

5   program caused admissions representatives to enroll obviously unqualified students.  Rel. Ex. 77

6   (Rose) at 111:1-112:3.  It is not surprising then, that of all first-time, full-time freshman who

7   enrolled in 2007 in the Bachelor of Fine Arts, Associate of Arts, or Certificate programs, only

8   32% completed the program within six years, and only 36% completed the program within seven

9   years.  Rel. Ex. 71; Rel. Ex. 76 (Stephens) at 135:6-25.  AAU's tragic record further resulted in a

10  determination that AAU's retention and graduation numbers were "not within acceptable ranges"

11  for accreditation with the WASC Senior College and University Commission.  Rel. Ex. 72; Rel.

12  Ex. 76 (Stephens) at 130:3-23, 132:4-135:25.  This is exactly the misuse of federal student

13  financial aid that the Incentive Compensation Ban is intended to prevent.  *See United States ex*

14  *rel. Main*, 426 F.3d at 916 (ban designed to prevent "sign[ing] up poorly qualified students who

15  will derive little benefit from the subsidy and may be unable or unwilling to repay federally

16  guaranteed loans").

17  ## III.   ARGUMENT

18  ### A.   STANDARD ON SUMMARY JUDGMENT

19       To prevail on summary judgment, the moving party must establish that there is "no

20  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

21  law." .  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be

22  drawn in his favor."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty*

23  *Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  The Ninth Circuit, and other courts, "have long

24  recognized that summary judgment is singularly inappropriate where credibility is at issue."

25  *S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1054-55 (9th Cir. 2008) (quoting *SEC v. Koracorp*

26  *Indus., Inc.,* 575 F.2d 692, 699 (9th Cir. 1978)); *see also Mitchell v. City of Pittsburg*, No. C 09-

27  00794 SI, 2012 WL 3313178, at *11 (N.D. Cal. Aug. 13, 2012) ("Credibility determinations, the

28  weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

1   functions, not those of a judge ... ruling on a motion for summary judgment." (citation omitted)).

2       AAU's motion insists that somehow no trial is required because AAU's managers have

3   not admitted their misconduct and no one else has "personal knowledge" of what was in those

4   managers' heads.  Nonsense.  Relators may meet their burden of proof through circumstantial

5   evidence, which "is not only sufficient, but may also be more certain, satisfying and persuasive

6   than direct evidence."  *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1030 (9th Cir.

7   2006) (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)); Model Civ. Jury Instr. 9th

8   Cir. 1.9 (2007) ("The law makes no distinction between the weight to be given to either direct or

9   circumstantial evidence."); *United States v. Educ. Mgmt. LLC*, No. 2:07-CV-461, 2014 WL

10  1796686, at *2 (W.D. Pa. May 6, 2014) ("Direct evidence of this alleged fraud would be

11  possessed by a select number of top EDMC executives, but Plaintiffs are also entitled to an

12  opportunity to prove their case through circumstantial evidence.").

13      Moreover, personal knowledge "includes opinions and inferences grounded in

14  observations and experience."  *Great Am. Assur. Co. v. Liberty Surplus Ins. Corp.*, 669 F. Supp.

15  2d 1084, 1089 (N.D. Cal. 2009) (citation omitted); *see also Fonseca v. Sysco Food Servs. of

16  Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("personal knowledge requirement in Rule 56(e)

17  can be met by inference") (citation omitted).  Relators' evidence is plainly competent to show

18  what happened.  The inferences to be drawn from what happened are for the jury to make.[3]

19   **B.    EVIDENCE ESTABLISHES THAT THE RELATORS CAN PROVE ALL ELEMENTS OF
         THE FALSE CLAIMS ACT**

20

21      AAU's compensation practices for its admissions representatives continuously violated

22  the HEA's Incentive Compensation Ban.  As AAU agrees, the Relators must establish the

---

24  [3]     AAU contends in a footnote that the burden of proof for Relators is the clear and
25  convincing standard.  AAU MSJ at 6 n.4.  AAU's contention is 30 years stale: the 1986
    amendment to the False Claims Act expressly changed the burden from clear and convincing to
26  preponderance of the evidence.  31 U.S.C.A. § 3731(d); S. Rep. No. 99-345, *31 (1986),
    reprinted in 1986 U.S.C.C.A.N. 5266, 5296 (1986); *U.S. ex rel. Aflatooni v. Kitsap Physicians
27  Servs.*, 163 F.3d 516, 525 (9th Cir. 1999) ("The relator bears the burden of establishing . . . all
    other essential elements of his claim, by a preponderance of the evidence." (citation omitted)).

28

1  following four elements of False Claims Act claims: "(1) a false statement or fraudulent course

2  of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out

3  money or forfeit moneys due." *Hendow*, 461 F.3d at 1174.  The evidence set forth above

4  satisfies all of those elements.

5            **1.**      **AAU Made False Statements to the Government**

6        It cannot be disputed that AAU President Stephens certified through PPAs that AAU will

7  comply with the Incentive Compensation Ban.  *See*, *e.g.*, AAU Ex. 2 at D-AAU-3000097, D-

8  AAU-30000106.  The PPA states that its execution "is a prerequisite to the Institution's initial or

9  continued participation in any Title IV, HEA Program." *Id.*  In truth, as shown, *supra*, from the

10  fall semester in 2006 through the fall semester of 2010, AAU was violating the Incentive

11  Compensation Ban.  Accordingly, AAU made false statements to the Government both in its

12  PPAs and every time it made a request for Title IV funds during the period it was not in

13  compliance.

14        Although each request for Title IV loan and grant funds that AAU made did not contain

15  an express certification of compliance with the incentive ban, each request contained an implied

16  certification of continued compliance with the incentive ban.  In *Ebeid ex rel. U.S. v. Lungwitz*,

17  616 F.3d 993 (9th Cir. 2010), the Ninth Circuit expressly recognized a theory of implied

18  certification under the FCA.  *Id.* at 996.  As the Court explained:

19  
20          Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a
21          certification of compliance is not required in the process of submitting the claim.

22  *Id.* at 998.  Here, as required by the HEA and federal regulations, in order to become eligible to

23  make claims for and receive federal Title IV funds, AAU, though its PPAs "previously

24  undert[ook] to expressly comply" with the Incentive Compensation Ban, and that obligation was

25  implicated every time it submitted a request for payment.  As such, each of AAU's requests for

26  loan and grant funds from the federal Government was a false certification of compliance with the

27  Incentive Compensation Ban, and therefore a violation of the False Claims Act.

28

## 2. AAU's False Statements Were Made with Scienter

The False Claims Act imposes liability on parties that "*knowingly* present[], or cause[] to be presented, a false or fraudulent claim for payment…" or that "*knowingly* make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim…." 31 U.S.C. § 3729(a)(1)(A) – (B) (emphasis added).  The statue defines "knowingly" as follows:

> [T]he terms "knowing" and "knowingly" –
> (A) mean that a person, with respect to information –
> (i) has actual knowledge of the information;
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> (iii) acts in reckless disregard of the truth or falsity of the information; and
> (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1) (emphasis added).  In recent litigation involving alleged violations by Corinthian Colleges of the Incentive Compensation Ban, the Ninth Circuit held that the scienter requirement could be satisfied if:

> (1) Corinthian knew, or acted with reckless disregard of the fact, that its Compensation Program did not fall within the DOE Safe Harbor Provision when it certified to the United States government that it was compliant with the HEA; or, alternatively, (2) even if it believed that its written Compensation Program fell under the Safe Harbor Provision, it knew or acted with reckless disregard of the fact that, in reality, recruiter compensation decisions were made solely on the basis of recruitment numbers.

*Corinthian Colls.*, 655 F.3d at 997; *see also Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1054 (11th Cir. 2015) (plaintiff "argues that the relevant question is how Kaplan implemented its compensation policy, not the terms of its policy. And he is correct.").

AAU's motion fails to state – much less apply – the proper definition of scienter under the FCA.  AAU argues that Relators must establish an "intentional, palpable lie, made with knowledge of the falsity and with intent to deceive." (AAU MSJ at 7, 9, 12)  That is dead wrong.  As the Ninth Circuit explained nearly 15 years ago,

> While some of our cases may contain extraneous comments that might be read out of context to suggest that the FCA requires an intentional lie to trigger liability, . . . in order to be liable for an FCA violation, [defendant's] conduct need only qualify under one of the alternative statutory standards, such as "deliberate ignorance" or "reckless disregard".

1  *United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C.W. Roen Const. Co.*, 183

2  F.3d 1088, 1092-93 (9th Cir. 1999).  AAU's position has not been valid since 1986 when

3  Congress amended the FCA to "decrease[] the level of scienter required for a violation ...."

4  *United States ex rel. Shackelford v. Am. Mgmt., Inc.*, 484 F. Supp. 2d 669, 675 (E.D. Mich.

5  2007); *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d

6  114, 119, n. 2 (D.D.C. 2003); 31 U.S.C. § 3729(b)(1)(B).  That 1986 amendment was also

7  expanded to capture "ostrich-like" situations, whereby "corporate officers insulate themselves

8  from knowledge of false claims submitted by lower-level subordinates."  *United States v. Sci.*

9  *Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) (citing S.Rep. No. 99–345 at *7).

10      A jury could easily disbelieve AAU's protestations of innocence and find that AAU's

11  admitted knowledge of the Incentive Compensation Ban, deliberate attempts to camouflage its

12  violations of that ban, and generally secretive and furtive behavior all evidence actual knowledge

13  of wrongdoing.  Yet even if, as AAU claims, it subjectively believed its cursory efforts to

14  "consider" "other factors" (which did not change the math at all) were legally compliant, the jury

15  can find that AAU acted with deliberate ignorance or reckless disregard of the fact that any

16  salary adjustments were made solely on the basis of recruitment numbers.[4]

17      Any of these conclusions can be supported by the evidence discussed above.  During the

18  period from 2006 through Fall 2008, AAU made compensation adjustments based solely on

19  recruitment numbers and only <u>then</u> created qualitative reviews to support the quantitative

20  adjustments that had already been determined.  This intentional creation of sham qualitative

21  reports to obfuscate the reality of purely quantitative evidence is clear evidence of the requisite

22  knowledge of violation (indeed, of intentional deceit).  *See, e.g., Corinthian Colls.*, 655 F.3d at

23  994 (Safe Harbor A does not cover sham performance systems designed to circumvent Incentive

24  Compensation Ban).  Further, AAU's policy to not provide admissions representatives with

25

26  _____

[4]      The Declarations of Joe Vollaro, Rachel Lee, Joan Bergholt, and Chris Vislailli are
27  replete with impermissible hearsay, lack of foundation, speculation, legal conclusions, and lay
witness opinion.  Relators object to this improper material and seek leave to file a line-by-line
28  objection at or before the hearing.

1  written reviews, when AAU was purportedly relying on these same reviews to meet its Safe

2  Harbor obligations, is evidence of AAU's intentional scheme to defraud the Government.

3         From Spring 2009 through 2010, AAU's policy "as written" and "as implemented"

4  facially violated the Incentive Compensation Ban by containing a salary adjustment that was

5  based <u>solely</u> on recruitment numbers.  20 U.S.C. § 1094(a)(20) (an institution may not "provide

6  **<u>any</u>** . . . incentive payment based **<u>directly or indirectly</u>** on success in securing enrollments … to

7  any persons or entities engaged in any student recruiting or admission activities . . . .") (emphasis

8  added); *see also Corinthian Colls.*, 655 F.3d at 994 (regulation cannot "render meaningless the

9  'purpose or objective' of the statute") (citation omitted).  At deposition, Rachel Lee, the architect

10 of the scorecard compensation plan, confirmed it contains an adjustment <u>based solely on</u>

11 <u>recruitment results</u>.  Rel. Ex. 88 (Lee), at 162:3-21.  Lee's testimony and the plain facial

12 violation of the act make clear that AAU acted with knowledge or, at a minimum, in reckless

13 disregard of the fact that the scorecard compensation plan violated the Incentive Compensation

14 Ban, thus crossing the scienter threshold of the FCA.

15        AAU's knowledge of its violations is further supported by its numerous prohibitions of

16 dissemination—even internally—of any written records of its compensation practices, its refusal

17 to show admissions representatives the sham performance reviews during "reviews," its deletion

18 of documents "to protect" itself, and its sudden and disruptive abandonment of its results-based

19 compensation system immediately after it received an investigatory subpoena from the DOJ.

20        Relators have thus presented overwhelming evidence, far more than needed to create a

21 triable issue of material fact on scienter.

22              **3.      AAU's False Statements Were Material**

23        It cannot be disputed that AAU's statements of compliance were material to the

24 Government's decision to disperse federal Title IV funds to AAU.  Indeed, federal statute,

25 federal regulation, and the PPAs AAU entered into with the Government, all explicitly

26 conditioned Title IV funding on continued compliance with the Incentive Compensation Ban.

27 *See* 20 U.S.C. § 1094 (a); 34 C.F.R. § 668.14 (a)(1); *see also* AAU MSJ Exs. 1-3.  In *Hendow*,

28 the Ninth Circuit rejected the defendant's argument that the Incentive Compensation Ban is a

1   condition of participation rather than a condition of payment, and therefore materiality is not

2   met: "in this case, that is a distinction without a difference. In the context of Title IV and the

3   Higher Education Act, if we held that conditions of participation were not conditions of payment,

4   there would be no conditions of payment at all—and thus, an educational institution could flout

5   the law at will." *Hendow*, 461 F.3d at 1176.  Put simply, if AAU had not (falsely) certified

6   compliance with the Incentive Compensation Ban, it would not have been allowed to claim

7   federal Title IV loan and grant funds from the Government.  Materiality is satisfied here as a

8   matter of law.

9   <h3>4.      AAU's False Claims Caused the Government to Pay Out Money</h3>

10          It is not disputed that AAU's requests to the Government for Title IV funding caused the

11   Government to pay out money in the form of payments for grants and payments for loans.  AAU

12   MSJ 1 & Exs. 1-3.  (And, as discussed above, AAU's certification of compliance with the

13   Incentive Compensation Ban was a prerequisite to these payments.)

14          Joe Vollaro, AAU's Vice President of Financial Aid, testified at deposition regarding

15   how AAU requested Title IV loan and grant funds from the U.S. DOE.  25 times each

16   semester—or approximately twice per week—AAU submitted two separate requests for funds to

17   the Government through a website, one request for grant funds and one request for loan funds.

18   Rel. Ex. 81 (Vollaro), at 61:8-63:3, 127:15-129.5.  Each request was comprised of the sum of the

19   loan or grant awards for a particular batch of students; the reason the requests were made in 25

20   batches over the course of each semester was that AAU would get confirmation of each student's

21   eligibility for federal financial aid throughout the semester—if a student is late completing his

22   financial aid file, he will only become eligible later in the semester, and AAU will request loan

23   and grant funds for his education in a later batch.  *Id.*  After AAU requested a dollar amount for

24   loans or a dollar amount for grants through the federal website, the Government wired the funds

25   into two separate bank accounts AAU maintained to receive federal Title IV funds, one for loans

26   and one for grants.  *Id.* at 55:4-56:21.  Once AAU credited the loan and grant funds to a student's

27   account, the funds were transferred from the loan and grant accounts to AAU's main bank

28   account.  *Id.*, & at 61:8-63:3, 127:15-129:5. Thus, through this process, AAU made 50 separate

KERR
&
WAGSTAFFE
LLP

26

1  requests for Title IV funds to the Government each semester.[5]  As discussed above, each of these

2  requests constituted a separate False Claims Act violation.

3  ### C.   AAU'S ATTEMPTS TO AVOID LIABILITY DO NOT JUSTIFY SUMMARY JUDGMENT

4

5  Making no attempt to discuss the evidence against it, AAU's motion insists that AAU

6  complied with Safe Harbor A.  Under AAU's analysis, it is immune from liability as long as its

7  employees know about Safe Harbor A and say they were trying to comply with it.  The jury is

8  not required to accept these self-serving positions, which "would render meaningless the

9  'purpose or objective'" of the HEA.  *Corinthian Colls.*, 655 F.3d at 994.  Sufficient evidence

10  exists for the jury to find that each of AAU's challenged schemes fell outside of Safe Harbor A.

11  ### 1.   The "Totality of Performance" Scheme Violated the HEA As Applied

12  As discussed above, the jury can easily find that from approximately 2006 to 2008, AAU

13  provided incentive payments to admissions representatives based solely on the number of

14  enrollments secured.  *See*, pp. 7-14, *supra*.  Whether AAU's written policy complied with Safe

15  Harbor A on paper is irrelevant.  *See Corinthian Colls.*, 655 F.3d at 997 ("even if it believed that

16  its written Compensation Program fell under the Safe Harbor Provision," liability exists if "in

17  reality, recruiter compensation decisions were made solely on the basis of recruitment

18  numbers"); *Urquilla-Diaz*, 780 F.3d at 1054 (the relevant question is "how Kaplan implemented

19  its compensation policy, not the terms of its policy").  The evidence clearly supports the

20  conclusion that AAU's written policies were merely a cover for its illegal conduct.

21  That evidence includes both direct <u>and</u> circumstantial evidence of AAU's violation of the

22  HEA notwithstanding Safe Harbor A.  AAU promised admissions representatives cash based on

23  the number of enrollments secured.  Rel. Ex. 78 (Nelson), at 43:14-46:1; Rel. Ex. 16.  Despite

24  the written policies, compensation decisions were in fact made solely with quantitative

25  enrollment information, and then performance reviews were prepared to pad the file in support of

26

27  [5]    AAU's procedure for federal fund requests and disbursement appears consistent with the

28  "advance payment method" described in 34 C.F.R. Section 668.162(b).

1    those decisions after the fact.  *See*, *e.g.*, Rel. Exs. 18, 23.  AAU's practice of establishing

2    qualitative evaluations after making compensation decisions based on quantitative information

3    only was <u>exactly</u> the practice that the Ninth Circuit acknowledged would violate the HEA.

4    *Corinthian Colls.*, 655 F.3d at 994 ("this rating system would not in fact provide an additional

5    basis on which compensation decisions are made").  Indeed, the final decision-maker, Stephens,

6    never even saw the sham performance reviews, but <u>did</u> see admissions representatives' goal and

7    enrollment numbers when approving adjustments.  Rel. Ex. 76 (Stephens), at 139:2-141:1;

8    150:24-154:9; Rel. Ex. 88 (Lee), at 134:6-20, 139:2-14; Rel. Ex. 82 (Bergholt), at 83:2-16,

9    84:14-24; Rel. Ex. 81 (Vollaro), at 131:18-23, 140:4-14; Rel. Exs. 47, 73.  In other words,

10   Stephens's decisions on the recruiters' compensation could only have been solely based on

11   enrollments because that is the only information she was given.  AAU notably provides *no*

12   *evidence* about what Stephens did, and does even mention her in its motion.

13        AAU's insistence that Relators' witnesses were not the decision makers and thus "lack

14   personal knowledge" does not justify summary judgment.  If, as AAU alleges, Stiverson-Smith

15   and Bell "had no personal knowledge of how AAU determined salary adjustments," neither did

16   any of AAU's witnesses offered in support of its motion because Stephens was the final decision

17   maker.  Of course, AAU's insistence that other people who worked at AAU and experienced its

18   practices are incompetent to testify is meritless.  Personal knowledge "includes opinions and

19   inferences grounded in observations and experience."  *Great Am. Assur. Co.*, 669 F. Supp. 2d at

20   1089.  As leaders in AAU's admissions department, this Court may look to their testimony based

21   on their "observations and experience" running that department.

22        AAU's over-reliance on its Exhibit 44 – a memo prepared by Stiverson-Smith and

23   Bergholt discussing salary recommendations – further reinforces AAU's misunderstanding of the

24   summary judgment process.  The jury does not need to believe AAU's testimony about the

25   documentation it manufactured.  Indeed, Stephens testified that she did not look at this memo

26   when making decisions.  Rel. Ex. 76 (Stephens), at 139:2-17, 140:12-141:1; 150:24-154:9.

27        The only question before the Court is whether Relators have enough evidence to support

28   a jury verdict.  They plainly do.  AAU's counter-evidence about its actions and intention in this

1    first period provides no basis for summary judgment.

2    **2.      The Scorecard, As Written and Applied, Violated the HEA**

3    AAU's scorecard scheme is even more clearly a violation of the Incentive Compensation

4    Ban because it directly paid people based on enrollment goals.  These quantitative adjustments

5    directly violate the HEA's prohibition on incentive payments based "on success in securing

6    enrollments."  20 U.S.C. § 1094(a)(20).  Nor does Safe Harbor A justify these separate

7    payments.  Safe Harbor A makes clear that "any adjustment" must <u>not</u> be based solely on the

8    number of enrollments.  34 C.F.R. 668.144(b)(22)(ii)(A).  AAU has admitted that these

9    quantitative adjustments were based solely on the number of enrollments, and has therefore

10   admitted its own violation of the HEA.  Rel. Ex. 81 (Vollaro) at 154:20-155:16; Rel. Ex. 88

11   (Lee), at 162:3-21; Rel. Ex. 89 (Del Rico), at 106:8-25.

12   AAU seems to believe that accompanying the illegal incentive payments with separate,

13   smaller adjustments, and summing the total, somehow negates the fact that the large adjustments

14   were based <u>solely</u> on enrollments.  That presents a clear question of law, not fact, and AAU's

15   interpretation of the law is absurd.  Under AAU theory, a school could pay admissions

16   representatives $100 per student enrolled as long as it also made a separate $1 adjustment

17   available for punctuality and dress.  The plain language of 20 U.S.C. § 1094 and 34 C.F.R.

18   668.14(b)(22)(ii)(A) prevents AAU from making separate direct payments for enrollment

19   irrespective of whether other payments are made for other reasons.  If anything, summary

20   judgment on this scheme should be granted to Relators.

21   **3.      AAU's Grant of Vacations and Weekly Awards Violated the HEA**

22   Finally, AAU violated the HEA when it awarded vacations and gift cards to admissions

23   representatives based solely on enrollments.  In *United States v. Everglades Coll., Inc.*, No. 12-

24   60185-CIV, 2014 WL 5139301 (S.D. Fla. Aug. 14, 2014), the court concluded that "gift cards,

25   token days, and meals . . . were incentives," and found a violation of the HEA on those grounds

26   alone.  *Id.* at *3-4.  AAU makes no argument as to the propriety of awarding gift cards to

27   admissions representatives as awards based solely on enrollments.  These incentives, while

28   comparatively minor, also provide sufficient grounds to deny summary judgment.

### 4.    The DOE Review Provides No Defense To AAU

Finally, AAU contends it is somehow immunized by the DOE's decision not to pursue claims against AAU after a program review. AAU cites no legal authority even suggesting that the DOE's decision is determinative in a False Claims case. AAU also vastly overstates the purpose of the program review and the DOE's conclusions.

First, as the DOE's letter notes, the review "cannot be assumed to be all-inclusive." AAU Ex. 7. The DOE adds that the "absence of statements in the report concerning AAU's specific practices and procedures must not be construed as acceptance, approval, or endorsement of those specific practices and procedures." *Id.* (emphasis added). Thus, by its own terms, the DOE's letter does not conclude that there are "no violations of the Incentive Compensation Ban," as AAU insists. It is just as reasonable to assume that the DOE declined to follow up on any issues due to resources. In fact, as part of the safe harbor repeal, the DOE lamented the difficulty of accessing what was really happening at universities:

> The Department's need to look behind the documents that institutions allege they have used to make recruiter compensation decisions requires the expenditure of enormous amounts of resources, and has resulted in an inability to adequately determine whether institutions are in compliance with the Incentive Compensation Ban in many cases.

Program Integrity Issues, 75 Fed. Reg. at *66873.

It is indisputable that the DOE did not charge AAU. And perhaps the Court will let the jury consider that fact, although Relators believe it is inadmissible. The DOE's investigation and letter provide no basis, however, for granting summary judgment to AAU.

## IV.    CONCLUSION

For the aforementioned reasons, the Relators respectfully request that this Court deny Defendant's motion for summary judgment.

Date:   February 1, 2016                    Respectfully submitted,

By:    /s/ Michael von Loewenfeldt

1                               Stephen R. Jaffe (49539)
                                 **THE JAFFE LAW FIRM**

2                               101 California Street, Suite 2710
                               San Francisco, California 94111

3                               Telephone: (415) 618-0100
                               Facsimile: (415) 618-0080

4

5                               Michael von Loewenfeldt (178665)
                               Brady R. Dewar (252776)

6                               Kenneth P. Nabity (287927)
                               **KERR & WAGSTAFFE LLP**

7                               101 Mission Street, 18th Floor
                               San Francisco, CA 94105

8                               Telephone: (415) 371-8500
                               Facsimile: (415) 371-0500

9

10                             ATTORNEYS FOR PLAINTIFF RELATORS
                             Scott Rose, Mary Aquino, Mitchell Nelson

11                            and Lucy Stearns

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP