UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SCOTT ROSE, et al.,

                Plaintiff-relators,

      v.

STEPHENS INSTITUTE,

                Defendant.

Case No. 09-cv-5966-PJH

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

On March 9, 2016, defendant's motion for summary judgment came on for hearing before this court.  Plaintiff-relators Scott Rose, Mary Aquino, Mitchell Nelson, and Lucy Stearns ("relators") appeared through their counsel, Stephen Jaffe and Kenneth Nabity. Defendant Stephens Institute, doing business as Academy of Art University ("defendant" or "AAU"), appeared through its counsel, Steven Gombos and Gerald Ritzert.  Having read the papers filed in conjunction with the motion and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

This case arises under the False Claims Act.  Relators generally allege that AAU fraudulently obtained funds from the U.S. Department of Education by falsely alleging compliance with Title IV of the Higher Education Act ("HEA").

The HEA requires colleges and universities that receive federal funds to enter into a Program Participation Agreement ("PPA") with the Department of Education.  The PPA requires schools to comply with certain regulations, including one prohibiting the payment

1    of "any commission, bonus, or other incentive payment based directly or indirectly on

2    success in securing enrollments or financial aid to any persons or entities engaged in any

3    student recruiting or admissions activities."  20 U.S.C. § 1094.  This is referred to as the

4    "incentive compensation ban," and is designed to prevent schools from incentivizing its

5    recruiters to enroll poorly-qualified students who will not benefit from the subsidy and may

6    be unable or unwilling to repay federal student loans.

7        The regulations did contain a "safe harbor" to the incentive compensation ban,

8    allowing schools to provide "payment of fixed compensation, such as a fixed annual

9    salary or a fixed hourly wage, as long as that compensation is not adjusted up or down

10   more than twice during any twelve month period and any adjustment is not based solely

11   on the number of students recruited, admitted, enrolled, or awarded financial aid."  34

12   C.F.R. § 668.14(b)(22)(ii)(A).  However, relators allege that AAU's actions fall outside of

13   the safe harbor, because it did award compensation based solely on enrollment success.

14       On December 21, 2009, relators filed suit, asserting two related causes of action

15   under the False Claims Act: (1) knowingly presenting, or causing to be presented, a false

16   or fraudulent claim for payment or approval under 31 U.S.C. § 3729(a)(1)(A), and (2)

17   knowingly making, using, or causing to be made or used, a false record or statement

18   material to a false or fraudulent claim under 31 U.S.C. § 3729(a)(1)(B).  After the

19   government declined to intervene, relators filed the operative second amended complaint

20   ("SAC"), asserting the same two causes of action.  AAU now moves for summary

21   judgment.

22                                    **DISCUSSION**

23   A.    Legal Standard

24       A party may move for summary judgment on a "claim or defense" or "part of . . . a

25   claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there

26   is no genuine dispute as to any material fact and the moving party is entitled to judgment

27   as a matter of law.  Id.

28       A party seeking summary judgment bears the initial burden of informing the court

United States District Court
Northern District of California

1   of the basis for its motion, and of identifying those portions of the pleadings and discovery

2   responses that demonstrate the absence of a genuine issue of material fact.  Celotex

3   Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the

4   outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

5   dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable

6   jury to return a verdict for the nonmoving party.  Id.

7          Where the moving party will have the burden of proof at trial, it must affirmatively

8   demonstrate that no reasonable trier of fact could find other than for the moving party.

9   Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue

10  where the nonmoving party will bear the burden of proof at trial, the moving party may

11  carry its initial burden of production by submitting admissible "evidence negating an

12  essential element of the nonmoving party's case," or by showing, "after suitable

13  discovery," that the "nonmoving party does not have enough evidence of an essential

14  element of its claim or defense to carry its ultimate burden of persuasion at trial."  Nissan

15  Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000);

16  see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to

17  the district court that there is an absence of evidence to support the nonmoving party's

18  case).

19         When the moving party has carried its burden, the nonmoving party must respond

20  with specific facts, supported by admissible evidence, showing a genuine issue for trial.

21  Fed. R. Civ. P. 56(c), (e).  But allegedly disputed facts must be material – the existence

22  of only "some alleged factual dispute between the parties will not defeat an otherwise

23  properly supported motion for summary judgment."  Anderson, 477 U.S. at 247-48.

24         When deciding a summary judgment motion, a court must view the evidence in the

25  light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

26  Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

27  B.     Legal Analysis

28         Before addressing the merits of AAU's motion, the court will address a threshold

3

United States District Court
Northern District of California

1  jurisdictional issue that was raised by AAU – for the first time – at the summary judgment

2  hearing.  AAU's counsel argued that the "public disclosure bar" deprives this court of

3  subject matter jurisdiction, and when asked why this issue was not included in its

4  summary judgment brief, counsel responded that "it came to light as we were doing the

5  brief – the reply brief and comparing the allegations to public disclosures."  Dkt. 178 at

6  40.  Following the hearing, the court directed AAU to file a supplemental brief on the

7  "public disclosure" issue, and relators were given an opportunity to file a response.

8      AAU's supplemental brief starts by setting forth the statutory "public disclosure"

9  bar:  "No court shall have jurisdiction over an action under this section based upon the

10  public disclosure of allegations or transactions in a criminal, civil, or administrative

11  hearing, in a congressional, administrative, or Government Accounting Office report,

12  hearing, audit, or investigation, or from the news media, unless the action is brought by

13  the Attorney General or the person bringing the action is an original source of the

14  information."  31 U.S.C. § 3730(e)(4)(A)[1].

15      The Ninth Circuit has set forth the relevant test as follows:  "The public disclosure

16  bar is triggered if three things are true:  (1) the disclosure at issue occurred through one

17  of the channels specified in the statute, (2) the disclosure was 'public,' and (3) the

18  relator's action is 'based upon' the allegations or transactions publicly disclosed.  U.S. ex

19  rel. Mateski v. Raytheon Co., 816 F.3d 565, 570 (9th Cir. 2016) (internal citations

20  omitted).

21      Applying that three-part test to this case, there appears to be no dispute that (1)

22  AAU has identified disclosures made through the channels specified in the statute, and

23  (2) those disclosures were public.  Specifically, AAU points to "congressional hearings

24  and Department of Education reports" that "identified widespread fraud among

25  proprietary schools," and "numerous" False Claims Act suits that "advanced the same

26  allegations raised in relators' complaint."

27  _____

28  [1] AAU cites the 2009 version of the public disclosure bar, which has since been
amended.

United States District Court
Northern District of California

1        AAU admits that "those public disclosures do not specifically identify AAU," but

2 nevertheless argues that a public disclosure "need not name a defendant specifically,"

3 and instead, need only "contain enough information to place the government on notice of

4 the fraud." However, while AAU cites a number of cases acknowledging the general

5 principle that a defendant need not be specifically named, nearly all of those cases

6 actually do involve disclosures about the same defendant named in the suit.

7        For instance, <u>U.S. ex rel. Hoggett v. University of Phoenix</u> was a case alleging

8 violations of the incentive compensation ban, just as this suit does. 2014 WL 3689764

9 (E.D. Cal. July 24, 2014). While the court ultimately dismissed the case based on the

10 public disclosure bar, its discussion of the specific public disclosures is instructive. The

11 court started by citing a news report about the state of New York blocking the University

12 of Phoenix's attempt to open a Manhattan campus, based in part on "concerns" about

13 how the school "compensates recruiters." <u>Id</u>. at *6. The court went on to discuss a

14 segment on PBS's "Frontline," which reported "continuing abuses in incentive

15 compensation among for-profit colleges." <u>Id</u>. However, rather than referring to "for-profit

16 colleges" generally, the "Frontline" program specifically discussed the University of

17 Phoenix "at length," and even referred to it as "the 'granddaddy' of for-profit schools." <u>Id</u>.

18 The court then cited a Reuters news article specifically mentioning the University of

19 Phoenix as a subject of a congressional investigation. <u>Id</u>. Only after citing those multiple

20 specific references to the University of Phoenix and its compensation practices did the

21 court dismiss the suit under the public disclosure bar.

22        Similarly, in <u>U.S. ex rel. Lee v. Corinthian Colleges</u>, the court dismissed a FCA suit

23 after considering previous "securities class action litigation brought against Corinthian"

24 that made "nearly identical" allegations regarding Corinthian's incentive compensation

25 practices. Case no. 07-1984, Dkt. 224 at 6, 8 (C.D. Cal. Mar. 15, 2013). The court then

26 discussed, at length, a subsequent congressional hearing that "echoe[d] the allegations

27 in the securities litigation" regarding Corinthian's alleged violations of the "spirit and

28 intent" of the incentive compensation ban. <u>Id</u>. at 8. Testimony at the hearing frequently

1    focused on Corinthian Colleges specifically (rather than for-profit schools generally) – in

2    fact, a former Corinthian Colleges employee "testified as to Corinthian's allegedly

3    complete focus on hitting enrollment targets." Id.  Again, only after citing these

4    disclosures specific to Corinthian Colleges did the court dismiss the FCA suit.

5         In another case, a suit was dismissed under the public disclosure bar after the

6    court considered two news articles that named the defendant specifically, and further

7    discussed a previous lawsuit that involved allegations about the defendant's use of

8    enrollment numbers in evaluating recruiters.  U.S. ex rel. Lopez v. Strayer Education,

9    Inc., 698 F.Supp.2d 633, 643 (E.D. Va. 2010).

10        While the University of Phoenix, Corinthian, and Strayer courts also cited other

11   disclosures that discussed for-profit schools more generally, the fact that each case

12   involved multiple disclosures about each specific defendant serves to distinguish those

13   cases from the present one, which involves no disclosures about AAU's own practices.

14        AAU cites only one case in which a suit was dismissed based only on public

15   disclosures about non-parties.  Schultz v. DeVry Inc., 2009 WL 562286 (N.D. Ill. Mar. 4,

16   2009).  However, as relators point out in their brief, Schultz has since been discredited by

17   the Seventh Circuit.  See U.S. ex rel. Baltazar v. Warden, 635 F.3d 866, 868 (7th Cir.

18   2009) ("no court of appeals supports the view that a report documenting widespread false

19   claims, but not attributing them to anyone in particular, blocks qui tam litigation against

20   every member of the entire industry").

21        Moreover, even more importantly, the Ninth Circuit has recently addressed the

22   issue, and endorsed the view currently taken by the Seventh Circuit.  See Mateski, 816

23   F.3d 565.  Mateski was a False Claims Act suit filed by an engineer working for a

24   government defense contractor.  The engineer alleged that his employer (Raytheon)

25   failed to comply with the government's contractual requirements and improperly billed the

26   government for erroneous and incomplete work.  Id. at 568.  The defendant sought

27   dismissal of the suit under the public disclosure bar, citing government reports of

28   "inadequate project management" and "inadequate oversight," as well as news articles

1    reporting "cost overruns and schedule delays." Id. at 567-68.

2          In applying the public disclosure bar, the Mateski court first explained that, "for a

3    relator's allegations to be 'based upon' a prior public disclosure, 'the publicly disclosed

4    facts need not be identical with, but only substantially similar to, the relator's allegations.'"

5    816 F.3d at 573 (internal citations omitted).  However, the court recognized the elasticity

6    of the "substantially similar" test, noting that "whether [the] complaint is substantially

7    similar to prior public reports depends on the level of generality at which the comparison

8    is made." Id. at 575.  If considered at a high level, then the complaint and the public

9    reports did indeed both describe problems with Raytheon's performance of the

10   government contract.  But if "considered at a more granular level, the allegations in

11   Mateski's complaint discuss specific issues found nowhere in the publicly disclosed

12   information." Id. at 574.  The court noted that the case required it to "address for the first

13   time whether we should approach the substantial similarity question at a high or low level

14   of generality, and accordingly whether a complaint that is similar only at a high level of

15   generality triggers the public disclosure bar." Id. at 575.

16         The Mateski court then observed that the Seventh Circuit "appears to be the only

17   circuit to have focused on this level-of-generality question," and cited three of its cases

18   addressing the issue.  816 F.3d at 575.  Of particular relevance is Leveski v. ITT

19   Educational Services, Inc., which, like the present case, arose out of allegations that a

20   for-profit college was violating the incentive compensation ban.  See Leveski, 719 F.3d

21   818 (7th Cir. 2013).  The public disclosures at issue in Leveski were more than

22   generalized reports regarding for-profit schools as a whole – instead, the defendant

23   argued that the suit (brought by a former employee) was "substantially similar" to a

24   previous suit filed by another former employee, who even had the same job title as the

25   plaintiff-relator in Leveski.  Both suits alleged that ITT violated the incentive

26   compensation ban, but the Seventh Circuit found that, in the second-filed case, the

27   "details of how ITT allegedly violated" the False Claims Act were "quite different" than

28   those alleged in the first-filed case.  While the first suit alleged a "rudimentary scheme" to

1    violate the incentive compensation ban, the Leveski suit alleged a "more sophisticated,

2    second-generation method of violating" the Act, and thus, the public disclosure bar did

3    not apply.

4        The Ninth Circuit in Mateski found the Seventh Circuit's approach to be

5    persuasive, and articulated its own approach to the public disclosure bar as follows:

6        Allowing a public document describing 'problems' – or even some
7        generalized fraud in a massive project or across a swath of an industry – to
         bar all FCA suits identifying specific instances of fraud in that project or
8        industry would deprive the Government of information that could lead to
         recovery of misspent Government funds and prevention of further fraud.
9

10   816 F.3d at 577.

11       Based on the guidance provided by the Mateski court, the court finds that the

12   public disclosure bar does not apply to the present suit.  If the Mateski disclosures –

13   which were made not only about the same defendant, but about the same project – were

14   not enough to trigger the bar, then the disclosures in this case do not come close to doing

15   so.  As mentioned above, AAU relies on reports of generalized fraud among for-profit

16   schools, including with regard to the incentive compensation ban.  The relators'

17   complaint[2] not only ties the alleged conduct to AAU, but also provides specific allegations

18   regarding AAU's conduct.  For instance, in addition to alleging that their compensation

19   was "directly based upon and proportional to their success in securing student

20   enrollments," relators also allege that "AAU formally evaluated its admissions

21   representatives and adjusted their salaries twice a year in March and October," with each

22   recruiter given a goal of student enrollments and a promise that "if they met this 'goal' (in

23   reality, a quota) their annual salary would be increased $30,000 at the time of their next

24   evaluation."  Dkt. 1, ¶¶ 22, 42.  Relators further allege that their "salary histories illustrate

25   and substantiate the unlawful compensation scheme," and that "[i]n addition to salary,

26

27   _____
     [2] Because subject matter jurisdiction is determined at the time of the original complaint's
28   filing, the court will consider the original complaint, rather than the operative second
     amended complaint, for purposes of the public disclosure bar.

United States District Court
Northern District of California

1    AAU also illegally compensates enrollment counselors based upon enrollments through

2    trips and gifts," including a promised "trip to Hawaii if their team enrolled a minimum

3    number of students."  Id., ¶¶ 43-44.

4          Although the above allegations are already sufficient to avoid the public disclosure

5    bar, as relators provided specific details that were not disclosed through public sources,

6    the complaint provides even more detail.  Specifically, relators allege that "AAU did not

7    and does not allow its admissions representatives to retain any written documentation of

8    its incentive compensation scheme," and instead "conveyed the enrollment goals and

9    accompanying financial incentives only through information sheets that were shown to

10   admissions representatives at their semiannual evaluations but were retained by AAU."

11   See Dkt. 1, ¶¶ 22-25.

12         The court finds that the complaint's allegations are not "substantially similar" to the

13   prior public disclosures when viewed at the appropriate level of generality, and thus, the

14   public disclosure bar does not apply.

15         The court now turns to the merits of AAU's motion for summary judgment.  The

16   first issue for the court to resolve is the specific theory under which relators are

17   proceeding.  Because relators do not allege that AAU's claims for payment were facially

18   false (in other words, relators do not allege that AAU submitted claims on behalf of

19   fictitious students, or submitted claims for inflated amounts), any viable FCA cause of

20   action must arise out of one of the "two doctrines that attach potential False Claims Act

21   liability to claims for payment that are not explicitly and/or independently false:  (1) false

22   certification (either express or implied), [or] (2) promissory fraud."  U.S. ex rel. Hendow v.

23   University of Phoenix, 461 F.3d 1166, 1171 (9th Cir. 2006) (citing Harrison v.

24   Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)).

25         As explained by the Ninth Circuit, the "false certification" doctrine "could just as

26   easily be called the 'false statement of compliance with a government regulation that is a

27   precursor to government funding' theory, but that is not as succinct."  Hendow, 461 F.3d

28   at 1172.  It applies when a party "falsely certifies compliance with a statute or regulation

9

1    as a condition to government payment." Id. at 1171.

2          While the Hendow court did not explain the difference between the two types of

3    "false certifications" – express or implied – the Ninth Circuit did so in a later case.  See

4    Ebeid ex rel. U.S. v. Lungwitz, 616 F.3d 993 (9th Cir. 2010).  Express false certification

5    "simply means that the entity seeking payment certifies compliance with a law, rule, or

6    regulation as part of the process through which the claim for payment is submitted." Id.

7    at 998.  In contrast, implied false certification "occurs when an entity has previously

8    undertaken to expressly comply with a law, rule, or regulation, and that obligation is

9    implicated by submitting a claim for payment even though a certification of compliance is

10   not required in the process of submitting a claim." Id.  The court then explained that

11   "[u]nder both theories, it is the false certification of compliance which creates liability

12   when certification is a prerequisite to obtaining a government benefit." Id. (emphasis in

13   original) (internal citation and quotation omitted).

14         Aside from the "false certification" theories, the Ninth Circuit has also recognized a

15   "promissory fraud" theory of liability, which does not require a "false statement of

16   compliance with government regulations." Hendow, 461 F.3d at 1173.  Instead, liability

17   attaches to "each claim submitted to the government under a contract, when the contract

18   or extension of government benefit was originally obtained through false statements or

19   fraudulent conduct." Id. (internal citations omitted).  "In other words, subsequent claims

20   are false because of an original fraud," even though those subsequent claims do not

21   require a false certification.  Id. (emphasis in original).  As applied to this case, the

22   alleged "original fraud" occurred when AAU entered into a PPA with the federal

23   government, thereby promising to comply with the incentive compensation ban.

24         This distinction between the "original fraud" and "subsequent claims" is particularly

25   relevant in this case, because AAU contends that relators must show not only a false

26   promise to comply with a PPA, but also proof that the promise was false when made.

27   See U.S. ex rel. Hopper v. Anton, 91 F.3d 1261, 1267 (9th Cir. 1996) ("although

28   promissory fraud may be actionable in rare circumstances under the FCA, the promise

United States District Court
Northern District of California

1   must be false when made").  AAU points out that it entered into a PPA on March 30,

2   2006, which was in effect until the next PPA was executed on April 10, 2012.  See Dkt.

3   150, Ex. 2 (2006 PPA); Ex. 3 (2012 PPA).  And while entering into the PPAs did require

4   AAU to promise that it would comply with the incentive compensation ban, AAU argues

5   that relators have not provided evidence that either promise was false when made.  In

6   fact, even relators' own opposition brief appears to concede that all of the evidence that

7   "AAU was violating the incentive compensation ban" is temporally limited "from the fall

8   semester in 2006 through the fall semester of 2010."  Dkt. 159 at 22.

9          Relators do provide some evidence from before March 2006, but it is not directly

10  relevant to the incentive compensation ban.  Specifically, relators point to a December

11  2005 email from AAU's executive vice president of marketing, who proposed solutions to

12  "take recruitment to the next level" by finding leaders who are "goal-driven," "results-

13  oriented," and "experienced in the fields of sales and business," and by finding recruiters

14  "able to close the sales off site" and who "understand sales and know the basic 101

15  Sales technique."[3]  Dkt. 159-1, Ex. 1.  While the December 2005 email certainly

16  demonstrates an emphasis on recruiting, it is entirely unrelated to the incentive

17  compensation ban, and thus does not serve as evidence that AAU made a false promise

18  when entering into the 2006 PPA.  Nor do relators provide any evidence that AAU was

19  violating the incentive compensation ban at the time that the 2012 PPA was signed.

20  Accordingly, the court finds that relators cannot proceed under a "promissory fraud"

21  theory.

22         Relators' "express false certification" theory suffers from the same flaw.  In their

23  opposition brief, relators concede that "each request for Title IV loan and grant funds that

24  AAU made did not contain an express certification of compliance with the incentive ban."

25  In fact, relators' only reference to an express "certification" is their assertion that "AAU

26

27  [3] At the hearing, the court specifically asked relators' counsel to identify the evidence
    supporting the argument that AAU entered into the 2006 PPA with the intent to violate the
28  incentive compensation ban, and counsel pointed to this same email.  See Dkt. 178 at
    17:4-19:13.

President Stephens certified through PPAs that AAU will comply with the incentive

compensation ban." Dkt. 159 at 22. Because relators have not provided evidence

showing that AAU intended to violate the ban when it certified compliance through either

the 2006 PPA or the 2012 PPA, they cannot show that either express certification was

false, and thus, their "express certification" theory is not viable.

At the hearing, the court noted the lack of evidence from early 2006 regarding the

alleged incentive compensation ban violation, and sought to clarify whether relators truly

intended to proceed under all three theories. Relators' counsel indicated that they did

indeed seek to proceed under all three theories in the alternative. However, in

supplemental briefing, relators started by stating that they "are proceeding under the false

certification claim" (apparently abandoning promissory fraud), and then appeared to

further narrow their theory, explaining that "the evidence establishes each element [of a

FCA claim] including that AAU's claims for money were false based on an <u>implied false

certification</u> that AAU was in compliance with the incentive compensation ban when, in

fact, AAU was not." <u>See</u> Dkt. 173 at 1-2 (emphasis added). The court's own finding that

only the implied false certification theory remains viable is bolstered by (but not

dependent on) this apparent concession from relators.

The court also sought to clarify another issue at the hearing. As mentioned above,

the operative SAC asserts two causes of action – the first under 31 U.S.C. §

3729(a)(1)(A), which applies to anyone who "knowingly presents, or causes to be

presented, a false or fraudulent claim for payment or approval," and the second under 31

U.S.C. § 3729(a)(1)(B), which applies to anyone who "knowingly makes, uses, or causes

to be made or used, a false record or statement material to a false or fraudulent claim."

In other words, subsection (A) applies in cases of a "false or fraudulent claim," whereas

subsection (B) applies in cases of a "false record or statement material to a false or

fraudulent claim."

At the hearing, the court asked relators' counsel to explain the difference between

the two asserted causes of action. After noting that neither party's briefs addressed the

1    distinction between the two claims, the court directed relators to file a supplemental brief

2    explaining the meaningful difference (if any) between the two asserted claims, and

3    permitted AAU to file a response.

4          In their supplemental brief, relators first explain that, at the time of the complaint's

5    filing, "the case law was unclear" as to whether their claim should be pled under

6    subsection (A) or (B), and as a result, relators pled both claims "out of an abundance of

7    caution."  Dkt. 173 at 2-3.  Since then, the Tenth Circuit has become the first circuit court

8    to address the distinction, holding that "implied certification" claims can arise under

9    subsection (A) but not under subsection (B).[4]  U.S. ex rel. Lemmon v. Envirocare of Utah,

10   Inc., 614 F.3d 1163, 1168 (10th Cir. 2010).  In light of Lemmon, relators explain that they

11   have "no objection to the court dismissing the second cause of action as duplicative."

12   Dkt. 173 at 3.  The court similarly finds that there is no reason to present two duplicative

13   causes of action to a jury, and dismisses the second cause of action based on relators'

14   representation.  Thus, the only claim that remains is a single cause of action under 31

15   U.S.C. § 3729(a)(1)(A) for knowingly presenting, or causing to be presented, a false or

16   fraudulent claim for payment or approval.  And as discussed above, the court will analyze

17   this claim under an "implied false certification" theory.

18         The elements of a cause of action under the False Claims Act are as follows:  (1) a

19   false statement or fraudulent course of action, (2) made with scienter, (3) that was

20   material, and (4) that caused the government to pay out money.  Hendow, 461 F.3d at

21   1174; see also 31 U.S.C. § 3729(a).[5]

22         Starting with the first element, relators contend that each of AAU's requests for

23   Title IV funds contained an "implied certification of continued compliance with the

24   incentive ban" which was, in fact, false.  For support, relators point to evidence that

25   AAU's admissions director (Joan Bergholt) told recruiters that they would be paid an

26   _____

27   [4] The Tenth Circuit's opinion cites to a previous version of the False Claims Act, and thus
     refers to the two relevant sections as (a)(1) and (a)(2), rather than (a)(1)(A) and (a)(1)(B).

28   [5] AAU asserts that relators must meet a "clear and convincing" burden of proof, but its
     cited authority does not actually support its assertion.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    additional $30,000 if they hit their enrollment goal.  See Dkt. 159-1, Ex. 78 at 45:2-18, Ex.

2    80 at 147:14-17, Ex. 87 at 24:18-25, Ex. 77 at 33:10-22 (deposition testimony from

3    recruiters regarding $30,000 payment for hitting enrollment goal); see also Dkt. 159-1,

4    Ex. 16 (email to Bergholt discussing a $20,000 raise and stating "that's 2/3 of what was

5    promised to someone who made their goal").

6            AAU responds by arguing that the salary adjustments were made in compliance

7    with a HEA "safe harbor" provision, which allowed[6] schools to compensate recruiters for

8    enrollments, "as long as that compensation is not adjusted up or down more than twice

9    during any twelve month period, and any adjustment is not based solely on the number of

10   students recruited, admitted, enrolled, or awarded financial aid."  34 C.F.R. §

11   668.14(b)(22)(ii)(A) (July 1, 2010).  AAU maintains that any compensation adjustments

12   were made only after considering "a totality of factors and not solely or exclusively

13   success in enrolling students," and cites to extensive deposition testimony purporting to

14   state as such.  Dkt. 150 at 3.  However, relators provide two declarations – one from a

15   former admissions representative (Julie Bell) and one from a former admissions director

16   (Joan Stiverson-Smith) – stating that AAU's qualitative criteria were "cosmetic and

17   superficial in nature and designed by AAU to circumvent the prohibition against incentive

18   or commission pay by giving AAU the appearance of compliance with the law."  See Dkt.

19   159-1, Ex. 43 (Stiverson-Smith decl.), Ex. 44 (Bell decl.).  The declarants further attest

20   that the "'qualitative criteria results' were adjusted and 'backed into' the compensation

21   calculations so that the final compensation of each admissions representative – while

22   appearing on paper to include the 'qualitative' factors – in fact reflected only his or her

23   enrollment statistics – positive or negative."  Id.

24           AAU attempts to undermine the Stiverson-Smith and Bell declarations by casting

25   doubt on whether the declarants had personal knowledge of the ultimate compensation

---

[6] The safe harbor has since been eliminated, such that schools are not permitted to
compensate recruiters "based in any part, directly or indirectly, upon success in securing
enrollments or the award of financial aid."  34 C.F.R. § 668.14(b)(22)(ii)(A) (effective July
1, 2011).

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

decisions, but there are two problems with this argument.  First, personal knowledge "includes opinions and inferences grounded in observations and experience."  Great American Assurance Co. v. Liberty Surplus Insurance Co., 669 F.Supp.2d 1084 (N.D. Cal. 1084, 1089 (N.D. Cal. 2009) (internal citation omitted).  Second, the substance of the declarations is corroborated by documentary evidence.  In particular, relators submit a December 12, 2007 email from Joan Bergholt with the subject line "performance reviews," in which she instructs two employees that "we need to bring these ratings up, especially for the people who are getting good raises."  Dkt. 159-1, Ex. 23.  While the email, by itself, indicates that the raises were already decided and that the performance ratings needed to be reverse-engineered to reflect the pre-determined raises, that conclusion is further bolstered by a spreadsheet showing the salary increases as "OK per Elisa Stephens" (AAU's sole shareholder, who is responsible for all compensation decisions) on December 11, 2007 – one day before Ms. Bergholt issued her instructions "bring these ratings up, especially for the people who are getting good raises."  Dkt. 159-1, Ex. 40.

Similarly, relators submit another email from Joan Bergholt with the subject line "performance appraisal checklists for spring 07," in which she directs four employees to fill out performance reviews for recruiters, and tells them to "[r]emember that the totality rating needs to be consistent with the salary increases or decreases."  Dkt. 159-1, Ex. 18. While not as explicit as the previously-cited email in stating that the salary adjustments had already been determined, the implication is the same, because there would be no need for a "reminder" to keep ratings consistent with salary increases/decreases if those increases/decreases had not been determined yet.  And while AAU presents its own evidence showing that draft versions of the performance reviews had already been started, the fact remains that Ms. Bergholt is instructing her employees to "fill out" performance reviews in a certain way, because "the totality rating needs to be consistent with the salary increases or decreases."  Whether or not the reviews had already been started, the email supports relators' argument that the final performance ratings were

15

1   ultimately reverse-engineered to fit the salary increases, as claimed by Ms. Stiverson-

2   Smith and Ms. Bell.

3          At her deposition, Ms. Bergholt insisted that the totality ratings were determined

4   first, and that the salary adjustments were based on those ratings.  See Dkt. 159-1, Ex.

5   82 at 158:24-161:14.  However, at best, this testimony creates a disputed issue of fact as

6   to whether the salary adjustments were determined before or after the performance

7   ratings.  And when viewed with the rest of the above-mentioned evidence, in a light most

8   favorable to the non-moving parties, relators have raised a triable issue of fact as to

9   whether AAU paid compensation solely on the basis of enrollment success, and in doing

10  so, made an impliedly false certification to the Department of Education.  Thus, for

11  purposes of this motion, the first element of a FCA claim is met.

12         The second element of the False Claims Act asks whether AAU acted with

13  scienter in making the allegedly false certifications, and there appears to be some

14  uncertainty regarding the applicable standard for this element.  AAU cites Ninth Circuit

15  authority holding that "for a certified statement to be 'false' under the [False Claims] Act, it

16  must be an intentional, palpable lie" that is "known to be a lie when it is made."  Hendow,

17  461 F.3d at 1172.  However, relators cite more recent Ninth Circuit authority holding that

18  the scienter requirement may be met if the defendant either "knew, or acted with reckless

19  disregard of the fact that its compensation program did not fall within the DOE safe

20  harbor provision."  U.S. v. Corinthian Colleges, 655 F.3d 984, 997 (9th Cir. 2011)

21  (emphasis added).  Interestingly, the Corinthian court actually cited Hendow in its

22  discussion of scienter, even though it did not adopt the "intentional, palpable lie"

23  language.

24         The apparent tension between Hendow and Corinthian can be resolved by looking

25  to the words of the False Claims Act itself.  The Act requires a "knowing" presentation of

26  a false claim, and then defines "knowing" (or "knowingly") as meaning that a person

27  either "has actual knowledge of the information[,] acts in deliberate ignorance of the truth

28  or falsity of the information[,] or acts in reckless disregard of the truth or falsity of the

United States District Court
Northern District of California

1   information." 31 U.S.C. § 3729(b)(1) (emphasis added). The statute also specifically

2   states that it "require[s] no proof of specific intent to defraud." Id. Thus, the Corinthian

3   court's version of the scienter requirement more closely tracks the statute, and the court

4   finds that "reckless disregard" is sufficient to establish scienter under the False Claims

5   Act. However, as applied to this case, relators have adequately shown scienter under

6   either standard.

7          Much of the same evidence cited in support of the "falsity" prong is equally

8   relevant to the "scienter" prong. The declarations from Ms. Stiverson-Smith and Ms. Bell

9   that AAU's qualitative criteria were "cosmetic and superficial in nature and designed by

10  AAU to circumvent the prohibition against incentive or commission pay by giving AAU the

11  appearance of compliance with the law," if true, certainly serve as evidence that AAU

12  made an "intentional, palpable lie" in impliedly certifying compliance with the HEA.

13  Moreover, the email from Ms. Bergholt instructing employees to "bring these ratings up,

14  especially for the people who are getting good raises," when read in a light most

15  favorable to the non-moving parties, also supports an inference that AAU knew that it

16  was not complying with the safe harbor.

17         In addition to the above-mentioned evidence, relators also provide evidence of the

18  lengths taken by AAU to hide their compensation practices. For instance, one of the

19  relators asked an admissions manager whether she could have a "copy of the goal sheet

20  with the $ increase information included based on the number of student[s] we register,"

21  and the manager responded that she was "unable to hand that out" because it was "for

22  management use only." Dkt. 159-1, Ex. 57.

23         In another email exchange, AAU's chief operating officer asked the admissions

24  director whether she had information on the "summer and fall team goal," but the

25  admissions director responded that she "deleted all those docs" because she "[s]aw REP

26  GOALS and was trying to protect us." Dkt. 159-1, Ex. 70.

27         Another AAU employee testified at his deposition that there "was an instruction not

28  to share that document" (referring to the "score value card" used for performance

reviews) and to "make everything verbal." Dkt. 159-1, Ex. 85 at 188:7-13.  When asked why the document was not to be shared, the witness answered that his supervisor "was concerned with that information," and that "compliance was concerned."  Id. at 188:15-17.

This evidence provides further support for the allegation that AAU knew that it was actively circumventing the law by attempting to create the appearance of compliance with the safe harbor provision, and took efforts to avoid leaving a paper trail.  While it will ultimately be up to a jury to decide whether to credit this evidence and find that AAU acted with scienter, relators have raised a triable issue of fact sufficient to defeat summary judgment.

AAU does not meaningfully challenge the remaining two elements – that the allegedly false certifications were material, or that they caused the government to pay out money – and the court finds both elements to be met.

Accordingly, the court finds that relators have raised a triable issue of fact as to whether AAU failed to comply with the incentive compensation ban, and thus violated the False Claims Act.

### CONCLUSION

For the foregoing reasons, AAU's motion for summary judgment is DENIED.  The court will conduct a case management conference on **June 2, 2016** at **2:00 p.m.** to set a pretrial schedule.

Finally, both parties have filed motions to seal, seeking to redact certain non-party financial information contained in exhibits filed in connection with the summary judgment motion.  Because the parties have shown that the salary information is entitled to protection, and because the proposed redactions are narrowly tailored to cover only the sealable information, the motions to seal are GRANTED.

**IT IS SO ORDERED.**

Dated:  May 4, 2016

_____          _____

PHYLLIS J. HAMILTON
United States District Judge