UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT ROSE, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>STEPHENS INSTITUTE,<br><br>　　　　Defendant. | Case No. 09-cv-05966-PJH<br><br>**ORDER DENYING MOTION FOR RECONSIDERATION**<br><br>Re: Dkt. No. 192 |

Defendant's motion for reconsideration came on for hearing before this court on August 31, 2016. Plaintiff-relators Scott Rose, Mary Aquino, Mitchell Nelson, and Lucy Stearns ("relators") appeared through their counsel, James Wagstaffe, Stephen Jaffe, Kenneth Nabity, and Brady Dewar. Defendant Stephens Institute, doing business as Academy of Art University ("AAU"), appeared through its counsel, Steven Gombos, Gerald Ritzert, and Jacob Shorter. The United States appeared through its counsel, Jonathan H. Gold. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby DENIES the motion, for the following reasons.

**BACKGROUND**

**A.    The Relators' Claims**

This is a qui tam action brought by relators against AAU for violations of the False Claims Act ("FCA"). Relators allege that AAU fraudulently obtained funds from the U.S. Department of Education (the "DOE") by falsely alleging compliance with Title IV of the Higher Education Act.

Specifically, relators allege that defendant ran afoul of Title IV's prohibition on providing "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admissions activities." 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22). This requirement, which applies to colleges and universities that receive federal funding, is referred to as the incentive compensation ban ("ICB"). The ICB is designed to prevent schools from incentivizing recruiters to enroll poorly-qualified students who will not benefit from federal subsidies, and may be unable or unwilling to repay federal student loans. United States ex rel. Main v. Oakland City Univ., 426 F.3d 914, 916 (7th Cir. 2005).

Relators acknowledge the existence of a "safe harbor," which allowed colleges to provide "payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added) (2010). However, relators allege that AAU's actions fall outside of the safe harbor, because it awarded compensation based only upon enrollment success. (Although it applied at the time of the events of this suit, this safe harbor was subsequently repealed in 2011.)

On December 21, 2009, relators brought two causes of action, both under the False Claims Act: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval under 31 U.S.C. § 3729(a)(1)(A); and (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim under 31 U.S.C. § 3729(a)(1)(B). On November 8, 2011, after the government declined to intervene, relators filed the operative second amended complaint ("SAC"), asserting the same two causes of action. Dkt. 18.

///

///

## B.   Procedural History

AAU's motion for summary judgment came on for hearing on March 9, 2016. Dkt. 150, 169. In a May 4, 2016 order, the court denied the motion, but limited the relators' claims to a single "implied false certification theory" under § 3729(a)(1)(A). Dkt. 179 at 12–13 (the "May 4 Order"). The court found that an express certification theory was "not viable" because relators conceded that AAU's individual requests for Title IV loans did not contain any explicit certification of compliance with the ICB. Id. at 11. Rather, AAU expressly certified compliance only in its 2006 and 2012 program participation agreements ("PPAs"). Id. As the allegations of ICB violations were limited to the fall of 2006 through the fall of 2010, relators had no evidence that either promise in the PPAs was "false when made." Id. at 11–12. As a result, a promissory fraud theory was also not viable.

The remaining claim is based on implied false certification, which "occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." Ebeid ex rel. U.S. v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010). The court found triable issues of fact as to whether, from late 2006 through 2010, AAU submitted claims that were impliedly false in light of its 2006 promise to comply with the ICB. In particular, relators submitted evidence tending to show that AAU applied for Title IV student loans even though its recruiters were being paid bonuses based on enrollment success.

An FCA claim has four elements: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." U.S. ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1174 (9th Cir. 2006). As to falsity, the court found that there was a material dispute of fact over whether AAU paid out compensation solely based on enrollment, and thus fell outside the scope of the safe harbor. Dkt. 179 at 16. Similarly, there was evidence tending to show AAU acted with knowledge of falsity—or at least a reckless disregard for

the truth—with respect to its alleged noncompliance with the ICB. In particular, the court noted evidence suggesting that AAU attempted to hide its compensation practices. Id. at 17–18. AAU did not "meaningfully challenge" materiality or causation, the two remaining elements. Id. at 18.

## C.   The Escobar Decision

On June 1, 2016, the court granted a stay of proceedings until the Supreme Court issued its ruling in Universal Health Services, Inc. v. U.S. ex rel. Escobar. Dkt. 183. The Supreme Court had granted certiorari in Escobar to decide whether the implied certification theory of legal falsity under the FCA was viable. On June 16, the Supreme Court issued its opinion in Escobar. In pertinent part, the Court held that "the implied false certification theory can, at least in some circumstances, provide a basis for liability." Escobar, 136 S. Ct. 1989, 1995 (2016). Noting that "[w]e need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment," id. at 2000, the Court found that liability attaches:

> at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

Id. at 2001.

However, the Supreme Court required a "rigorous" showing that the defendant's failure to disclose noncompliance was material to the government's payment decision, noting that "statutory, regulatory, and contractual requirements are not automatically material." Id. at 2001–02. Instead, materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Id. at 2002 (citing 26 Williston on Contracts § 69:12, p. 549 (4th ed. 2003)). The Court noted some factors that may be considered:

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not

4

> automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

Id. at 2003–04.

On June 23, pursuant to Local Rule 7-9(b)(2), this court granted AAU leave to file a motion for reconsideration regarding the impact of Escobar on the May 4 Order. Dkt. 191. The basis for leave was a potential "change in law occurring after the time" of the summary judgment order. L.R. 7-9(b)(2). Materiality was not "meaningfully challenged" in defendant's motion for summary judgment, and therefore not addressed in the May 4 Order, because this issue was settled by Ninth Circuit law. See Hendow, 461 F.3d at 1175–76. The court noted that "Escobar articulated a materiality standard under the [FCA] that, at least potentially, undermines the existing Ninth Circuit law on the issue." Dkt. 191 at 1–2.

AAU followed with the instant motion, which argues that the court should reconsider its denial of summary judgment because there is no material dispute of fact that: (1) the allegations in this case fail the "two-part test" for falsity established by Escobar; and (2) materiality is not satisfied under the Escobar's "demanding" standard. See Dkt. 192 ("Mot.").

**DISCUSSION**

**A.    Legal Standard**

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment

5

as a matter of law. Id. When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1105–06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324–25 (moving party can prevail merely by pointing to an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material – existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247–48.

///

### B. AAU's Motion for Leave to Take Judicial Notice

In conjunction with its motion, AAU asks the court to take judicial notice of seven documents based upon their status as official government reports and agency records. Dkt. 194. AAU submits these documents as evidence regarding the DOE's past enforcement of the ICB.

The court GRANTS the request for judicial notice. The motion is unopposed, and judicial notice is appropriate because AAU has established that the documents are official government reports available on official websites. See, e.g., Jarvis v. JP Morgan Chase Bank, N.A., No. CV 10–4184–GHK, 2010 WL 2927276 (C.D. Cal. July 23, 2010) ("Judicial notice may be taken of documents available on government websites.").

However, the court will consider the evidence only as they relate to the DOE's historical practice in enforcing the ICB—which is relevant to the materiality issues—and not for the truth of any legal conclusions asserted therein. In particular, the court will consider the so-called "Hansen Memo" only as evidence regarding the DOE's past enforcement of the ICB, and ignore its legal assertion that ICB noncompliance "does not render a recruited student ineligible." See Dkt. 194-1 Ex. B, Memorandum from William D. Hansen, Deputy Secretary of the Department of Education to Terri Shaw, Chief Operating Officer of Federal Student Aid (October 30, 2002). The Hansen Memo lacks binding legal force; it is an informal internal memo, not an authoritative agency regulation. See Main, 426 F.3d at 917 (Hansen Memo has "no legal effect").

### C. Analysis

Turning to the merits, in order for the court to reconsider its May 4 denial of summary judgment, ASU must show that, in light of Escobar, there is no longer any material dispute of fact as to liability under the FCA. The required elements for FCA liability are: (1) a false statement; (2) made with scienter; (3) materiality; and (4) causation. Hendow, 461 F.3d at 1174. AAU's motion for reconsideration only challenges the falsity and materiality elements.

///

In particular, AAU alleges two bases for reconsideration under Escobar. First, it argues that the claims here fail Escobar's new "two-part test" for falsity in implied certification claims. Second, AAU argues that non-compliance with the ICB was not material to the payment decision under Escobar based on (i) the DOE's history of rarely revoking Title IV funds for ICB violations; and (ii) because the DOE has continued to pay AAU despite having knowledge of the allegations in this case. Mot. at 2–3.[1]

### 1. Escobar's Alleged "Two-Part Test" for Implied False Certification

AAU is incorrect as a matter of law that Escobar establishes a rigid "two-part test" for falsity that applies to every single implied false certification claim. The Supreme Court's statement that FCA liability attached "at least where two conditions are satisfied," Escobar,136 S. Ct. at 2001, must be read in context. The Court explicitly prefaced its holding by making clear that "[w]e need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment." Id. at 2000. The Supreme Court's use of "at least" indicated that it need not decide whether the implied false certification theory was viable in all cases, because the particular claim before it contained "specific representations" that were "misleading half-truths." Id. at 2001. The language in Escobar that AAU relies upon does not purport to set out, as an absolute requirement, that implied false certification liability can attach only when these two conditions are met.

Even assuming that this "two-part test" applied, relators have raised a triable issue that the claims here were impliedly false per the two conditions of Escobar. As the loan

---

[1] AAU also asserts, in a conclusory fashion, that there is no evidence that anyone at AAU knew that the ICB was material. Mot. at 20. This argument is a non-starter, because this court has already held that the relators' evidence established a triable issue on whether AAU acted with scienter under the FCA. May 4 Order at 16–18. In particular, relators presented evidence suggesting that AAU was keenly aware of the significance of ICB and the safe harbor, such that AAU employees took active steps "to hide their compensation practices." Id. at 17. This evidence suffices to create a genuine dispute of fact that "AAU knew that it was actively circumventing the law," and that AAU knew the ICB was material to the government. Id. at 18. Nothing in Escobar alters this prior finding.

8

form submitted by AAU shows, see Dkt. 194-1 Ex. E, AAU's request for payment represents that the student-borrower is "eligible" and is enrolled "in an eligible program." If AAU was not in compliance with the ICB, failure to disclose this fact would render the loan forms misleading because AAU would not have been an "eligible" institution. While AAU attempts to distinguish between an "eligible program" and an "eligible institution," an eligible program can only exist if the institution is eligible, and a student can only be eligible if she is enrolled an eligible institution. See 34 C.F.R. § 668.32(a)—(a)(1)(i) ("A student is eligible [for Title IV funds] if the student . . . [is] enrolled . . . at an eligible institution."). AAU's distinction between student eligibility and institutional eligibility has been implicitly rejected by the Ninth Circuit. See Hendow, 461 F.3d at 1176 ("[C]ompliance with the incentive compensation ban is a necessary condition of continued eligibility and participation: compliance is a 'prerequisite' to funding; funding shall occur 'only if' the University complies . . . .").

In sum, Escobar did not establish a rigid two-part test for falsity that must be met in in every single implied certification case.  In any event, AAU did make "specific representations" in the submitted student loan forms that would be "misleading half-truths" should the relators prove at trial that AAU was not in compliance with the ICB. As the court has already found, the relators have presented evidence creating a triable issue as to whether the AAU's implied certifications of compliance with the ICB were, in fact, false. May 4 Order at 13–16.

**2.    Whether the Alleged ICB Violations Were Material**

AAU's primary argument is that any noncompliance with the ICB was not material under the "rigorous" standard set forth in Escobar. As preliminary matter, the Ninth Circuit has previously held that the ICB is material under the FCA. See Hendow, 461 F.3d at 1176–77 (9th Cir. 2006). As a result, to even assert its materiality argument, AAU must show that Escobar "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003).

Hendow's materiality holding does rely heavily on the fact that Title IV funds are "explicitly conditioned, in three different ways, on compliance with the incentive compensation ban." 461 F.3d at 1175. This is only one non-dispositive factor after Escobar, which held that "statutory, regulatory, and contractual requirements are not automatically material." 136 S. Ct. at 2001–02. The focus under Escobar is not how the condition is designated but instead "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Id. at 2002. However, Hendow further found that "if the University had not agreed to comply with [the ICB], it would not have gotten paid." 461 F.3d at 1176. As a result, this court finds that Hendow and Escobar are not "clearly irreconcilable," and thus Hendow remains binding precedent.

Nonetheless, the court has evaluated the ICB and concludes that it is a material condition under the standard articulated in Escobar. The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Under Escobar, the court is to examine the ICB's tendency to influence the behavior of the government, looking to such factors as whether the provision was a condition of payment, whether the government consistently refuses to pay claims in the mine run of cases based on noncompliance, or whether, instead, the government routinely pays a particular claim in full despite its actual knowledge of noncompliance. 136 S. Ct. at 2003–04.

In support of its materiality argument, AAU relies on (i) the DOE's decision not take action against AAU despite its awareness of the allegations in this case; and (ii) the fact that, historically, the DOE has only rarely revoked a school's Title IV funds based on an ICB violation. Mot. at 14–20.

The court finds that the DOE's decision to not take action against AAU despite its awareness of the allegations in this case is not terribly relevant to materiality. The DOE did not cite any reason for this decision, which could well have been based on difficulties of proof or resource constraints, or the fact that the truth of the allegations has yet to be proven. In such circumstances, the DOE's inaction does not provide any basis for the

10

1   court to infer that the DOE had "actual knowledge" of AAU's violations or chose not to act
2   because it considered the ICB unimportant.
3       AAU also relies on the DOE's history of uneven enforcement of the ICB.  The
4   record shows that, between 1998 and 2009, the DOE handled 54 incentive compensation
5   ban cases.  See Dkt. 194-1, Ex. C at 30.  Of these, 22 ended in settlement agreements
6   yielding over $59 million for the DOE.  Id. at 32.  Of the 32 substantiated violations, the
7   DOE required corrective action (i.e., forward-looking reforms) in 25 cases, imposed fines
8   in two cases, and imposed liability (i.e., revoking Title IV funds) in one case.  Id. at 31.
9       AAU is thus correct that, with one exception, the DOE "has not limited, suspended
10  or terminated any schools' participation in Title IV" based on ICB violations.  Dkt. 194-1
11  Ex. A at 9.  However, this fact does not prove that the DOE considered ICB violations
12  immaterial or unimportant to the Title IV bargain.  To the contrary, the DOE took
13  corrective actions against schools, issued fines, and entered into settlement agreements
14  (which function like a fine or partial revocation of funds) totaling tens of millions of dollars.
15  The government's actions show that the DOE cared about the ICB, and that it did not
16  always pay the claims "in full" despite knowledge of the ICB violations.  Escobar, 136 S.
17  Ct. at 2003; cf. Hendow, 461 F.3d at 1176 ("[T]he DOE . . . quite plainly care about an
18  institution's ongoing conduct, not only its past compliance [with the ICB.]").
19      Finally, the court notes that the DOE's enforcement of the ICB has changed over
20  time, signaling a "change in position" that is relevant under Escobar.  136 S. Ct. at 2004.
21  In 2002, in informal guidance, the DOE took the position that fines, and not suspension of
22  participation in Title IV, were the most appropriate penalty for ICB violations.  See
23  Hansen Memo, Dkt. 194-1 Ex. B at 1.  It also created the safe harbors in that year.  Dkt.
24  194-1 Ex. D at 2.  However, by 2008 this position had attracted criticism and Congress
25  commissioned a study of DOE's ICB enforcement.  See Dkt. 194-1 Ex. C at 2.  The DOE
26  subsequently took steps to eliminate the safe harbors.  Dkt. 194-1 Ex. A at  1.  In 2015,
27  after the Office of the Inspector General released a critical report, see id., the DOE
28  officially rescinded the Hansen Memo.  Considering these recent changes, it would be a

11

1  mistake to give too much weight to the DOE's record of past enforcement.

2       In sum, ICB compliance is a matter "to which a reasonable person would attach
3  importance in determining his or her choice of action with respect to the transaction
4  involved." Escobar, 136 S. Ct. at 2003 n.5 (citing Williston on Contracts § 69:12, pp.
5  549–50). Nothing in Escobar suggests that actions short of a complete revocation of
6  funds are irrelevant to the court's materiality analysis. Here, the government's corrective
7  reforms, fines, and settlement agreements show that it considered the ICB to be an
8  important part of the Title IV bargain, and that it took action against schools based on ICB
9  noncompliance. These actions show that ICB noncompliance was "capable of
10 influencing" the government's payment decisions. 31 U.S.C. § 3729(b)(4). At the least,
11 relators have shown that there is a triable issue as to whether the ICB is material under
12 the Escobar standard. Summary judgment in favor of AAU would therefore be
13 inappropriate.

## CONCLUSION

For the foregoing reasons, the motion for reconsideration is DENIED. The court shall hold a joint case management conference on **October 6 at 2:00 p.m.** to set a pretrial schedule.

**IT IS SO ORDERED.**

Dated: September 20, 2016

_____
PHYLLIS J. HAMILTON
United States District Judge