**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES EX REL. SCOTT ROSE; MARY AQUINO; MITCHELL NELSON; LUCY STEARNS, *Plaintiffs-Appellees*, v. STEPHENS INSTITUTE, dba Academy of Art University, *Defendant-Appellant.* | No. 17-15111 D.C. No. 4:09-cv-05966-PJH OPINION |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, Chief Judge, Presiding

Argued and Submitted December 6, 2017
San Francisco, California

Filed August 24, 2018

Before:  Susan P. Graber and N. Randy Smith, Circuit
Judges, and Jennifer G. Zipps,[*] District Judge.

Opinion by Judge Graber;
Dissent by Judge N.R. Smith

---

[*] The Honorable Jennifer G. Zipps, United States District Judge for the District of Arizona, sitting by designation.

## SUMMARY[**]

### False Claims Act

The panel affirmed the district court's order denying defendant's motion for summary judgment in a qui tam action brought under the False Claims Act.

Relators, former admissions representatives for Academy of Art University, an art school in San Francisco, alleged that the school violated an incentive compensation ban included in its program participation agreement with the Department of Education, through which it qualified for federal funding in the form of federal financial aid to its students under Title IV of the Higher Education Act.

A claim under the False Claims Act requires:  (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.

In *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010), this court held that the falsity requirement can be satisfied either by express false certification or by implied false certification, which requires a showing that (1) the defendant explicitly undertook to comply with a law, rule, or regulation that was implicated in submitting a claim for payment and that (2) claims were submitted (3) even though the defendant was not in compliance with the law, rule, or regulation.  In *Universal Health Servs., Inc. v. United*

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

*States ex rel. Escobar*, 136 S. Ct. 1989 (2016), the Supreme Court held that a showing of implied false certification requires the satisfaction of two conditions:  "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  The panel held that under two post-*Escobar* Ninth Circuit cases, relators must satisfy *Escobar*'s two conditions to prove falsity.  The panel concluded that a reasonable trier of fact could conclude that Academy of Art's actions met the *Escobar* requirements for falsity.

In *Escobar*, the Supreme Court also clarified that whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality requirement; therefore, even when a requirement is expressly designated a condition of payment, not every violation of that requirement gives rise to liability.  Instead, materiality looks to the effect on the likely or actual recipient of the alleged misrepresentation, meaning the government. The panel concluded that *Escobar* did not overrule *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), which held that, with regard to materiality, the question is whether the false certification was relevant to the government's decision to confer a benefit.   Applying the *Escobar* standard of materiality, the panel concluded that a reasonable trier of fact could find materiality because the Department of Education's payment was conditioned on compliance with the incentive compensation ban, because of the Department's past enforcement activities, and because of the substantial size of the forbidden incentive payments.

The panel further held that, on summary judgment, Academy of Art did not show that any violations of the incentive compensation ban fell within the Department of Education's now-repealed safe harbor provision, which required, among other things, that any adjustment in compensation was not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

Dissenting in part, Judge N.R. Smith agreed with the majority's opinion through its discussion of falsity. Judge Smith disagreed with the majority's analysis of materiality because the majority failed to recognize that *Hendow*'s materiality holding is no longer good law after *Escobar*; failed to fully articulate the Supreme Court's materiality standard as outlined in *Escobar*; and applied its erroneous legal standard to the facts at hand, reaching an erroneous conclusion. Judge Smith wrote that he would reverse the district court's materiality finding, vacate the judgment, and remand for additional discovery and further briefing.

## COUNSEL

Stephen Gombos (argued), Jacob C. Shorter, and Gerald M. Ritzert, Ritzert & Leyton PC, Fairfax, Virginia; Leland B. Altschuler, Law Offices of Leland B. Altschuler, Woodside, California; for Defendant-Appellant.

Michael von Lowenfeldt (argued), Kenneth Nabity, Brady R. Dewar, and James M. Wagstaffe, Kerr & Wagstaffe LLP, San Francisco, California; Stephen R. Jaffe, The Jaffe Law Firm, San Francisco, California; for Plaintiffs-Appellees.

Charles W. Scarborough (argued) and Michael S. Raab, Appellate Staff; Chad A. Readler, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Amicus Curiae United States of America.

John P. Elwood and Ralph C. Mayrell, Vinson & Elkins LLP, Washington, D.C.; Warren Postman and Steven P. Lehotsky, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

Justin S. Brooks, Reuben A. Guttman, and Elizabeth H. Shofner, Philadelphia, Pennsylvania; Asher S. Alavi and David A. Bocian, Kessler Topaz Meltzer and Check LLP, Radnor, Pennsylvania; Daniel Miller, Berger & Montague P.C., Philadelphia, Pennsylvania; David S. Stone, Stone & Magnanini LLP, Berkeley Heights, New Jersey; for Amicus Curiae National Nurses United—California Nurses Association, et al.

Claire M. Sylvia, Phillips & Cohen LLP, San Francisco, California; Jacklyn N. DeMar, Taxpayers Against Fraud Education Fund, Washington, D.C.; Jennifer M. Verkamp, Morgan Verkamp LLC, Cincinnati, Ohio; for Amicus Curiae Taxpayers Against Fraud Education Fund.

Brandon J. Mark, Parsons Behle & Latimer, Salt Lake City, Utah, for Amicus Curiae Veterans Education Success.

## OPINION

GRABER, Circuit Judge:

This qui tam action, brought under the False Claims Act, comes to us on interlocutory appeal from the district court's denial of summary judgment so that we can settle questions of law posed in the wake of *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). We affirm.

## FACTUAL AND PROCEDURAL HISTORY[1]

Defendant Stephens Institute, doing business as Academy of Art University, is an art school in San Francisco that offers undergraduate and graduate degrees. Defendant receives federal funding—in the form of federal financial aid to its students—through various funding programs available under Title IV of the Higher Education Act. To qualify for that funding, Defendant entered into a program participation agreement with the Department of Education ("Department"), in which it pledged to follow various requirements, including the incentive compensation ban. The incentive compensation ban prohibits schools from rewarding admissions officers for enrolling higher numbers of students. 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22).

---

[1] "We review *de novo* the district court's denial of summary judgment. When doing so, we 'must determine whether the evidence, viewed in a light most favorable to the non-moving party, presents any genuine issues of material fact and whether the district court correctly applied the law.'" *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (quoting *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995)). Here, therefore, we view the evidence in the light most favorable to Relators.

In 2006, Defendant's admissions department instituted a new policy to encourage admissions representatives to enroll more students. The policy established an enrollment goal for each admissions representative. If a representative succeeded in enrolling that number of students, he or she would receive a salary increase of up to $30,000. Conversely, a representative could have his or her salary decreased by as much as $30,000 for failing to reach the assigned enrollment goal. Defendant characterized those adjustments as dependent on both quantitative success, meaning a representative's enrollment numbers, and qualitative success, meaning the representative's non-enrollment performance. But, in practice, the employees understood that their salary adjustments rested entirely on their enrollment numbers. Defendant rewarded one team of representatives with an expense-paid trip to Hawaii. The team received that reward solely because of their enrollment numbers.

That enrollment incentive policy remained in place until 2009, when Defendant instituted new enrollment goals and a "scorecard" system for calculating salary adjustments. The scorecard system involved separate salary adjustment calculations for qualitative and quantitative performance. An admissions representative could receive an adjustment of as much as $23,000 for quantitative performance alone; adjustments related to qualitative performance topped out at $6,000. Managers were told not to share those scorecards with admissions representatives because of concerns about compliance with the participation agreement. The scorecard policy remained in effect until 2010.

Relators Scott Rose, Mary Aquino, Mitchell Nelson, and Lucy Stearns, who are former admissions representatives for Defendant, brought this False Claims Act action in 2010, claiming that Defendant violated the incentive compensation ban from 2006 through 2010. Defendant filed a motion for summary judgment, which the district court denied on May 4, 2016. But on June 16, 2016, the Supreme Court decided *Escobar*, in which the Court clarified the law surrounding falsity and materiality in False Claims Act claims. 136 S. Ct. at 1999, 2001. Defendant filed a motion for reconsideration in light of *Escobar*, which the district court likewise denied. But the district court granted in part Defendant's motion for an interlocutory appeal, certifying to this court several questions relating to *Escobar*'s effect on our precedent.[2]

---

[2] The three questions certified for interlocutory appeal are:

(1) Must the "two conditions" identified by the Supreme Court in Escobar always be satisfied for implied false certification liability under the [False Claims Act], or does *Ebeid*'s test for implied false certification remain good law?

(2) Does an educational institution automatically lose its institutional eligibility if it fails to comply [with] the [incentive compensation ban]?

(3) Does *Hendow*'s holding that the [incentive compensation ban] is material under the [False Claims Act] remain good law after *Escobar*?

Although we structure our discussion differently, we have endeavored to answer those questions.

## DISCUSSION

### A.  Legal Background

The Department of Education oversees the grant of Title IV funds to colleges and universities.  To qualify for such funds, schools must comply with a number of statutory, regulatory, and contractual requirements.   One such requirement is the incentive compensation ban, which is mandated by statute, regulation, and contractual program participation agreements.  The incentive compensation ban prohibits schools from providing "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities."  20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22).  If individuals become aware of a school's violation of the incentive compensation ban, they can bring a qui tam action on behalf of the United States under the False Claims Act.  When the Department becomes aware of such violations, it also can take direct action against noncompliant schools by, among other things, mandating corrective action; reaching a settlement agreement; imposing fines; or limiting, suspending, or terminating a school's participation in federal student aid programs.

The False Claims Act imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."   31 U.S.C. § 3729(a)(1)(A).  We articulated the four elements of a False Claims Act claim in *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), another

case that involved alleged violations of the incentive compensation ban. Under *Hendow*, a successful False Claims Act claim requires: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Id.* at 1174. But *Escobar* has unsettled the state of this circuit's law with regard to two of those elements: falsity and materiality.

## B. Implied False Certification

The falsity requirement can be satisfied in one of two ways. The first is by express false certification, which "means that the entity seeking payment [falsely] certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). The other is by implied false certification, which "occurs when an entity has *previously* undertaken to expressly comply with a law, rule, or regulation [but does not], and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Id.* (emphasis added).

In *Ebeid*, we clarified that, to establish a claim under the implied false certification theory, a relator must show that "(1) the defendant explicitly undertook to comply with a law, rule or regulation that is implicated in submitting a claim for payment and that (2) claims were submitted (3) even though the defendant was not in compliance with that law, rule or regulation." *Id.* Thus, under *Ebeid*, a relator bringing an implied certification claim could show falsity by pointing to

noncompliance with a law, rule, or regulation that is necessarily implicated in a defendant's claim for payment.

The Supreme Court subsequently addressed implied false certification in *Escobar*.  There, the Supreme Court held that

> [t]he implied certification theory can be a basis for liability, *at least* where two conditions are satisfied:  first, the claim does not merely request payment, but also makes *specific representations* about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphases added).

We have addressed *Escobar* in two cases that create uncertainty about the ongoing validity of *Ebeid*'s test for falsity in implied false certification cases.  First, in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 332 (9th Cir. 2017), we considered only *Escobar*'s two-part test in determining that the plaintiff's implied false certification claim failed; we did not consider whether the claim met the lower standard for falsity enunciated in *Ebeid*.  Then, in *United States ex rel. Campie v. Gilead Sciences, Inc.*, we noted that *Escobar* "'clarif[ied] *some* of the circumstances in which the False Claims Act imposes liability' under [an implied false certification] theory."  862 F.3d 890, 901 (9th Cir. 2017) (emphasis added) (quoting *Escobar*, 136 S. Ct. at 1995), *petition for cert. filed*, 86 U.S.L.W. 3519 (U.S. Dec. 26, 2017) (No. 17-936).  But we then stated that the

"Supreme Court held that although the implied certification theory can be a basis for liability, two conditions *must* be satisfied." *Id.* (emphasis added) (citing *Escobar*, 136 S. Ct. at 2000).

Were we analyzing *Escobar* anew, we doubt that the Supreme Court's decision would require us to overrule *Ebeid*. The Court did not state that its two conditions were the *only* way to establish liability under an implied false certification theory. But our post-*Escobar* cases—without discussing whether *Ebeid* has been fatally undermined—appear to *require Escobar*'s two conditions nonetheless. We are bound by three-judge panel opinions of this court. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc). We conclude, therefore, that Relators must satisfy *Escobar*'s two conditions to prove falsity, unless and until our court, en banc, interprets *Escobar* differently.

On this record, a reasonable trier of fact could conclude that Defendant's actions meet the *Escobar* requirements for falsity. In the Federal Stafford Loan School Certification form, Defendant specifically represented that the student applying for federal financial aid is an "eligible borrower" and is "accepted for enrollment in an eligible program." Because Defendant failed to disclose its noncompliance with the incentive compensation ban, those representations could be considered "misleading half-truths." That is sufficient evidence to create a genuine issue of material fact and, therefore, to defeat summary judgment.

## C.  Materiality

Under the False Claims Act, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).  In *Hendow*, we held that the relators had alleged adequately that the University of Phoenix "engaged in statements or courses of conduct that were *material* to the government's decision with regard to funding." 461 F.3d at 1177.  In concluding that the alleged violations of the incentive compensation ban were material, we relied on the fact that the statute, regulation, and program participation agreement all explicitly conditioned payment on compliance with the incentive compensation ban. *Id.* We did not explicitly consider any other factors in determining that the relators properly pleaded the materiality of the university's violations. *Id.* We noted, with regard to materiality, that "the question is merely whether the false certification . . . was relevant to the government's decision to confer a benefit." *Id.* at 1173.

In *Escobar*, the Supreme Court elaborated on what can and cannot establish materiality in the context of the False Claims Act.  The Court clarified that "[w]hether a provision is labeled a condition of payment is *relevant* to but not *dispositive* of the materiality inquiry." *Escobar*, 136 S. Ct. at 2001 (emphases added).  Therefore, "even when a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability." *Id.* at 1996.  Instead, the Court explained, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation,"

meaning the government.  *Id.* at 2002 (internal quotation marks and brackets omitted).[3]

The Supreme Court then laid out three scenarios that may help courts determine the likely or actual behavior of the government with regard to a given requirement.  First, "proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."  *Id.* at 2003.  Second, the Court explained that, "if the Government pays a particular claim in full despite its *actual knowledge* that certain requirements were violated, that is very strong evidence that those requirements are not material."  *Id.* (emphasis added).  Third, "if the Government regularly pays a particular type of claim in full despite *actual knowledge* that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."  *Id.* at 2003–04 (emphasis added).  The Court further noted that materiality "cannot be found where noncompliance is minor or insubstantial."  *Id.* at 2003.

In our view, *Hendow* is not "clearly irreconcilable with the reasoning or theory of" *Escobar* and, therefore, has not been overruled.  *Miller*, 335 F.3d at 893.  It is true that *Hendow* explicitly considered only the facts that the

---

[3] The dissent maintains that we have ignored the Supreme Court's assertion that the materiality standard is "rigorous" or "demanding." Dissent at 24–25.  Those adjectives, while they give flavor to the Court's discussion, do not establish the *test* that the Court requires us to use.  The actual test to be applied is the one that we quote and apply in text:  what is the effect of a misrepresentation on the likely or actual behavior of the government.  We have, in our view, applied that test rigorously.

defendant had violated a statute, regulation, and contract—by not complying with the incentive compensation ban—and that payment was conditioned on compliance with the ban. 461 F.3d at 1175. But *Hendow* did not state that noncompliance is material in *all* cases. For instance, *Hendow* itself may have been decided differently had there been countervailing evidence of immateriality.[4] After *Escobar*, it is clear that noncompliance with the incentive compensation ban is not material per se. Nor does noncompliance automatically revoke institutional eligibility. Rather, we must examine the particular facts of each case. In other words, we view *Escobar* as creating a "gloss" on the analysis of materiality. But the four basic elements of a False Claims Act claim, set out in *Hendow*, remain valid. *See supra* p. 10.

Applying the *Escobar* standard of materiality to the facts here, we conclude that Defendant has not established as a matter of law that its violations of the incentive compensation ban were immaterial. A reasonable trier of fact could find materiality here because the Department's payment was conditioned on compliance with the incentive compensation ban, because of the Department's past enforcement activities,

---

[4] The dissent claims that *Hendow* explicitly rejected "the 'countervailing evidence' [of immateriality] before it" when determining that the incentive compensation ban is material. Dissent at 23. *Hendow* did not do so. The opinion contains no suggestion whatsoever that any countervailing *evidence* existed. Rather, the dissent quotes from a passage in which the opinion considers the parties' *legal* arguments concerning the extent of the enforcement powers of the Department of Education; did "its authority to take 'emergency action' . . . mean[] that the statutory requirements are causally related to its decision to pay out moneys due"? *Hendow*, 461 F.3d at 1175. *Hendow* simply does not discuss the relevance of evidence that, for example, the Department refused to impose sanctions on schools that violated the incentive compensation ban. *Hendow* and *Escobar*, therefore, are not clearly irreconcilable. *Miller*, 335 F.3d at 893.

and because of the substantial size of the forbidden incentive payments.[5]

## 1. Funds Conditioned on Compliance

We consider first the same factor that *Hendow* did: the government conditioned the payment of Title IV funds on compliance with the incentive compensation ban through statute, regulation, and contract. Had Defendant not certified in its program participation agreement that it complied with the incentive compensation ban, it could not have been paid, because Congress required as much.[6] After *Escobar*, that triple-conditioning of Title IV funds on compliance with the incentive compensation ban may not be sufficient, without

---

[5] In concluding that the existing record is insufficient to create an issue of fact as to materiality, the dissent demands more certainty than *Escobar* and general principles governing summary judgment require. For example, the dissent argues that the government's responses to other schools' similar misrepresentations is insufficient to demonstrate that the government "*would* find" the misrepresentations material in this case. Dissent at 27 (emphasis added). But *Escobar* speaks in terms of "likely," as well as "actual," behavior. 136 S. Ct. at 2002. As another example, the dissent states that "[s]ignificant materiality questions remain," the answers to which "are required before liability" can attach. Dissent at 27–28. But the only question that we are called on to answer in this summary judgment appeal is whether there is a genuine issue of material fact; we need not and do not decide whether Relators do or should prevail.

[6] Defendant argues that the incentive compensation ban is expressly identified as a condition of *participation* in the government's Title IV programs, not as a condition of *payment*. We addressed that argument in *Hendow* and concluded that it is "a distinction without a difference." 461 F.3d at 1176. Because no subsequent Supreme Court or Ninth Circuit en banc case has undermined our holding, we cannot, and do not, revisit that determination now.

more, to prove materiality, but it is certainly probative evidence of materiality.

## 2. Past Department Actions

We next consider how the Department has treated similar violations. We look to the three scenarios bearing on materiality that the Supreme Court enunciated in *Escobar*, though none of them is necessarily required or dispositive. *See Escobar*, 136 S. Ct. at 2003–04 (laying out scenarios that can constitute proof of materiality or immateriality, but noting that such proof "is not necessarily limited to" those scenarios).

First, we ask whether there is "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance" with the incentive compensation ban, because such a showing can help establish that the requirement was material. *Escobar*, 136 S. Ct. at 2003. There is no such evidence in this case and, therefore, that inquiry does not factor into our analysis.

Second, we ask whether the Department has paid "a particular claim in full despite its *actual knowledge* that" the incentive compensation ban was violated, because "that is very strong evidence that [the incentive compensation ban is] not material." *Id.* (emphasis added). The record does not establish that, during the relevant time period, the Department had actual knowledge that Defendant was violating the incentive compensation ban. We cannot, therefore, analyze the Department's behavior here to determine whether

compliance with the incentive compensation ban was material.[7]

Third, we examine whether the Department "regularly pays a particular type of claim in full despite *actual knowledge* that certain requirements were violated, and has signaled no change in position, [because] that is strong evidence that the requirements are not material." *Id.* at 2003–04 (emphasis added). To show that the Department does regularly pay claims in full despite knowing about violations of the incentive compensation ban, Defendant points to two 2010 Government Accountability Office ("GAO") reports. The first report identifies 32 instances in which schools violated the incentive compensation ban between 1998 and 2009, and the second documents the Department's responses to those 32 violations. Because the Department "did not limit, suspend, or terminate any [of those] school[s'] access to federal student aid," Defendant argues, the Department regularly paid claims in full despite actual knowledge of violations of the incentive compensation ban.

---

[7] Defendant points to the Department's 2011 program review of Defendant, which took place after Relators filed this action. Defendant argues that the program review, which made no findings regarding the incentive compensation ban and resulted in no action against Defendant for noncompliance, is proof that the incentive compensation ban was not material to the Department. But the letter closing the review cautioned that the review's determination "does not relieve [Defendant] of its obligation to comply with *all* of the statutory or regulatory provisions governing the Title IV, [Higher Education Act] programs," and specifically noted that "compensation *must not* be based in any way on the number of students enrolled." (Emphases added.) Further, at the summary judgment stage, the presence of some contrary evidence does not negate the existence of an issue of fact on materiality.

Defendant's argument does not tell the whole story.  Of the 32 schools with substantiated violations, the Department ordered 25 of them to take corrective action, which included terminating bonus payments to recruiters and ending referral fees to students.  And 2 of those 25 schools were required to pay fines as a penalty, which together totaled $64,000.  The Department also identified a liability of more than $187 million in misspent student aid funds at 1 of the 32 schools, meaning that the Department required the school to repay improperly awarded federal funds.  The Department recouped more than $16 million of the total liability.  The GAO reports also show that the Department took no further enforcement action at six schools with violations.   But, of those six schools, three of them closed, two were terminated for other reasons, and one school's violations fell within a "safe harbor provision."    The GAO reports further reveal that the Department reached settlement agreements with 22 additional schools, which allowed it to recoup funds totaling more than $59 million in payments.

There is evidence, then, that the Department *did* care about violations of the incentive compensation ban and did not allow schools simply to continue violating the ban while receiving Title IV funds.   And in many cases, through one means or another, the Department recouped many millions of dollars from the violating schools, showing that it was not prepared to pay claims "in full" despite knowing of violations of the incentive compensation ban.  The Department can demonstrate that requirements, such as the incentive compensation ban, are material without directly limiting, suspending, or terminating schools' access to federal student aid.  A full examination of the Department's past enforcement habits in similar cases, therefore, reveals that a reasonable

trier of fact could find that Defendant's violations of the incentive compensation ban were material.

### 3.   Magnitude of Violation

As mentioned, the Supreme Court also noted in *Escobar* that materiality does not exist "where noncompliance is minor or insubstantial." 136 S. Ct. at 2003. For instance, were a school to offer admissions representatives cups of coffee or $10 gift cards for recruiting higher numbers of students, there would be no viable claim under the False Claims Act. That is not the case here. Under Defendant's 2006–2008 compensation scheme, admissions representatives stood to gain as much as $30,000 and a trip to Hawaii simply by hitting their enrollment goals. And under Defendant's 2009–2010 scorecard compensation scheme, representatives' salaries could be adjusted by as much as $23,000 for meeting their enrollment goals.

Those large monetary awards are quite unlike a small, occasional perk. Rather, those awards are precisely the kind of substantial incentive that Congress sought to prevent in enacting the ban on incentive compensation. Therefore, the tremendous bonuses that Defendant's admissions representatives could receive by achieving their enrollment goals (and the similar decreases that could result from falling short of the targets set by Defendant) also counsel against a finding that Defendant's noncompliance was immaterial.

Overall, then, when we construe the evidence in the light most favorable to Relators, we conclude that a reasonable trier of fact could find that Defendant's noncompliance with the incentive compensation ban was material.

**D.  Safe Harbor**

Finally, Defendant argues that, even if there is a question of fact as to one or more of *Hendow*'s four requirements for claims under the False Claims Act, it should win on summary judgment because any violations of the incentive compensation ban fell within the Department's safe harbor provision.  The now-repealed safe harbor provision was in effect from 2003 through 2010.  *Compare* Federal Student Aid Programs, 67 Fed. Reg. 67,048-01, 67,072 (Nov. 1, 2002), *with* 34 C.F.R. § 668.14(b)(22)(i)(B).  That provision required, among other things, that "any adjustment [in compensation] is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." Federal Student Aid Programs, 67 Fed. Reg. at 67,072.

Defendant's argument fails, at least on summary judgment.  Viewed in the light most favorable to Relators, the record contains evidence that Defendant *did* make compensation adjustments based solely on admissions representatives' enrollment numbers.

**AFFIRMED.**

N.R. SMITH, Circuit Judge, dissenting in part:

I agree with the Majority's opinion through Section B of the Discussion Section, however we part ways regarding: (1) the validity of *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), in light of the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016); and (2) whether, under *Escobar*'s "demanding" and "rigorous" materiality standard, there was sufficient evidence of a "material" violation of the Incentive Compensation Ban (ICB) to defeat summary judgment, *id* at 1996, 2003. Instead, I would reverse the district court's materiality finding, vacate the judgment, and remand for additional discovery and further briefing. Why?

The Majority makes three errors in its analysis. First, it fails to recognize that *Hendow*'s materiality holding is no longer good law after *Escobar*. Second, it fails to fully articulate the Supreme Court's materiality standard as outlined in *Escobar*. Finally, the Majority applies its erroneous legal standard to the facts at hand, reaching an erroneous conclusion. Let me explain.

**I.  *Escobar* overruled the logic of *Hendow*'s materiality holding.**

The Majority erroneously concludes that it can still rely—at least in some regard—on *Hendow*'s materiality holding, because it "may have been decided differently had there been countervailing evidence of immateriality." Maj. Op. at 14–15. *Escobar*, the Majority concludes, merely "creat[ed] a 'gloss' on the analysis of materiality." Maj. Op. at 15. I disagree. Instead, *Escobar* explicitly overruled

*Hendow*'s materiality standard and imposed a new materiality analysis that we must follow and apply.

The Majority's theory that *Hendow* could have reached a different conclusion in light of "countervailing evidence" does not acknowledge *Hendow*'s own reasoning. *Hendow* explicitly rejected the "countervailing evidence" before it: "questions of enforcement power are *largely academic*, because the eligibility of the University under Title IV and the Higher Education Act of 1965 . . . is *explicitly* conditioned, in three different ways, on compliance with the [ICB]." *Hendow*, 461 F.3d at 1175 (last emphasis original). Put another way: the government's enforcement *power*—much less what it actually did with that power—did not matter. Rather, *Hendow* clearly held that "expressly condition[ing] [payment] in three different ways" on compliance with the ICB was sufficient to make compliance with the ICB material. *Id.* at 1177.

However, *Escobar* rejected this *Hendow* materiality standard. In *Escobar*, the First Circuit followed *Hendow* and concluded that the "express and absolute language of the regulation in question, in conjunction with the repeated references to supervision throughout the regulatory scheme, constitute[d] dispositive evidence of materiality." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 780 F.3d 504, 514 (1st Cir. 2015) (citations and quotation marks omitted), *vacated and remanded by Escobar*, 136 S. Ct. at 1996. Rejecting that reasoning, the Supreme Court instead held that "the label the Government attaches to a requirement" is not dispositive. *Escobar*, 136 S. Ct. at 1996. Accordingly, the Supreme Court outlined that the proper inquiry is "whether the defendant knowingly violated a requirement that the defendant knows is *material* to the

Government's payment decision." *Id.* at 1996 (emphasis added); *see also id.* at 2001 ("[S]tatutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment."); *id.* at 2003 ("In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive.").

Thus, under *Escobar*, the analysis focuses not on *whether* payment is conditioned on compliance, but *whether* the Government would truly find such noncompliance material to a payment decision. Because *Hendow* does not follow that analysis, the Majority opinion should conclude that *Hendow*'s materiality holding is "clearly irreconcilable with the reasoning and theory of" *Escobar* and explicitly overrule *Hendow* to that extent. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003).

## II. The Majority fails to articulate the "demanding" and rigorous" nature of the materiality standard imposed by *Escobar*.

There is no question that the Majority outlines part of the *Escobar* materiality standard. However, it leaves out two very significant aspects, both of which are required to determine whether a misrepresentation is actually material.

First, the Supreme Court stated four times that the materiality test was "rigorous" or "demanding." *Escobar*, 136 S. Ct. at 1996 ("We clarify below how that *rigorous materiality requirement* should be enforced." (emphasis added)); *id.* at 2002 ("[The materiality and scienter] requirements are *rigorous*." (emphasis added)); *id.* at 2003

("The materiality standard is *demanding*." (emphasis added)); *id.* at 2004 n.6 ("The standard for materiality that we have outlined is a familiar *and rigorous one*." (emphasis added)). The Majority states that these descriptors of the analysis merely "give flavor to the Court's discussion," but otherwise ascribes no use to them. Maj. Op. at 14, n.3. Descriptions of *how* the test is to be applied are not just "flavor[ing]," they are the key in conducting the analysis the Supreme Court has instructed us to do. Anything less is insufficient and the Majority's application of *Escobar* reveals its lack of rigor.

Second, the Supreme Court provided a very clear standard for evaluating whether the misrepresentation was "material to the Government's payment decision." *Id.* at 1996; *see also id.* at 2002–03. The Supreme Court stated that the primary inquiry "looks to the effect on the *likely or actual behavior* of the recipient of the alleged misrepresentation." *Id.* at 2002 (emphasis added and quotation marks omitted). To illustrate *what* the inquiry looks like, the Supreme Court then explicitly referenced both tort and contract law materiality standards. These standards require an analysis of what, for example, "a reasonable man would attach importance to . . . in determining his choice of action in the transaction" or whether "the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, even though a reasonable person would not." *Id.* at 2002–03 (quotation marks omitted) (citing Restatement (Second) of Torts § 538 at 80); *see also id.* at 2003 n.5.[1] Again, similar to

---

[1] Indeed, the Supreme Court's illustrations of the inquiry outline the required specificity. It held that "proof of materiality can include" evidence that: (1) "the defendant *knows* that the Government consistently refuses to pay claims *in the mine run of cases* based on noncompliance

the "demanding" and "rigorous" nature of the inquiry, the Majority does not even mention the contract or tort guideposts provided by the Supreme Court. *Id.* at 1996, 2003.

In sum, though expressly suggesting that payment can be *relevant*, *Escobar* requires that the primary inquiry of whether a misrepresentation is material mandates a "rigorous" and "demanding" inquiry into the "likely or actual behavior" of the Government to determine whether it "would attach importance [to the misrepresentation] in determining [its] choice of action in the transaction." *Id.* at 2002–03 (quotation marks omitted). Stated differently, the evidence (regarding the government's response to a misrepresentation) must be specific or directly analogous to the current alleged misrepresentation. Anything else would not be sufficiently "demanding" or "rigorous" to determine the Government's "likely or actual behavior." *Id.*

### III.    The Majority erroneously concludes that, on this record, there are sufficient questions of material fact to defeat summary judgment.

The Majority, like the district court, fails to properly apply the "demanding" and "rigorous" *Escobar* standard to the evidence in this case. *Id.* at 2002–03.

---

with the *particular* statutory, regulatory, or contractual requirement"; or (2) "the Government pays a particular claim in full despite its *actual knowledge* that certain requirements were violated . . . ." *Escobar*, 136 S. Ct. at 2003–04 (emphasis added). Actual knowledge of regular, repeated nonpayment or actual knowledge of violations are both particular and demanding standards.

First, there is simply no evidence before us regarding *how* the Government would respond to the specific ICB violations alleged against Stephens Institute. At most, the Majority relies on aggregate data regarding the Government's *general* enforcement of the ICB.[2] The Majority concludes that this is sufficient: "There is evidence, then, that the Department *did* care about violations of the incentive compensation ban and did not allow schools simply to continue violating the ban while receiving Title IV funds." Maj. Op. at 17. Certainly, the Majority is correct that this evidence demonstrates that the Government *cares* in a broad sense. But, caring is not enough to make it material under the *Escobar* standard. Whether aggregate data demonstrates that the Government cares is not evidence that, *in this case*, the Government would find these alleged misrepresentations *material*. Significant materiality questions remain, for example: Does a fine for noncompliance represent a "material" aspect? Or, are fines only imposed for minor regulatory violations, which *Escobar* explicitly stated were not material? *Escobar*, 136 S. Ct. at 2003 ("The False Claims Act is not . . . a vehicle for punishing garden-variety breaches of contract or regulatory violations."). If the fines are material, were they imposed for more or less egregious behavior than the alleged Stephens

---

[2] Plaintiffs establish no more. A plaintiff bears the burden to present sufficient evidence from which a jury could conclude the misrepresentations were material to the government's payment decision. Here, Plaintiffs alleged Stephens Institute knowingly paid significant compensation to recruiters for meeting certain enrollment goals. Yet, the record also indicates that the ICB is only one of many (if not hundreds) of the regulations with which the Department of Education (DOE) requires schools to comply and that the DOE has generally doled out only minor penalties for ICB violations—particularly for several seemingly significant violations. In this light, I think a jury would be left to speculate *how* important the alleged misrepresentations actually are.

Institute behavior? The aggregate data answers none of these questions and yet their answers are required before liability under the "demanding" and "rigorous" *Escobar* standard may be imposed. *Id.* at 2002–03.[3]

Second, with no specific evidence regarding how the Government would respond to the instant allegations, the only "relevant" evidence that remains is the fact that compliance with the ICB is a condition for payment. Indeed, to reach its conclusion, the Majority appears to invoke the all or nothing *Hendow* analysis, which the Supreme Court squarely rejected. And, the Majority steps beyond such evidence being "relevant" and concludes that the Government's triple-conditioning of ICB compliance is "probative evidence of materiality." Maj. Op. at 16–17.

---

[3] The Majority faults my dissent for stating that answers to these questions are required before "liability . . . may be imposed." Maj. Op. at 16, n.5. Particularly, it argues that on summary judgment, we must only determine whether there are questions of material fact, not whether "liability . . . may be imposed." The Majority's argument misreads my dissent and confuses the standard. Like we must on summary judgment, I am "view[ing] the evidence in the light *most favorable to the non-moving party*." *Vos. v. City of Newport Beach*, 892 F.3d 1024, 1030 (9th Cir. 2018) (emphasis added) (quoting *Lal v. California*, 746 F.3d 1112, 1115–16 (9th Cir. 2014)). In this case, there is no real dispute about *what* the evidence is, but whether the evidence proffered is—viewed in the light most favorable to the non-moving party—sufficient to even go to trial, i.e., impute liability in the best case Plaintiffs have. Here, the evidence proffered is simply not enough under *Escobar*—there is *no* evidence about *what* the Government would actually do in this case (or even in a similar case). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

However, the sole fact that compliance is a condition of payment is not enough. *Escobar*, 136 S. Ct. at 2003 ("In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but *not automatically dispositive*." (emphasis added)). Yes, certification of compliance with the ICB is required for payment, but so is certification of compliance with a *host* of additional statutes, regulations, and contractual requirements. There is no indication that the Government holds the ICB out as an exceptionally important requirement and, under *Escobar*, misrepresentations regarding compliance "must be material to the Government's payment decision." *Id.* at 1996. Therefore, absent additional evidence demonstrating that in *this* situation, the Government treated a violation as material, and in *that* situation, it did not, conditioning compliance with the ICB is simply not enough to prove materiality. *Id.* at 2003 & n.5 (holding the misrepresentation must go "to the very essence of the bargain" (quoting *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (N.Y. 1931))).

As such, all we have before us is (1) general, aggregate evidence that the Government cares about ICB violations (not that what Stephens Institute is specifically accused of doing is, indeed, material such that it would influence a payment decision by the Government), and (2) the fact that payment is triple-conditioned on compliance with the ICB. This is not enough to meet the "rigorous" and "demanding" inquiry into the "likely or actual behavior" of the Government to determine whether it "would attach importance to [the misrepresentation] in determining [its] choice of action in the transaction." *Id.* at 2002–03 (quotation marks omitted).

**IV.    Conclusion.**

It is apparent from both the district court's order and the parties' briefing that there was confusion regarding the materiality question, particularly the role of *Hendow* in light of *Escobar*. And, there is insufficient evidence to establish that the allegations against Stephens Institute would be considered material. However, the clarification of the interaction between *Hendow* and *Escobar* could change what the parties seek in discovery and the district court's ultimate conclusion. Therefore, in light of the clarified reasoning, I would reverse the district court's denial of Stephens Institute's motion for summary judgment, vacate the judgment, and remand for (1) additional discovery to develop the summary judgment record; (2) additional briefing; and, after that, (3) a re-examination by the district court.